UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                                      :

CHRISTOPHER NOEL, SIMI LINTON,         Case no. 11-cv-0237 (GBD)
UNITED SPINAL, a nonprofit organization,
THE TAXIS FOR ALL CAMPAIGN, a      :
nonprofit organization, 504 DEMOCRATIC
CLUB, a nonprofit organization, DISABLED  :
IN ACTION, a nonprofit organization
                                      :

                     Plaintiffs,      :    **PLAINTIFFS' MEMORANDUM**
                                      :    **OF LAW IN SUPPORT OF**
                                         **PLAINTIFFS' MOTION FOR**
           -against-                :    **PARTIAL SUMMARY**
                                         **JUDGMENT**

NEW YORK CITY TAXI AND          :
LIMOUSINE COMMISSION, a charter
mandated agency, and DAVID YASSKY, in   :
his official capacity as chairman and
commissioner of the New York City Taxi    :
and Limousine Commission,
                                         :

                     Defendants.      :

---------------------------------------------------- x

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     SUMMARY OF THE ARGUMENT ............................................................ 3

III.    STATEMENT OF FACTS ........................................................................... 4

        A.      It Is Undisputed that 98.2% of Taxicabs Are Not Accessible ................................ 4

        B.      It is Undisputed that the TLC Can Increase the Number of Accessible Taxicabs
                But Has Chosen Not to Do So. ............................................................................. 5

        C.      The TLC Is the Public Entity that Runs Every Major Aspect of the New York
                City Taxicab Fleet. ............................................................................................... 6

        D.      The TLC Mandates the Exact Specifications, Including Accessibility Or Non-
                Accessibility, For All Taxicabs. ........................................................................... 8

        E.      Taxicab Service Provides Clear Benefits to Both the General Public and to
                Persons Using Wheelchairs. ................................................................................ 9

IV.     LEGAL STANDARD FOR SUMMARY JUDGMENT ................................. 11

V.      ARGUMENT ............................................................................................. 11

        A.      The ADA Must Be Broadly Construed. ................................................................ 11

        B.      There Is No Genuine Issue of Material Fact as to Any of Plaintiffs' ADA Title II
                Claims for Declaratory Relief. ............................................................................ 12

                1.      The TLC's Undisputed Actions Violate the Statutory Mandate of Subtitle
                        A of Title II of the ADA. ......................................................................... 12

                        a.      Plaintiffs and the Plaintiff Class Are Qualified Individuals with
                                Disabilities. ................................................................................. 12

                        b.      The TLC Is a Public Entity Which Provides a Program, Service or
                                Activity of Public Transportation. ............................................... 12

                        c.      The TLC Discriminates by Denying Wheelchair Users, by Reason
                                of Their Disability, Both the Opportunity to Participate In and to
                                Benefit From a Public Transportation System Provided By the
                                TLC. ............................................................................................. 13

                                (1)     The TLC Denies Persons Using Wheelchairs Both the
                                        Opportunity to Participate In and to Benefit From
                                        Medallion Taxicab Service. ............................................. 14

                                (2)     The TLC's Discrimination Is By Reason of Disability. ... 15

                2.      The TLC's Undisputed Actions Also Violate the Subtitle A Regulatory
                        Requirements of Title II of the ADA. ...................................................... 15

a.   The TLC Violates Title II Regulations Because it Undisputedly Provides a Benefit to the General Public Which It Denies to Persons with Disabilities............................................................... 15

b.   The TLC Also Violates Title II Regulations By Utilizing Criteria And Methods of Administration that Have the Effect of Subjecting Persons with Disabilities to Discrimination.................................... 17

c.   The TLC Also Violates Title II Regulations by Establishing Requirements for Medallion Taxicab Service that Subject Persons with Disabilities to Discrimination. ............................................. 18

d.   The TLC Also Violates Title II Regulations by Failing to Make Reasonable Modifications to Its Transportation Policies. ............ 20

3.   The TLC's Undisputed Actions Violate the Subtitle B Requirements of Title II of the ADA. ................................................................................ 21

C.   This Motion Only Addresses Liability. ............................................................... 23

VI.   CONCLUSION.................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Brown v. County of Nassau,*
  736 F. Supp. 2d 602 (E.D.N.Y. 2010) .................................................................. 15

*Buckhannon Bd. & Care Home v. W. Va. Dept. Of Health And Human Resources,*
  19 F. Supp. 2d 567 (N.D.W.Va. 1998) ................................................................. 18

*Cayuga Indian Nation of New York v. Cuomo,*
  730 F. Supp. 485 (N.D.N.Y. 1990) ....................................................................... 23

*Cayuga Indian Nation of New York v. Cuomo,*
  771 F.Supp. 19 (N.D.N.Y. 1991) .......................................................................... 23

*Cayuga Indian Nation of NY v. Pataki,*
  413 F. 3d 266 (2d Cir. 2005) ................................................................................. 23

*Cayuga Indian Nation v. Cuomo,*
  No. 80-CIV-930, 1999 U.S. Dist. LEXIS 10579 (N.D.N.Y. July 1, 1999) ............... 23

*Cayuga Indian Nation v. Pataki,*
  No. 80-CIV-930, 1999 U.S. Dist. LEXIS 5228 (N.D.N.Y. Apr. 15, 1999) ............... 23

*Clarkson v. Coughlin,*
  898 F. Supp. 1019 (S.D.N.Y. 1995) ...................................................................... 20

*Communities Actively Living Independent & Free v. City of Los Angeles,*
  No. 09 Civ. 0287 (C.D. Cal. Feb. 10, 2011) ......................................................... 23

*Doe v. Pfrommer,*
  148 F.3d 73 (2d Cir. 1998) .................................................................................... 12

*Garcia-Ayala v. Lederle Parenterals, Inc.,*
  212 F.3d 638 (1st Cir. 2000) ................................................................................. 20

*Henrietta D. v. Bloomberg,*
  331 F.3d 261 (2d Cir. 2003) ....................................................................... 11, 12, 15

*Henrietta D. v. Giuliani,*
  119 F. Supp. 2d 181 (E.D.N.Y. 2000), *aff'd,* 331 F.3d 261 (2d Cir. 2003) ............ 20

*Henrietta D. v. Giuliani,*
  246 F.3d 176 (2d Cir. 2001) .................................................................................. 23

*Howe v. Bank of New York Mellon,*
  No. 09 Civ. 10470 (HB) (S.D.N.Y. March 4, 2011) ............................................... 23

*Innovative Health Sys., Inc. v. White Plains,*
  117 F.3d 37 (2d Cir. 1997) .................................................................................... 13

*Innovative Health Sys., v. White Plains,*
   931 F.Supp. 222  (S.D.N.Y.,1996), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997). ................. 11, 20

*Kerzer v. Kingly Mfg.,*
   156 F.3d 396 (2d Cir. 1998) ................................................................................ 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ........................................................................................... 11

*Milliken v. Bradley,*
   433 U.S. 267 (1977) ........................................................................................... 23

*Partelow v. Massachusetts,*
   442 F.Supp.2d 41 (D.Mass. 2006) ...................................................................... 20

*Robertson v. Las Animas County Sheriff's Dept.,*
   500 F.3d 1185 (10th Cir. 2007) .......................................................................... 20

*Swenson v. Lincoln County Sch. Dist. No. 2,*
   260 F.Supp.2d 1136 (D.Wyo.2003) .................................................................... 20

*Torres v. Gristede's Operating Corp.,*
   628 F. Supp. 2d 447 (S.D.N.Y. 2008) ................................................................. 23

*Wong v. Regents of the Univ. of Cal.,*
   192 F.3d 807 (9th Cir.1999) ............................................................................... 20

## Statutes

42 U.S.C. § 12101(a)(3) .......................................................................................... 11

42 U.S.C. § 12101(a)(4) .......................................................................................... 11

42 U.S.C. § 12132 .............................................................................................. 3, 12

42 U.S.C. § 12144 ............................................................................................... 4, 21

## Regulations

28 C.F.R.  Pt. 35, App. A. ...................................................................................... 17

28 C.F.R. 35.130(b)(1) ........................................................................................... 15

28 C.F.R. 35.130(b)(3)(i) ........................................................................................ 17

28 C.F.R. 35.130(b)(6) ........................................................................................... 18

28 CFR § 35.130(b)(7) ........................................................................................... 20

49 C.F.R. § 37.23 ................................................................................................... 22

49 C.F.R. § 37.3. .................................................................................................... 21

49 C.F.R. § 38.23 ................................................................................................................. 9

49 C.F.R. § 38.23(a).............................................................................................................. 9

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(a) ......................................................................................................... 11

## I.   INTRODUCTION

> *Q: Can you or can you not agree that currently with 98 percent or more of the medallion taxicab fleet not being wheelchair accessible that people who use wheelchairs in Manhattan do not have equal opportunity to benefit from taxi service as compared to people who do not use wheelchairs. Are you able to agree to that?*
>
> *A: I think that's probably a fair statement.*
> *(Ashwini Chabbra, Deputy Commissioner for Policy and Planning at the New York City Taxi and Limousine Commission)[1]*

The iconic yellow taxicab fleet, a familiar part of the landscape of the City, is central to life in New York City and depended upon by millions. Yet, despite the central role that taxicab service plays in all aspects of life in the City, Defendants claim that it is perfectly acceptable to exclude seniors, veterans and all other wheelchair users from the largest and most important taxicab fleet in America. Over twenty years after the passage of the Americans with Disabilities Act ("ADA"), persons using wheelchairs remain essentially barred from New York City's taxicab fleet. Only 232 New York City taxicabs, out of a total of 13,237, are accessible to persons using wheelchairs. This is in spite of the fact that the New York City Taxi and Limousine Commission ("TLC") admits that "there's no reason why the TLC could not require that more taxicabs be accessible." Plaintiffs' 56.1 Statement of Undisputed Facts in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pltfs 56.1 Statement"), ¶ 23. Thus, it is undisputed that the TLC has the ability to increase the number of accessible taxicabs in New York City. Yet the TLC has refused to do this.

Defendants agree that the "basic facts are not in dispute." Declaration of Julia M. Pinover In Support of Plaintiffs' Motion for Partial Summary Judgment ("Pinover Decl."), Exh. Q (Letter to Judge Daniels) at p.1. Whether the TLC's failure to require more than 231 wheelchair accessible taxicabs is a violation of the Americans with Disabilities Act is, according

to Defendants, "a pure question of law." *Id.* Indeed, this case is unusual in that the material facts that relate to liability are not only undisputed but are also a matter of public record. Because all of the relevant facts concerning the inaccessibility of the taxicab fleet and the role of the TLC are undisputed, this Court can and should find that, as a matter of law, the TLC is liable for violating the ADA.[2]

The TLC is liable for discrimination under the statutory provisions of both Subtitle A and Subtitle B of Title II of the ADA and pursuant to several applicable regulations. Under Subtitle A, the TLC is a public entity that offers a program, service or activity (here a public transportation system) and the TLC both excludes from this system and denies the benefits of this system to persons using wheelchairs.[3] Under Subtitle B, the TLC is an operator of a public transportation system, the vehicles of which are not readily accessible to and useable by persons who use wheelchairs. The TLC also is liable for discrimination under several regulations of Title II of the ADA because whether as (a) a "provider" of public benefit, (b) an "administrator," (c) a "licensor," (d) a "policy-maker" or (e) an "operator," it is and has been discriminating against wheelchair users.

This motion deals only with the discriminatory taxicab system *as it now exists*.[4] It argues simply that there are far too few wheelchair accessible taxicabs in New York City for that service to be considered accessible and that the current status of taxicab service in New York City is a

---

[1] Pltfs 56.1 Statement, ¶ 48. Deputy Commissioner Chhabra was Defendants' 30(b)(6) designee responsive to Plaintiffs' request for the person most knowledgeable about the current status of the New York City medallion taxi fleet. Pinover Decl., Exh. P (Plaintiffs' Notice of Deposition).
[2] The TLC is also violating both Section 504 of the Rehabilitation Act and the New York City Human Rights Law ("CHRL"), as alleged in Plaintiffs' Complaint. However, because Section 504 and CHRL would yield no different remedy, Plaintiffs are now asking only that the Court rule as to liability under the ADA.

[3] Wheelchair refers to any mobility aid with three or four wheels whether operated manually or powered (e.g., scooters, powerchairs, wheelchairs)

[4] TLC admits that neither the Taxi of Tomorrow nor plans involving a dispatch system for accessible taxicabs are currently in place. Pltfs 56.1 Statement, ¶ 20.

clear and undeniable violation of the anti-discrimination mandates of both the ADA and its regulations. Plaintiffs seek only declaratory relief with respect to liability. Once liability has been determined, the parties can fashion an appropriate remedy, as discussed below.

This motion is an efficient procedural mechanism for all involved. Disposing of the clear liability issue will avoid wasting very substantial resources and time of the parties and the Court on wholly unnecessary and costly discovery and motion practice when the facts as to the current system cannot be disputed. It will also avoid wasting judicial resources on a trial when the legal issues are already ripe for decision and will allow for the resolution of the core legal dispute.

Accordingly, Plaintiffs request that this Court hold that, by providing a taxicab fleet which is now only 1.8% accessible to persons using wheelchairs, the TLC is violating the ADA.

## II.    SUMMARY OF THE ARGUMENT

The current state of the TLC's taxicab fleet violates all of the following statutory and regulatory prohibitions on discrimination under Title II of the ADA:

- The statutory provisions of Subtitle A (42 U.S.C. § 12132): The TLC, as a public entity offering a program of on-demand public transportation, cannot discriminate against persons with disabilities by reason of their disabilities in the program it offers. The TLC violates this non-discrimination mandate by offering a transportation program in which 98.2% of the vehicles cannot be accessed by persons using wheelchairs.

- The regulatory provisions of Subtitle A (28 C.F.R. § 35.130 et seq.): The TLC, as a public entity (a) providing a benefit, (b) administrating a program, (c) establishing requirements for its licensees and (d) making transportation public policy, cannot subject persons with disabilities to discrimination. The TLC violates each and all of such regulations by setting specifications for the vehicles that can serve as taxicabs which require wheelchair accessible features for only 231 taxicabs when there is no reason why the TLC could not require more taxicabs to be wheelchair accessible.

- The statutory and regulatory provisions of Subtitle B (42 U.S.C. § 12144 and 49 C.F.R. § 37 *et seq.*): The TLC, as an operator of a demand responsive public transportation system by "contract or other arrangement," must ensure that the vehicles are "readily accessible to and useable" by persons with disabilities. The TLC fails to do this.

## III.  STATEMENT OF FACTS

### A.  It Is Undisputed that 98.2% of Taxicabs Are Not Accessible

The facts concerning the core issue in this case – the extent of the inaccessibility of the taxicab fleet – are undisputed. There are 13,237 medallion taxicabs in New York City.[5] Pltfs 56.1 Statement, ¶ 10. Only 232 of these are wheelchair accessible. *Id.* at ¶ 11. Of those, 231 are accessible because the owner purchased a medallion that under local law requires the taxicab to be accessible. *Id.* at ¶ 12. Only a single taxicab medallion owner has voluntarily chosen to use an accessible taxicab (i.e. the vehicle was made accessible by the owner even though the owner's medallion does not mandate it). *Id.* at ¶14. Thus, although the TLC argues that unrestricted (i.e. non-accessible) medallion owners are free to select an accessible taxicab (*id.* at ¶ 13), the reality is that unrestricted medallion owners almost never select an accessible vehicle if not required to do so. As a result, currently only 1.8% of the medallion taxicab fleet is accessible and over 98% of the medallion taxicab fleet is inaccessible. *Id.* at ¶ 9.

Moreover, as statistical expert Douglas Kruse notes:

> [P]eople with disabilities face competition for the few accessible taxicabs that do exist. This is because (1) the 1.8% of accessible

---

[5] Licensed taxicabs are known as "medallion taxicabs" because each vehicle has been issued a metal plate, known as a medallion, displaying the license number of the vehicle. Pltfs 56.1 Statement, ¶ 1. Taxicab vehicles and their drivers obtain medallions from the TLC. *Id.* at ¶ 3. In 2010, an unrestricted (i.e. a license that does not require a taxicab to be accessible) corporate medallion cost $850,000. *Id.* at ¶ 4. In 2010, an unrestricted individual medallion cost $624,000. *Id.* at ¶ 4. These medallions have been selling of late for approximately $950,000 and $650,000 respectively in 2011. *Id.* at ¶ 5. An accessible medallion is a medallion that requires, as a condition of its use, that the owner of the medallion obtain and utilize a wheelchair accessible vehicle in providing taxicab service. *Id.* at 2. When last auctioned in 2008, an accessible medallion cost $413,000. *Id.* at ¶ 6.

cabs may be used by a non-disabled person while (2) a wheelchair
user cannot access the 98.2% of inaccessible taxicabs. Thus, at
any given time a certain percentage of the accessible taxicabs may
be in use by persons without disabilities.

Declaration of Douglas Kruse In Support of Plaintiffs' Motion for Partial Summary
Judgment ("Kruse Decl."), ¶ 12. TLC does not dispute this analysis. It agrees that a "[n]on-
disabled person can use accessible cabs whenever wheelchair cabs are available. . . That is, there
is no rule against a non-disabled person hailing an accessible cab." Pltfs 56.1 Statement, ¶ 15.

Because the fleet is overwhelmingly not accessible, wait times for accessible taxicabs are
much higher than wait times for non-accessible taxicabs. In fact, a non-disabled person is over
twenty-five (25) times more likely to hail a taxicab within ten minutes than is a person who uses
a wheelchair.[6] Kruse Decl., ¶¶ 1, 16. This is because the overall likelihood of a non-disabled
person being able to hail a taxicab they can access within ten minutes is 87.33%. In comparison,
the likelihood of a wheelchair-user being able to hail and obtain an accessible taxicab within ten
minutes is only 3.31%. Kruse Decl., ¶ 16. Based on his analysis, Plaintiffs' expert concludes
that a taxicab fleet in which 13,005 of the 13,237 taxicabs are inaccessible to people with
disabilities is a fleet which is, for all practical purposes, not accessible at all. Kruse Decl., ¶¶ 2,
12. Moreover, the TLC agrees that persons using wheelchairs are less likely to be able to hail
and wheelchair accessible vehicle than a non-wheelchair accessible vehicle. Pltfs 56.1 Statement,
¶ 17.

**B.     It is Undisputed that the TLC Can Increase the Number of Accessible
Taxicabs But Has Chosen Not to Do So.**

The TLC admits that it "could designate a single vehicle for use in the taxicab fleet
which...could be wheelchair accessible." *Id.* at ¶ 21. Indeed, TLC does not know of "any legal
restriction on [TLC's] ability to require unrestricted medallion holders to purchase wheelchair
accessible vehicles." *Id.* at ¶ 22. The number of accessible medallions that the legislature says
the TLC must issue is a floor and not a ceiling. *Id.* at ¶ 24. In sum, the TLC admits that "there's

---

[6] Professor Kruse relies on data from an independent 2006 survey. The TLC admits that it does not have
any such data that is more current. Pltfs 56.1 Statement, ¶ 18.

no reason why the TLC could not require that more taxicabs be accessible." *Id.* at ¶ 23. The TLC has simply chosen not to do so.

In fact, the TLC has made the situation worse and not better for wheelchair users by perpetuating the inaccessibility of the taxicab system. As recently as last month, the TLC selected three additional models to serve as taxicabs: the Ford Transit Connect van, the Ford Taurus and the Chevrolet Impala. None are wheelchair accessible. *Id.* at ¶ 36. Over two thousand and five hundred (2,500) taxicabs or more are replaced annually with new models (*id.* at ¶ 37) because of the TLC's mandatory retirement rules. These rules state that taxicab vehicles generally may stay in service up to five years with certain exceptions. *Id.* at ¶ 38. The three newly approved models are intended as "interim cabs" to be used from the present until the new taxi cabs selected pursuant to the Taxi of Tomorrow Initiative are ready. *Id.* at ¶ 36. Thus, the TLC's "interim" taxi program will add an average of forty-eight taxicabs *every week* to the fleet that have no lift or ramp for wheelchair users. These inaccessible "interim" vehicles will all remain in service until roughly 2017. As a result, these steps by the TLC serve only to perpetuate the inaccessibility of the New York medallion taxi fleet.

There are numerous ways in which the TLC could increase the accessibility of the New York City taxicab fleet because, as is discussed below, the TLC makes every critical decision, promulgates every policy and procedure and micro-manages implementation of every aspect of these decisions, policies and procedures.

## C.   The TLC Is the Public Entity that Runs Every Major Aspect of the New York City Taxicab Fleet.

The TLC is a part of the government of the City of New York under the Deputy Mayor for Operations (Plts. 56.1 Statement, ¶ 26) and a public entity for purposes of Title II of the ADA. *Id.* at ¶ 27.

Under the City Charter, the TLC "set[s] standards and criteria for the licensing of vehicles," "adjudicates charges of violation of the provisions of the administrative code and rules," and establishes "requirements of standards of safety, and design, comfort, convenience,

noise and air pollution control and efficiency." *Id.* at ¶ 28.  Operationally, this means that the

TLC does far more than simply issue licenses.  The TLC has an adjudication division that

conducts hearings as to violations (66,225 for 2010) and consumer complaints (2392 in 2010).

In addition, the licensing division not only issues licenses but also sets driver educational

requirements and drug test requirements.  The TLC also has a call center for complaints and

tracking property lost by passengers.  The TLC's enforcement division monitors drivers'

compliance with laws, rules and regulations (including undercover enforcement initiatives).  The

TLC also has a Safety and Emissions Division that performs DMV inspections (55,255 in 2010)

at the TLC inspection facilities. *Id.* at ¶ 29.

Most significantly, the TLC determines whether a medallion taxicab may offer service in

New York City.  It mandates precisely which vehicles can serve as taxicabs.  Without a TLC

issued medallion, a taxicab may not provide medallion (i.e. street hail response) taxicab service

in New York City.  *Id.* at ¶ 7.  With a medallion, a taxicab may provide such service in New

York City.  *Id.*  In addition, "[t]he TLC sets forth specifications, minimum specifications, that

vehicles must conform to if they are to be considered for medallion taxicabs." *Id.* at ¶ 30.  If a

vehicle does not meet such specifications, it cannot serve as a medallion taxicab. *Id.*  The

issuance of taxicab medallions by the TLC is conditional on agreement from the owners of these

medallions to adhere to requirements and specifications adopted by the TLC. *Id.* at ¶ 8.  The TLC

enforces these requirements and specifications and punishes those who violate them. *Id.* at ¶ 31.

The TLC is also charged with "development and effectuation of a broad public policy of

transportation." *Id.* at ¶ 32.  Despite this public duty to implement effective transportation

services, the TLC has taken no steps to encourage non-accessible medallion owners to purchase

accessible vehicles. *Id.* at ¶ 19.

### D.     The TLC Mandates the Exact Specifications, Including Accessibility Or Non-Accessibility, For All Taxicabs.

In addition to the many functions described above, the TLC establishes the exact specifications of the vehicles that may serve as taxicabs. *Id.* at ¶ 33. Specifications for all taxicabs include interior size, engine size, air conditioning and types of windows. *Id.* The TLC also mandates specific manufacturers and models of various vehicles which may serve as taxicabs in New York City. *Id.* On its website, TLC specifies 16 such manufacturers and models. *Id.* at ¶ 34. Only one of these is an accessible vehicle, the Toyota Sienna van. *Id.* It is unclear whether the Toyota Sienna is currently still approved for use as an accessible taxicab. The TLC states that as of April 2011, "[t]he Toyota Sienna is no longer on the list of approved vehicles for use as a medallion taxicab." *Id.* at ¶ 35. However, whether the Toyota Sienna may be used for an accessible medallion taxicab is ambiguous. If it may not, there are currently no vehicles which are approved to serve as accessible taxicabs. Yet the TLC admits that it has the power to change its specifications to "expand the number of vehicles that are eligible to provide wheelchair accessible transport." *Id.* at ¶ 25. That is, nothing prohibits the TLC from designating more accessible vehicles which may serve as taxicabs.

There is also no dispute concerning what is required to make a taxicab accessible. Indeed, the TLC sets specifications for the few New York taxicabs that must be accessible (i.e. the 231 vehicles holding accessible medallions). *Id.* at ¶ 39. Under TLC Rules, an accessible taxicab must follow the ADA regulations in 49 C.F.R. parts 37 and 38 and must be capable of transporting at least one passenger using a wheelchair (as defined in 49 C.F.R. § 37.3). *Id.* at ¶ 40. Parts 37 and 38 of Title 49 of the Code of Federal Regulations require the following key features, among others, for an accessible vehicle:

- a level-change mechanism or boarding device (e.g., lift or ramp);

8

- sufficient clearances to permit a wheelchair or other mobility aid user to reach a securement location; and

- at least one securement location and device (for vehicles under 22 feet).

*See* 49 C.F.R. § 38.23. Just as a building is not "accessible" because some mobility impaired persons can drag themselves up the stairs of the building, a taxicab is not accessible even if some persons using manual wheelchairs can stow their wheelchairs in the trunk of a taxicab. Accessibility is carefully defined under both federal regulations and TLC rules. A taxicab is not accessible unless it has, among other features, a lift or ramp. 49 C.F.R. § 38.23(a); *see also* Pltfs 56.1 Statement, ¶ 40. The TLC admits that a person in a wheelchair, whether power or manual, cannot get into a taxicab without a ramp while remaining in their wheelchair. *Id.* at ¶ 41.

**E.     Taxicab Service Provides Clear Benefits to Both the General Public and to Persons Using Wheelchairs.**

It is beyond dispute that medallion taxicab service is a valuable benefit both to those who live, work and visit New York City. *Id.* at ¶ 43. Taxicabs provide readily available on-demand transportation to employment, education, political events, doctors, recreation and appointments. Declaration of Susan Dooha In Support of Plaintiffs' Motion for Partial Summary Judgment ("Dooha Decl."), ¶ 20, 22; Declaration of Christopher Noel in Support of Plaintiffs' Motion for Partial Summary Judgment ("Noel Decl.), ¶¶ 6-7; Declaration of Simi Linton in Support of Plaintiffs' Motion for Partial Summary Judgment ("Linton Decl."), ¶¶ 5, 12, 16. Taxicabs also allow for spontaneity in travel and for unplanned or unanticipated trips. Dooha Decl., ¶ 11; Noel Decl., ¶¶ 6-7; Linton Decl., ¶¶ 12, 16. In addition, taxicabs are critical to tourism in New York City, offering about 38 million passenger-trips by visitors annually, which is an average of 2.5 passenger trips per overnight visitor. Pltfs 56.1 Statement at ¶ 45. Taxicab service is especially beneficial because other public transportation systems in New York City are not comparable to

9

the efficient, on-demand transportation that taxicabs offer customers. In fact, for 30.4% of

taxicab trips, the reason for taking a taxicab was because it was easier and took less time than

subway or bus. *Id.* at ¶ 46.

The benefits from taxicab service are even more important for the 60,000 wheelchair

users who reside in New York City, not to mention the countless visitors who rely on

wheelchairs.[7] Dooha Decl., ¶ 11. Being able to hail a taxicab during inclement weather may

prevent serious damage to a power wheelchair. Also wheelchair users can rely on taxicabs to

provide safe passage through areas late at night where they may otherwise be vulnerable. Dooha

Decl., ¶ 21. In addition, most wheelchair users, as with most New Yorkers, do not have access to

a personal vehicle and are dependent upon public transportation. Dooha Decl., ¶ 11. However,

other transportation options in New York City are largely inaccessible or not a viable choice for

persons using wheelchairs. Currently over 80% of subway stations in New York City are not

fully ADA wheelchair accessible, making most of the City's famed subway system unusable by

people with disabilities. Dooha Decl., ¶ 14; Plts. 56.1 Statement, ¶ 48. Similarly, many

wheelchair users are not able to travel to the closest bus stop (because buses run on fixed routes)

and/or cannot manage the requisite bus transfers to get to their destination. Dooha Decl., ¶ 17;

Plts. 56.1 Statement, ¶ 48. Paratransit offers no better alternative. To arrange for service,

customers must call one to two days in advance to reserve their trip. Dooha Decl., ¶ 18; Plts. 56.1

Statement, ¶ 48. As the TLC admits "currently with 98 percent or more of the medallion taxicab

fleet not being wheelchair accessible. . . people who use wheelchairs in Manhattan do not have

an equal opportunity to benefit from taxi service as compared to people who do not use

wheelchairs." Plts. 56.1 Statement, ¶ 49.

---

[7] Both individual Plaintiffs and members of the Plaintiff class are wheelchair users who are substantially
limited in the major life activity of walking. They are otherwise qualified in that they reside in or visit
New York City and want to use taxicabs. Plts. 56.1 Statement, ¶ 42.

IV.   **LEGAL STANDARD FOR SUMMARY JUDGMENT.**

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). To survive summary judgment "the nonmoving party must come forward with

'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 n. ll (1986) (quoting Fed. R. Civ. P. 56(e)). "Conclusory

allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of

fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

V.   **ARGUMENT**

A.   **The ADA Must Be Broadly Construed.**

Congress and the courts have consistently construed the ADA broadly. The ADA offers

a rich statutory and regulatory framework designed by Congress to address every possible type

of discrimination by a public entity. Congress enacted the ADA because "discrimination against

individuals with disabilities persists in such critical areas as employment, housing, public

accommodations, education, *transportation*, communication, recreation, institutionalization,

health services, voting, and access to public services." 42 U.S.C. § 12101(a)(3)(emphasis added).

Congress recognized that without the ADA, persons with disabilities "often had no legal recourse

to redress such discrimination." 42 U.S.C. § 12101(a)(4). The ADA was intended to "provide a

clear and comprehensive national mandate for the elimination of discrimination against

individuals with disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

(citing 42 U.S.C. § 12101(B)(1) (2000). Accordingly, courts have held that "[a]s a remedial

statute, the ADA must be broadly construed to effectuate its purpose." *Innovative Health Sys., v.*

*White Plains*, 931 F.Supp. 222, 232 (S.D.N.Y.,1996*), aff'd in part*, 117 F.3d 37, 45 (2d Cir.

1997).

//

//

**B.**     **There Is No Genuine Issue of Material Fact as to Any of Plaintiffs' ADA Title II Claims for Declaratory Relief.**

**1.**     **The TLC's Undisputed Actions Violate the Statutory Mandate of Subtitle A of Title II of the ADA.**

Under Subtitle A of Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  In this Circuit, plaintiffs establish a *prima facie* violation of Subtitle A of Title II, when they show (1) plaintiffs are "qualified individuals" with a disability; (2) defendants are subject to the ADA; and (3) plaintiffs were denied the opportunity either to participate in or to benefit from defendants' services, programs or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities. *Henrietta D.*, 331 F.3d at 272; *see also Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998).  Here, there are no disputed facts as to any of these elements and the remaining legal issues entitle Plaintiffs to partial summary judgment.

### a.     *Plaintiffs and the Plaintiff Class Are Qualified Individuals with Disabilities.*

Both individual Plaintiffs and members of the Plaintiff class are wheelchair users who are substantially limited in the major life activity of walking.  They are otherwise qualified in that they reside in or visit New York City and want to use taxicabs. Pltfs 56.1 Statement, ¶ 42.

### b.     *The TLC Is a Public Entity Which Provides a Program, Service or Activity of Public Transportation.*

The TLC is subject to Title II of the ADA because it is both a public entity and it provides a program, service or activity.  The TLC admits that it is a public entity for purposes of Title II of the ADA. *Id.* at ¶ 27.

The Second Circuit interprets the phrase "programs, services, or activities" in Title II to be "a catch-all phrase that *prohibits all discrimination by a public entity regardless of the*

*context." Innovative Health Sys., Inc. v. White Plains,* 117 F.3d 37, 45 (2d Cir. 1997) (emphasis

added). In so finding, the Court in *Innovative Health* relied on the language of the Department

of Justice regulations preamble, which states "Title II applies to anything a public entity

does....All governmental activities of public entities are covered.'" *Id.* Attempting to distinguish

which public functions are services, programs, or activities, and which are not, would

disintegrate into needless "hair-splitting arguments." *Id.* The focus of the inquiry, therefore, is

not on whether a particular public function can technically be characterized as a service,

program, or activity, but whether it is "'a normal function of a governmental entity.'" *Id.* at 44.

Here, it is undisputed that the TLC engages in a variety of governmental activities and

functions. Pltfs 56.1 Statement, ¶¶ 28-32. Together these activities and functions provide a

system of public transportation consisting of medallion taxicab service. As case law dictates,

anything the TLC does, and any normal function the TLC engages in is a program, service or

activity covered under the public entity section of the ADA. Because it is covered under Title II,

the TLC cannot discriminate in the service, program or activity is offers, here a system of public

transportation, by excluding from or denying the benefits of this public transportation to

wheelchair users.

> **c.    The TLC Discriminates by Denying Wheelchair Users, by Reason of Their Disability, Both the Opportunity to Participate In and to Benefit From a Public Transportation System Provided By the TLC.**

A public entity discriminates under Title II if plaintiffs were denied the opportunity either

to "participate in" or to "benefit from" defendants' services, programs or activities, or were

otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.

//

//

13

(1)     **The TLC Denies Persons Using Wheelchairs Both the Opportunity to Participate In and to Benefit From Medallion Taxicab Service.**

The TLC violates Subtitle A of Title II's statutory prohibition on discrimination because it denies opportunities both to participate in and to benefit from the transportation system offered by the TLC.  It is undisputed that currently only 1.8% of the medallion taxicab fleet is wheelchair accessible. Plts. 56.1 Statement, ¶ 9.  As a result, a non-disabled person is over twenty-five (25) times more likely to hail a taxicab within ten minutes than is a person who uses a wheelchair. *Id.* at ¶ 18.  It cannot be disputed that persons using wheelchairs would benefit from being able to use the taxicab system. *Id.* at ¶ 47-49.

Defendants do not and cannot deny that the TLC has full authority to mandate that more taxicabs be accessible regardless of the number of accessible medallions issued.  The TLC admits that "there's no reason why the TLC could not require that more taxicabs be accessible." *Id.* at ¶ 23.  It is also undisputed that taxicab medallion owners may select an accessible taxicab regardless of whether he/she has an accessible medallion and thus, there certainly can be more than 231 accessible taxicabs in the system. *Id.* at ¶ 13.  TLC also acknowledges that currently only one medallion owner has selected an accessible cab without being required to do so. *Id.* at ¶ 14.

Clearly, the TLC has the power to require more accessible taxicabs.  In fact, the TLC admits that it "could designate a single vehicle for use in the taxicab fleet which...could be wheelchair accessible." *Id.* at ¶ 21.  It also is undisputed that the TLC already mandates the specifications for all vehicles that are permitted to serve as taxicabs, including detailed specifications for accessible taxicabs. *Id.* at ¶¶ 33, 39-40.  Just as the TLC requires certain specifications for taxicabs with accessible medallions, so too could it require these specifications for more taxicabs.  Defendants admit that they do not know of "any legal restriction on [the TLC's] ability to require unrestricted medallion holders to purchase wheelchair accessible

vehicles." *Id*. at ¶ 22.  There is no reason why the TLC should be limited by the number of

accessible medallions that the legislature says it must issue.  The number mandated by the

legislature is a floor and not a ceiling. *Id*. at ¶ 24.

### (2)   The TLC's Discrimination Is By Reason of Disability.

In this Circuit, a public program discriminates 'by reason of disability' if the program is

generally open to all persons, whether disabled or not, but people with disabilities are unable to

access those programs at the same level. *Henrietta D. v. Bloomberg*, 331 F. 3d 261, 296 (2d Cir.

2003) ("there must be something different about the way the plaintiff is treated "by reason of ...

disability.""); *Brown v. County of Nassau*, 736 F. Supp. 2d 602 (E.D.N.Y. 2010) (to prevail,

plaintiff must establish only that a public sports arena open to all is not readily accessible to

people who use wheelchairs).

Here there is no question that the medallion taxicab service is open to all who reside in or

visit New York City. Pltfs 56.1 Statement, ¶ 43.  It is also undisputed that the overwhelming

number of vehicles in the taxicab fleet are not accessible to persons using wheelchairs. *Id*. at ¶ 9.

Indeed, TLC admits that a person in a wheelchair is less likely to be able to hail an accessible

taxicab than a non-accessible taxicab. *Id*. at ¶ 17.  This is consistent with Plaintiffs' expert's

findings. *Id*. at ¶ 18.

### 2.   The TLC's Undisputed Actions Also Violate the Subtitle A Regulatory Requirements of Title II of the ADA.

The TLC not only violates the statutory terms of the ADA; the TLC's actions also

constitute prohibited discrimination under the regulations implementing Subtitle A of Title II of

the ADA.  The TLC violates at least four such regulations.

#### a.   *The TLC Violates Title II Regulations Because it Undisputedly Provides a Benefit to the General Public Which It Denies to Persons with Disabilities.*

28 C.F.R. 35.130(b)(1) requires that a public entity, "in providing any aid, benefit, or

service, may not, directly or through contractual, licensing, or other arrangements, on the basis of

disability...(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others...(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." Here the TLC provides a very important benefit of public transportation consisting of medallion taxicabs. Pltfs 56.1 Statement, ¶ 43-46.

The benefits of being able to fully access New York City's taxicabs are both substantial and numerous. These include on-demand, direct and efficient transportation to work, school, political events, doctors and appointments (*id.* at ¶ 44) as well as transportation for tourists. *Id.* at ¶ 45. Such benefits also include transportation for spontaneous and unplanned trips that are required in the moment. *Id.* at ¶ 44. The benefits from taxicab service are even more important for persons with mobility disabilities since most wheelchair users rely on public transportation. *Id.* at ¶ 47. However, much of the other transportation systems in New York City are inaccessible or not viable options for persons using wheelchairs. *Id.* at ¶ 48. Yet, wheelchair users do not have the opportunity of turning to taxicab service where and when other transportation systems in New York City fail them. This is because of the undisputed fact that only a tiny percentage of New York's taxicabs are currently accessible. Because the TLC has consciously chosen to make so few accessible taxicabs available to persons who use wheelchairs, the TLC is denying persons with disabilities "the opportunities, benefits and advantages" of being able to equally access New York's taxicab fleet.

//

//

16

### b.     The TLC Also Violates Title II Regulations By Utilizing Criteria And Methods of Administration that Have the Effect of Subjecting Persons with Disabilities to Discrimination.

28 C.F.R. 35.130(b)(3)(i) mandates that a "public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration...that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability..." This provision applies to actual practices as well as written policies. It is intended to prohibit both "blatantly exclusionary policies or practices" and "policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate." 28 C.F.R. Pt. 35, App. A. Here the TLC is utilizing criteria and methods of administration that deny individuals with disabilities an effective opportunity to participate. As explained above, it is undisputed that the TLC utilizes criteria mandating the precise and detailed specifications for all vehicles that are permitted to serve as taxicabs. Pltfs 56.1 Statement, ¶ 30, 33. It is also undisputed that the TLC's specifications do not require accessibility, except for those taxicabs operating under an accessible medallion. *Id.* at ¶ 2, 39. As a direct result of the TLC's current criteria, there are only 232 accessible taxicabs for the entire city, which necessarily denies persons with disabilities an effective opportunity to hail a taxicab. *Id.* at ¶ 11.

The TLC also administers its program of medallion taxicabs in a discriminatory manner in that the TLC has chosen to limit the number of accessible taxicabs to 231. It is undisputed that there is no reason why the TLC cannot mandate (whether through its licensing criteria, its rules, its arrangements with medallion owners, or its designation of particular vehicles as taxicabs) that more of the New York City taxicab fleet be accessible. *Id.* at ¶¶ 21-24. It is further undisputed that despite opportunities to increase the number of wheelchair accessible taxicabs on the road, the TLC has taken affirmative actions that only make the situation worse (e.g., approving inaccessible interim taxicabs) *Id.* at ¶ 36. Because the TLC has decided not to require

17

more accessible taxicabs, the TLC's "methods of administration" have led to an overwhelmingly

inaccessible taxicab fleet. *Id.* at ¶ 9.  By not requiring more accessible taxicabs, the TLC is

affirmatively mandating an inaccessible taxicab fleet for the City of New York as surely as if it

expressly prohibited 98% of its drivers from picking up someone in a wheelchair.  Ironically,

though the TLC recognizes its non-discrimination obligation by prohibiting drivers from refusing

to pick up people in wheelchair (Pinover Decl., Exh. R (Oral Argument Transcript) at 6:19-22),

it has created a fleet of vehicles that do not have the ramps or lifts that would make it possible for

wheelchair users to even enter the taxis.

### c.     The TLC Also Violates Title II Regulations by Establishing Requirements for Medallion Taxicab Service that Subject Persons with Disabilities to Discrimination.

28 C.F.R. 35.130(b)(6) prohibits a "public entity" from "establishing requirements for the

programs or activities of licensees or certified entities that subject qualified individuals with

disabilities to discrimination on the basis of disability."

A public entity such as the TLC may not establish requirements for the activities of

licensees that would have a discriminatory effect on people with disabilities.  For example, it is

discrimination for a state agency to refuse to license residential care homes that housed residents

who were incapable of "self-preservation" (i.e. residents must have the ability to remove

themselves from situations of imminent danger).  In so doing, the state agency effectively forced

licensed residential care homes to deprive non-ambulatory persons of access to these residential

care homes. *Buckhannon Bd. & Care Home v. W. Va. Dept. Of Health And Human Resources*,

19 F. Supp. 2d 567, 573-575 (N.D.W.Va. 1998).  Likewise, it constitutes discrimination for the

TLC to impose requirements on the taxicab fleet that effectively forces the fleet to deprive

people who use wheelchairs of access to the taxicab program.

Here, the TLC imposes such requirements on licensees by mandating the specifications for vehicles that are permitted to serve as taxicabs. Plts 56.1 Statement, ¶¶ 30, 33.  It is further undisputed that based on these specifications, the TLC designates particular manufacturers and models of vehicles that may serve as taxicabs. *Id.* at ¶¶ 33, 34.  It is unclear whether one of these vehicles has been designated for use as an accessible taxicab.[8] *Id.* at ¶ 34.  In any event the TLC's requirements for medallion taxicabs provide, at best, only one vehicle as an option for medallion owners who want to use an accessible taxicab.  In addition, the TLC admits that it has taken no affirmative steps to persuade the owners of general medallions to purchase accessible vehicles. *Id.* at ¶ 19.  It is unsurprising then that while a medallion owner may voluntarily select an accessible taxicab even if he/she does not have an accessible medallion, currently only one medallion owner has chosen to do so. *Id.* at ¶¶ 13-14.  Again, there is no reason why the TLC cannot mandate, through its requirements for medallion taxicabs, that more of the New York City taxicab fleet be accessible. *Id.* at ¶¶ 21-24.

The very narrow construction that Defendants have proposed (namely that the only obligation that this regulation sets forth is that the TLC may not discriminate against disabled taxicab drivers in granting licenses) is inconsistent with the broad construction of the ADA and its implementing regulations mandated by the Second Circuit.  There is no authority whatsoever for this inventive interpretation.  Indeed the Court expressed skepticism as to this argument. Pinover Decl., Exh. R (Oral Argument Transcript) at 7:12-17.  Moreover, Defendants' argument ignores the plain language of the prohibition which clearly states that requirements set for the programs of a public entity cannot subject persons with disabilities to discrimination.

//

//

---

[8] If the Toyota Sienna is no longer approved for use as an accessible taxicab, there are no approved models for accessible taxicabs. *Id.* at ¶ 35.

> **d.     The TLC Also Violates Title II Regulations by Failing to Make Reasonable Modifications to Its Transportation Policies.**

The ADA and its implementing regulations impose an *affirmative* duty on public entities to provide different treatment such that a public entity must modify its policies, practices, or procedures in order to avoid discrimination. 28 CFR § 35.130(b)(7)("[a] public entity shall make reasonable modifications[9] in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"); *see Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 206-207 (E.D.N.Y. 2000), *aff'd*, 331 F.3d 261, 272 (2d Cir. 2003) (explaining that "[t]he ADA 'stress[es] the concept of equal opportunity, not merely equal treatment, to eliminate discrimination ... [and i]t is not enough to open the door for the handicapped ...; a ramp must be built so the door can be reached." (citations omitted)); *see also Innovative Health Systems, Inc. v. City of White Plains*, 931 F. Supp. 222, 233 n4 (S.D.N.Y.,1996), *aff'd in part*, 117 F.3d 37, 45 (2d Cir. 1997) (a public entity has an "obligation to modify its policies, practices, and procedures"); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 n. 9 (1st Cir. 2000) ("[T]he ADA does more than prohibit disparate treatment.  It also imposes an affirmative obligation to provide reasonable accommodation to disabled employees."); *Clarkson v. Coughlin*, 898 F. Supp. 1019 (S.D.N.Y. 1995) (finding failure to provide interpreters/accommodations for inmates who are deaf a violation of a public entity's obligations under the ADA).

---

[9] Title II of the ADA uses the term "reasonable modification," whereas Title I of the ADA uses the term "reasonable accommodation."  Notwithstanding the different statutory language, there is little substantive difference between the terms.  Thus, these terms are used often interchangeably. *See Wong v. Regents of the Univ. of Cal.,* 192 F.3d 807, 816 n. 26 (9th Cir.1999) ("Although Title II of the ADA uses the term "reasonable modification," rather than "reasonable accommodation," these terms create identical standards"); *Robertson v. Las Animas County Sheriff's Dept.,* 500 F.3d 1185, 1195 n.8 (10th Cir. 2007)(Title II's use of the term "reasonable modifications" is essentially equivalent to Title I's use of the term "reasonable accommodation"); *Partelow v. Massachusetts,* 442 F.Supp.2d 41, 48 n. 10 (D.Mass. 2006); *Swenson v. Lincoln County Sch. Dist. No. 2,* 260 F.Supp.2d 1136, 1144 n. 10 (D.Wyo.2003)

It is undisputed that the TLC is charged with "development and effectuation of a broad public policy of transportation." Pltfs 56.1 Statement, ¶ 32. The TLC bureaucracy has developed and effectuated a transportation policy that excludes wheelchair users from all the advantages of a taxicab program. The TLC continues to issue only 231 accessible medallions and claims that its legal obligation stops there. Pinover Decl., Exh. R (Oral Argument Transcript) at 8:7-13. Determination of the precise reasonable modifications that should be made is a matter of remedy to be addressed separately from this motion, which deals only with liability. However, there are multiple ways the TLC could modify its policies, including changing the specifications for all taxicabs or subsidizing accessible taxicabs from the substantial revenue the City reaps from the sale of medallions. As a practical matter, the taxicab industry is very profitable for the New York City with some medallions selling for almost a million dollars each. *Id.* at ¶¶ 4-5. Particularly with such resources, there are many options for increasing the overall accessibility of the New York taxicab fleet.

### 3. The TLC's Undisputed Actions Violate the Subtitle B Requirements of Title II of the ADA.

Subtitle B of Title II of the ADA mandates that "if a public entity operates a demand responsive system, it shall be considered discrimination . . . for such an entity to purchase or lease a new vehicle for use on such a system . . . that is not readily accessible to and useable by individuals with disabilities, including individuals who use wheelchairs, unless such a system, when viewed in its entirety, provides a level of service to such individuals equivalent to the level of service such system provides to individuals without disabilities. 42 U.S.C. § 12144.

The implementing Department of Transportation regulations provide that the term "operates" "includes the provision of transportation service by a public or private entity itself *or by a person under a contractual or other arrangement or relationship with the entity.*" 49 C.F.R. § 37.3. (emphasis added). Thus, a public entity need not itself operate the demand responsive

system. It can do so based on contractual or other arrangement or relationship with a private

entity. Furthermore, "[w]hen a public entity enters into a contractual or other arrangement or

relationship with a private entity to operate . . . [transportation] service, the public entity *shall*

*ensure* that the private entity meet the requirements . . . that would apply to the public entity if

the public entity itself provided the service." 49 C.F.R. § 37.23. (emphasis added)

The TLC, as a public entity, has an arrangement or relationship with each and every

medallion owner, in which issuance of a medallion is conditional on adherence to the TLC's

requirements and specifications. Pltfs 56.1 Statement, ¶ 8. Thus, the TLC operates a public

transportation system consisting of medallion taxicabs and based arrangements and relationships

with the medallion owners. Under federal regulations, because it has an arrangement or

relationship with private providers, the TLC must ensure that taxicab medallion owners step into

the shoes of the TLC and comply with the applicable statutory requirements. Thus, the TLC

must ensure that each new vehicle purchased or leased be "readily accessible to and useable by

individuals with disabilities" or that the system, when viewed in its entirety, provides an

equivalent level of service to persons with disabilities.[10] It is undisputed that the TLC has failed

to do this.

The TLC approves multiple inaccessible vehicles for use *(id.* at ¶ 34) and it does not

currently provide an equivalent level of service to persons with disabilities. *Id.* at ¶ 20. Instead,

the TLC continues to maintain that it has met its legal duty because 231 medallion taxicabs are

accessible even though that constitutes only a miniscule portion of the total taxicab fleet in New

York. *Id.* at ¶ 9. Accordingly, the TLC's program of public transportation using medallion

taxicabs violates Subtitle B of Title II of the ADA.

---

[10] The equivalent service defense is applicable only to Subtitle B of Title II of the ADA and is not a
defense to claims under Subtitle A.

### C.    This Motion Only Addresses Liability.

It is well within this Court's authority to grant Plaintiffs' motion solely as to the TLC's liability. A court may grant partial summary judgment on liability, and later address remedies, including equitable relief. *See Cayuga Indian Nation of New York v. Cuomo*, 730 F. Supp. 485, 493 (N.D.N.Y. 1990) (granting plaintiffs' motion for partial summary judgment on liability); *Cayuga Indian Nation of New York v. Cuomo*, 771 F.Supp. 19, 24 (N.D.N.Y. 1991) (granting plaintiffs' second motion for partial summary judgment on liability); *Cayuga Indian Nation v. Pataki,* No. 80-CIV-930, 1999 U.S. Dist. LEXIS 5228, at *18-19 (N.D.N.Y. Apr. 15, 1999) (determining method of calculating damages); *Cayuga Indian Nation v. Cuomo,* No. 80-CIV-930, 1999 U.S. Dist. LEXIS 10579, at *97 (N.D.N.Y. July 1, 1999) (addressing injunctive relief); *Cayuga Indian Nation of NY v. Pataki*, 413 F. 3d 266 (2d Cir. 2005) (reversing on other grounds); *see also Howe v. Bank of New York Mellon*, No. 09 Civ. 10470 (HB) (S.D.N.Y. March 4, 2011) (citing *Cent. Irrigation Supply v. Putnam Country Club Associates, LLC*, 812 N.Y.S.2d 633, 634 (N.Y. App. Div. 2006) (affirming the lower court's holding that granted summary judgment with respect to liability); *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, n14 (S.D.N.Y. 2008) (granting summary judgment on liability).

After determining liability, the Court may then choose from a wide range of both procedural devices and remedies to bring the case to a conclusion. *Milliken v. Bradley*, 433 U.S. 267, 281 (1977) (finding that the scope of a district court's equitable powers is broad). For example, the Court could order the parties to propose a plan jointly, under the supervision of a magistrate judge. *Henrietta D. v. Giuliani*, 246 F.3d 176, 181 (2d Cir. 2001) (Title II ADA case in which court appointed magistrate judge to work with the parties to determine remedies); *see also Communities Actively Living Independent & Free v. City of Los Angeles*, No. 09 Civ. 0287 (C.D. Cal. Feb. 10, 2011) (order granting plaintiffs' motion for summary judgment on liability and ordering the parties to meet and confer with a magistrate judge to fashion remedy to submit for approval by the Court).

23

## VI.   CONCLUSION

Equal access to transportation has been at the forefront of virtually every major civil rights movement.  There can be no true equality if a group is excluded from public transportation.  Aside from the humiliation caused by such exclusion, the right to work, to obtain an education, and to participate meaningfully in all aspects of society rest upon an individual's ability to use public transportation.  In this case, TLC claims the legal right to deny the benefits of one of the largest public transportation systems in the country to men, women and children who use wheelchairs.  Although it admits that it has the power to do so, TLC has refused to make more of the New York taxicab fleet accessible to persons using wheelchairs.  The TLC's actions have the same blatantly exclusionary effect as if the TLC had issued a written policy prohibiting drivers from picking up men and women who use wheelchairs.  This is precisely the kind of pervasive and harmful discrimination by a public entity that the ADA, enacted over twenty years ago, was intended to halt.

The facts before this Court are not in dispute.  Accordingly, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment as to liability under the ADA.  Plaintiffs further request that the Court order the parties to meet and confer with a third party neutral to fashion a remedy for submission to the Court.

Dated:  August 26, 2011
        New York, NY

By:     _____
        JULIA PINOVER (JMP333)
        Disability Rights Advocates
        560 Broadway, 10th Floor
        New York, NY 10036
        Telephone:    (212)644-8644
        Facsimile:    (212) 644-8636
        Email:        general@dralegal.org

24

SID WOLINSKY (CA Bar No. 33716)*
MARY-LEE SMITH (CA Bar No. 239086)*
KARA J. WERNER (CA Bar No. 274762)*
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, CA 94704
Telephone:      (510) 665-8644
Facsimile:      (510) 665-8511
TTY:            (510) 665-8716
Email:          general@dralegal.org
*Admitted *pro hac vice*


ALLEGRA L. FISHEL (AF 4866)
MOLLY A. BROOKS (MB 2360)
DANA SUSSMAN (DS 3915)
Outten and Golden, LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone:      (212) 245-1000
Facsimile:      (212) 977-4005
Email:          afishel@outtengolden.com

Attorneys for Plaintiffs