UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

CHRISTOPHER NOEL, SIMI LINTON, UNITED
SPINAL, a nonprofit organization, THE TAXIS FOR ALL
CAMPAIGN, a nonprofit organization, 504
DEMOCRATIC CLUB, a nonprofit organization,
DISABLED IN ACTION, a non profit organization,

                                        Plaintiffs,                    11 Civ. 0237 (GBD)

              -against-

NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION, a charter mandated agency, and DAVID
YASSKY, in his official capacity as chairman and
commissioner of the New York City Taxi and Limousine
Commission,

                                        Defendants.

------------------------------------------------------------------------x


**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR CROSS-MOTION FOR
SUMMARY      JUDGMENT      AND      IN
OPPOSITION  TO  PLAINTIFFS'  MOTION
FOR PARTIAL SUMMARY JUDGMENT**


                    MICHAEL A. CARDOZO
                    Corporation Counsel of the City of New York
                    Attorney for Defendants
                    100 Church Street
                    New York, New York  10007
                    (212)788-0818/0758


GABRIEL TAUSSIG,
ROBIN BINDER,
MICHELLE GOLDBERG-CAHN,
              of counsel.

September 23, 2011

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT

POINT I

EVEN IF WE ASSUME THAT THE ADA MAKES
TLC RESPONSIBLE FOR GIVING DISABLED
PASSENGERS MEANINGFUL ACCESS TO THE
CITY'S TAXICAB SYSTEM, TLC'S DISPATCH
PROGRAM WILL ACCOMPLISH THAT GOAL
IMMINENTLY......................................................................................... 3

A.    TLC's Regulatory Authority with Respect to Taxicab
      Medallions.......................................................................... 3

B.    Title II(A) of the ADA Is Not Applicable Here....................... 7

C.    Even if Title II(A) Is Applicable, TLC's Dispatch Program Will
      Provide MEaningful Access And Thus Satisfy Title II(A) of
      the ADA.............................................................................. 9

D.    If Reached, Resolution of the Meaningful Access Question
      Should Be Held in Abeyance Until TLC's Accessible Dispatch
      Program is Up and Running.................................................. 11

E.    Title II(B) is Not Applicable As TLC Is Not a Transportation
      Provider; Private Taxicab Operation is Governed by Title III..... 12

POINT II

TO THE EXTENT THAT PLAINTIFFS STATE A
CLAIM UNDER THE REHABILITATION ACT, THE
MEANINGFUL ACCESS STANDARD GOVERNS
AS WELL. ............................................................................................... 6

POINT III

THE COURT SHOULD DECLINE TO EXERCISE
SUPPLEMENTAL      JURISDICTION      OVER
PLAINTIFFS' HUMAN RIGHTS LAW CLAIM AND
SUCH CLAIM FAILS AS A MATTER OF LAW. ........................................18

CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                        **Pages**

Alexander v. Choate,
   469 U.S. 287 (1985) .................................................................................... 17

Brief v. Albert Einstein College of Medicine,
   2011 U.S. App. LEXIS 11120 (2d Cir. 2011) ...................................... 17

Ehrlich v. Gatta,
   2009 U.S. Dist. LEXIS 92389 (S.D.N.Y. Oct. 2, 2009) ......................... 19

Friedman v. GMC,
   721 F. Supp.2d 218 (S.D.N.Y. 2010) ................................................... 15

Henrietta D v. Bloomberg,
   331 F.3d 261 (2d Cir. 2003) ........................................................ 9, 10, 17

In re Las Vegas Monorail Co.
   429 B.R. 770, 2010 Bankr. LEXIS 2285 (D. Bank. Nev. Apr. 26, 2010) ............... 15

Iverson v. City of Boston,
   452 F.3d 94 (1st Cir. 2006) .................................................................. 9

Lincoln CERCPAC v. Health and Hosps. Corp.,
   147 F.3d 165 (2d Cir. 1998) ............................................................... 10

Lonberg v. City of Riverdale,
   571 F.3d 846 (9th Cir. 2009) ............................................................... 9

Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,
   263 F.3d 108 (2d Cir. 1998) ............................................................... 19

Marcus v. AT&T Corp.,
   138 F.3d 46 (2d Cir. 1998) ................................................................ 19

Mazanderan v. Independent Taxi Owners Ass'n,
   700 F. Supp. 588 (D.D.C. 1988) ......................................................... 16

Minneapolis Taxi Owners Coalition v. City of Minneapolis,
   572 F.3d 502 (8th Cir. 2009) .............................................................. 15

Reeves v. Queens City Transportation, Inc.,
   10 F. Supp. 2d 1181 (D. Colo. 1998) ................................................. 8, 9

Rothschild v. Grottenthaler,
    907 F.2d 286 (2d Cir. 1990)............................................................... 17

Shannon v. Verizon New York, Inc.,
    519 F. Supp. 2d 304 (N.D.N.Y. 2007)................................................. 19

Statharos v. Taxi and Limousine Comm'n,
    198 F.3d 317 (2d Cir. 1999)................................................................ 15

The Civic Association of the Deaf of New York City, Inc. v. City of New York,
    95 Civ. 8591, 2011 U.S. Dist. LEXIS 90645 (S.D.N.Y. Aug. 15, 2011) ......................... 10, 17

Toomer v. Disabled Rights Action Committee,
    443 F.3d 1191 (10th Cir. 2006) .......................................................... 14

Tyler v. City of Manhattan,
    849 F. Supp. 1429 (D. Kan. 1994)......................................................... 8

WWBITV, Inc. v. Village of Rouses Point,
    589 F.3d 46 (2d Cir. 2009)................................................................ 19

**Statutes**

28 C.F.R. § 35.101 ............................................................................ 12

28 C.F.R. § 35.130(b)(6) ..................................................................... 8

28 C.F.R. § 36.104 ............................................................................ 14

28 C.F.R. 35.130(b)(1) ....................................................................... 7

28 C.F.R. 35.130(b)(3)(i) .................................................................... 7

35 R.C.N.Y. § 54-20 ...................................................................... 6, 17

35 R.C.N.Y. § 67-04. .......................................................................... 5

35 R.C.N.Y. § 67-05. .......................................................................... 5

35 R.C.N.Y. § 67-05.1 ........................................................................ 5

35 R.C.N.Y. § 67-05.2. ....................................................................... 5

5 R.C.N.Y. § 67-3-03(b) ...................................................................... 5

35 R.C.N.Y. § 5-02(e).................................................................... 6, 19

29 U.S.C. § 794 ............................................................................... 13

42 U.S.C. § 12132 ............................................................................................................ 7, 13

42 U.S.C. § 12141(1) .............................................................................................................. 13

42 U.S.C. § 12141(3) .............................................................................................................. 13

42 U.S.C. § 12141 ................................................................................................................... 12

42 U.S.C. § 12144 ...................................................................................................... 13, 15, 16

42 U.S.C. § 12184(a) .............................................................................................................. 14

42 U.S.C. § 12184(b)(3) .................................................................................................... 14, 15

42 U.S.C. §§ 12134, 12149 .................................................................................................... 12

42 U.S.C. §§ 12149, 12186 .................................................................................................... 14

49 C.F.R. § 37.1 ...................................................................................................................... 12

49 C.F.R. § 37.29 .................................................................................................................... 12

49 C.F.R. § 37.29(c) ......................................................................................................... 14, 18

N.Y.C. Admin. Code § 19-502(h) ........................................................................................ 4, 7

N.Y.C. Admin. Code § 19-502(l) ............................................................................................. 4

N.Y.C. Admin. Code § 19-504. ................................................................................................ 4

N.Y.C. Admin. Code § 19-532(b) ............................................................................................ 4

N.Y.C. Admin. Code § 19-532(c) ............................................................................................ 4

N.Y.C. Admin. Code § 8-102(9) ............................................................................................ 18

N.Y.C. Admin. Code § 8-107(4)(a) ....................................................................................... 18

N.Y.C. Charter §§2300, 2303. .................................................................................................. 4

N.Y.C. Charter §2303(b) .......................................................................................................... 4

N.Y. Transportation Law §§150, 151(11) ............................................................................. 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

CHRISTOPHER NOEL, SIMI LINTON, UNITED
SPINAL, a nonprofit organization, THE TAXIS FOR ALL
CAMPAIGN, a nonprofit organization, 504
DEMOCRATIC CLUB, a nonprofit organization,
DISABLED IN ACTION, a non profit organization,

                                        Plaintiffs,                    11 Civ. 0237 (GBD)

               -against-

NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION, a charter mandated agency, and DAVID
YASSKY, in his official capacity as chairman and
commissioner of the New York City Taxi and Limousine
Commission,

                                        Defendants.

------------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Defendants New York City Taxi and Limousine Commission ("TLC") and its Chairman David Yassky (sued in his official capacity) submit this memorandum of law in support of their cross-motion for summary judgment and in opposition to plaintiffs' motion for partial summary judgment.

The New York State Legislature has passed legislation (which awaits gubernatorial action) raising the number of accessible taxicab medallions in New York City from 231 to 800, and there is an alternative legislative proposal that would further increase the number of accessible medallions to 1731. In addition, to give disabled passengers meaningful access to

these accessible taxicabs, TLC is in the process of implementing a program whereby nearby accessible taxicabs (tracked via GPS) would be dispatched to wheelchair-bound passengers upon telephone request (eliminating the need for wheelchair-bound passengers to find a cruising accessible taxicab).   Without waiting for these imminent changes to take effect, plaintiffs now seek a judgment that the "taxicab system *as it now exists*" violates the Americans With Disabilities Act ("ADA").   Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl. Mem.") at 2 (emphasis in original).   Apparently recognizing that the factual underpinnings of this lawsuit are about to change, and that these changes would hurt their chances of success, plaintiffs filed the instant summary judgment without even waiting for the close of discovery.   Plaintiffs' motion should be held in abeyance until the dispatch program for accessible taxicabs is up and running, and the extent of the legislative mandate for more accessible taxicabs becomes clear.   In the alternative, plaintiffs' motion should be denied and defendants' cross-motion for summary judgment granted.

Subtitle B of Title II of the ADA requires that public bus and commuter van systems be wheelchair accessible.   Indeed, there are numerous public and private transportation options for wheelchair-bound passengers in New York City, as set forth in the accompanying declaration of TLC Deputy Commissioner Ashwini Chhabra, dated September 23, 2011 ("Chhabra Dec."), ¶¶ 2-18.   Taxicab service, however, is governed not by Title II of the ADA, as plaintiffs claim, but by Title III of the ADA, which explicitly exempts privately owned taxicabs from any requirement that they purchase or lease wheelchair accessible vehicles.   That exemption reflects Congress's intent not to require that private taxicab operators undertake the expense of purchasing or leasing wheelchair accessible vehicles.

As a public entity, TLC is concededly subject to Subtitle A of Title II of the ADA. As such, TLC cannot discriminate against qualified disabled individuals in the context of

administering its licensing authority over the private taxicab industry. We submit that Subtitle A applies to TLC only with respect to discrimination against disabled individuals seeking TLC licenses. But even if Subtitle A applies to TLC with respect to access to the taxicab system as a whole, it would mandate only that TLC take steps to ensure that disabled passengers have meaningful access to taxicab transportation. TLC is in the process of doing just that.

Because, even with an increase in the number of accessible medallions, it could be difficult for a wheelchair-bound passenger to hail a cruising accessible taxicab within a reasonable amount of time, TLC is in the process of launching a dispatch program whereby any wheelchair-bound passenger can receive an immediate dispatch of a wheelchair accessible taxicab without even having to go into the street to hail a taxicab. This system will give passengers in wheelchairs meaningful access to medallion taxicabs so as to satisfy Title II of the ADA even if interpreted broadly, while at the same time minimizing the economic and environmental costs that would be the byproduct of having a fully accessible fleet. Indeed, as set forth in the Chhabra Declaration, TLC estimates that it would cost the industry and/or the riding public almost a billion dollars to make the City's taxicab fleet fully accessible.

## ARGUMENT

### POINT I

**EVEN IF WE ASSUME THAT THE ADA MAKES TLC RESPONSIBLE FOR GIVING DISABLED PASSENGERS MEANINGFUL ACCESS TO THE CITY'S TAXICAB SYSTEM, TLC'S DISPATCH PROGRAM WILL ACCOMPLISH THAT GOAL IMMINENTLY.**

**A.    TLC's Regulatory Authority with Respect to Taxicab Medallions**

TLC is an administrative body that was established by Chapter 65 of the New York City Charter ("City Charter") to regulate the private taxicab industry and other for-hire

vehicle industries in New York City by way of licensing requirements and regulations addressed to the standards and conditions of service. City Charter §§ 2300, 2303. In this regard, local law requires that taxicab vehicles and their drivers obtain licenses from TLC and adhere to applicable regulations for licensees adopted by TLC. New York City Administrative Code ("Admin. Code") § 19-504.[1] Licensed taxicabs are known as "medallion taxicabs" because each vehicle has been issued a metal plate, known as a medallion, displaying the license number of the vehicle. Admin. Code § 19-502(h). The number of medallion taxicabs in New York City is limited pursuant to City Charter § 2303(b), which provides that additional medallions can be issued "only upon the enactment of a local law providing therefor." Pursuant to the New York State Constitution, the State Legislature can also enact legislation for the creation of additional medallions, either on its own or at the City's request.

The City Council authorized the issuance of additional medallions in 2003, some of which are required to be "fully accessible to persons with disabilities" and some of which are required to be "powered by compressed natural gas or … a hybrid electric vehicle." Admin. Code § 19-532(b). Under that law, 81 medallions are required to be accessible to persons with disabilities. Most recently, the City Council authorized the issuance of additional medallions in 2006, 150 of which are required to be "fully accessible to persons with disabilities." Admin. Code § 19-532(c). Pursuant to these provisions of law, 231 medallion taxicabs are required to be wheelchair accessible, and thus the holders of these medallions must obtain and utilize wheelchair accessible vehicles. As noted above, TLC has supported state legislation that has

---

[1] Taxicabs are passenger vehicles for hire that are permitted to accept hails from passengers in the street. Admin. Code § 19-502(l). TLC also has licensing authority over limousines and other for-hire vehicles that are dispatched by private arrangement and are not permitted to accept hails, and over certain types of van service. Admin. Code § 19-504.

passed both houses of the State Legislature and, if signed by Governor Cuomo, will increase the number of accessible medallions to at least 800.

TLC Rules authorize the use by medallion holders of taxicab models that are approved by TLC.  See 35 R.C.N.Y. §§ 67-3-03(b) (requirements for review of vehicle models); 67-04, 67-05, 67-05.1 (vehicle specifications); 67-05 (hybrid electric taxicab specifications); and 67-05.2 (wheelchair accessible taxicab specifications).  An alternative fuel medallion holder must utilize a taxi described in 35 R.C.N.Y. § 67-05. and an accessible medallion holder must utilize a taxicab authorized in accordance with 35 R.C.N.Y. § 67-05.2.  Currently, any sponsor or manufacturer may apply to TLC for approval of vehicle models.  See 35 R.C.N.Y. § 67-04.  A list of the current approved taxicab models is located on TLC's website.  See Chhabra Dec., ¶¶ 49-51, 55, Exhibit G (http://www.nyc.gov/html/tlc/html/safety_emissions/taxicab_vehicles_in_use.shtml (last accessed September 22, 2011).  As set forth in TLC's rules, the holder of an unrestricted medallion may operate any taxicab specified in 35 R.C.N.Y. § 67-05.1, including a wheelchair accessible taxicab.  See 35 R.C.N.Y. §§ 67-05.1, 67-05.2.  There are currently 233 accessible taxicabs in operation, consisting of the 231 accessible medallions and two unrestricted medallions opting to use an accessible vehicle.  Chhabra Dec., ¶ 20.

Currently, the Toyota Sienna is the only vehicle approved by TLC for use as an accessible taxicab.  See Chhabra Dec., ¶¶ 50-51, Exhibit G).[2]  However, TLC has commenced procedures for the adoption of rule amendments that will modify the specifications for vehicles that can be used as accessible taxicabs so as to authorize the use of the MV-1, a vehicle that has been designed and is being built specifically for use as an accessible taxicab vehicle.  Chhabra

---

[2] Throughout their papers, plaintiffs claim that it is unclear whether the Sienna remains on the list of vehicles approved for use as accessible taxicabs.  See, e.g., Pl. Mem. at 8.  To clarify, while plaintiffs correctly note that the Sienna is no longer on the list of vehicles approved for use as a non-accessible taxicab, the accessible version of the Toyota Sienna is the only vehicle currently approved for use as an accessible taxicab.  See Chhabra Dec., ¶ 51, Exhibit G.

Dec., ¶ 54.  This vehicle seats the wheelchair passenger facing forward, has extra-wide doors and a built-in ramp that extends to the sidewalk and can seat up to three additional passengers (i.e. five passengers in total, including the driver).  Id.[3]

So that disabled passengers can utilize the accessible taxicabs without having to find one in the street, TLC is in the process of launching its Medallion Taxicab Wheelchair Accessible Dispatch Program.  After a lengthy process that began in 2008 with a two-year pilot program, TLC has chosen a dispatcher to operate a centralized dispatch service that will direct accessible taxicabs to passengers in Manhattan who need them at no additional charge. Passengers calling 311 will be connected with the dispatcher, who will be able to determine the closest wheelchair accessible taxicab utilizing GPS-based technology.  This will obviate the need for passengers using wheelchairs to find a cruising accessible taxicab on the City streets.  The accessible dispatch system is expected to be fully operational by March 2012.  See Chhabra Dec., ¶¶ 30-42.[4]  Drivers will be compensated at the metered rate for the "deadhead" portion of the trip (the portion before they pick up the passenger) from monies submitted to a fund by all taxicab owners for that purpose.  Id. at ¶ 36.  In addition, drivers who fail to respond to a dispatch will be subject to strict penalties for service refusal, including high fines and license revocation for three refusals in three years.  See 35 RCNY §§ 5-02(e), 5-20; Chhabra Dec., ¶ 39.

---

[3] In December 2009, TLC issued a Request for Proposals inviting auto manufacturers and designers to submit their best ideas for a purpose-built vehicle to serve as the prototype for New York City taxicabs under a program known as the Taxi of Tomorrow.  Chhabra Dec., ¶¶ 56-57.  After evaluating the proposals, TLC chose the Nissan NV-200, a prototype that was not wheelchair accessible in the form that comes directly from the manufacturer (but can be retrofitted by a third-party at an additional cost for use as an accessible taxicab).  Id., ¶¶ 63-64.  TLC did not choose a wheelchair accessible prototype because it determined that the one finalist with a purpose-built wheelchair accessible prototype presented the highest risk of non-performance.  Id., ¶¶ 61-62.  Although the NV-200 was chosen as the Taxi of Tomorrow, the holders of accessible medallions, and any holder of an unrestricted medallion choosing to operate an accessible taxicab, will nonetheless be authorized to chose from a number of accessible taxicab models including the Toyota Sienna (the current accessible vehicle), an accessible version of the NV-200, the MV-1 (the new accessible vehicle about to be approved for use by TLC), and any other accessible vehicles approved by TLC in the future.  Id., ¶ 66.

[4] In addition, TLC issued an RFP and selected a vendor to provide for an accessible dispatch program for for-hire vehicles to pick up passengers using wheelchairs in the outer boroughs as well.  See Chhabra Dec., ¶¶ 43-48.

**B.      Title II(A) of the ADA Is Not Applicable Here.**

Subtitle A of Title II of the ADA[5] provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity."   42 U.S.C. § 12132.   United States Department of Justice regulations explicating this requirement require that a public entity, "in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability" deny qualified individuals with disabilities the opportunity to participate in or obtain government benefits or services.  28 C.F.R. 35.130(b)(1).  Nor can public entities "directly or through contractual, licensing, or other arrangements, utilize methods of administration" that subject qualified individuals with disabilities to discrimination on the basis of disability.  28 C.F.R. 35.130(b)(3)(i).

We submit that insofar as TLC is an agency that regulates the private taxicab industry through licensing, these provisions simply require that TLC administer its licensing and regulatory authority in a manner that does not discriminate against licensees who qualify for ADA protection.  Contrary to plaintiffs' assertions, TLC is not a transportation provider but a transportation regulator.   Thus, the programs administered by TLC are licensing programs whereby taxicab owners and operators are granted licenses and required to adhere to certain regulatory standards.  Indeed, the regulations adopted by the United States Department of Justice to implement Subtitle A make clear that the application of such proscription to licensing agencies is limited to the administration of the regulatory programs themselves:

---

[5] Enacted in 1990, the ADA prohibits discrimination against qualified individuals with disabilities in regard to their employment by covered employers (Title I), the provision of services by public entities (Title II), and the provision of public accommodations by private entities (Title III).

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

28 C.F.R. § 35.130(b)(6) (emphasis added).  See also Reeves v. Queens City Transportation, Inc., 10 F. Supp. 2d 1181 (D. Colo. 1998)(regulatory agency's issuance of certification to allegedly discriminatory private company providing public transportation does not implicate Title II of the ADA); Tyler v. City of Manhattan, 849 F. Supp. 1429 (D. Kan. 1994) (City's issuance of licenses and permits for facilities that were not accessible to persons with disabilities does not violate Title II).

That Title II is applicable only to TLC's exercise of its licensing and regulatory authority is made clear in Reeves, which quotes from DOJ's Title II Technical Assistance Manual, as follows:

> A public entity may not discriminate on the basis of disability in its licensing, certification, and regulatory activities.  … A public entity does not have to lower or eliminate licensing standards that are essential to the licensed activity to accommodate an individual with a disability.  … Where a public entity administers licensing examinations, it must provide auxiliary aids for applicants with disabilities and administer the examinations in accessible locations.  In addition, a public entity may not establish requirements for programs or activities of licensees that would result in discrimination against qualified individuals with disabilities. …

10 F. Supp. 2d at 1186.[6]  Thus, we submit that while TLC is mandated by Subtitle A of Title II

both to administer its licensing programs in a manner that does not discriminate against licensees

on the basis of disability, and to adopt non-discriminatory licensing programs, the activities of

the licensed entities themselves are not governed by Title II but by Title III, as discussed *infra*.

C.     **Even if Title II(A) Is Applicable, TLC's Dispatch Program Will Provide Meaningful Access And Thus Satisfy Title II(A) of the ADA**

Nonetheless, even if we assume that TLC is obligated by Subtitle A of Title II of

the ADA to ensure that the system of privately owned taxicabs it regulates does not discriminate

against disabled passengers, TLC's obligation is only to ensure that disabled passengers have

meaningful access to taxicab transportation.

In Henrietta D v. Bloomberg, 331 F.3d 261, 275 (2d Cir. 2003), the United States

Court of Appeals for the Second Circuit held that the relevant measure is "whether the plaintiffs

with disabilities could achieve meaningful access." See also, e.g., Lonberg v. City of Riverdale,

571 F.3d 846, 851 (9th Cir. 2009) (recognizing that Title II's "prohibition against discrimination

is universally understood as a requirement to provide 'meaningful access'" and citing cases);

Iverson v. City of Boston, 452 F.3d 94, 99 (1st Cir. 2006) ("The clear purport of Title II is to

guarantee that qualified disabled persons enjoy meaningful access to public services, programs,

and activities.").

---

[6] In this regard, as noted in Reeves, supra, DOJ's Title II Technical Assistance Manual sets forth the following illustration:

> ILLUSTRATION:    A State prohibits the licensing of transportation companies that employ individuals with missing limbs as drivers.  XYZ company refuses to hire an individual with a missing limb who is "qualified" to perform the essential functions of the job, because he is able to drive safely with hand controls.  The State's licensing requirements violate Title II.

To the extent that plaintiffs argue that disabled passengers are entitled to have access to taxicabs that is equal to that provided to non-disabled passengers under Title II(A) (Pl. Mem. at 22), plaintiffs are mistaken.  The applicable standard is "meaningful access," not "equal access."  See The Civic Association of the Deaf of New York City, Inc. v. City of New York, 95 Civ. 8591, 2011 U.S. Dist. LEXIS 90645 (S.D.N.Y. Aug. 15, 2011) (Sweet, J.), citing Henrietta D. and the other cases cited above.  In that regard, Judge Sweet stated as follows:

> Case law stresses that the ADA and RA [Rehabilitation Act] do not require equal results [from the provision of a public service or benefit]. The ADA and RA prohibit discrimination against the disabled in the provision of public services, but the statutes neither guarantee "any particular level of services for disabled persons, nor assure maintenance of services previously provided."

2011 U.S. Dist. LEXIS 90645, at ** 30-31 (internal brackets omitted), quoting Lincoln CERCPAC v. Health and Hosps. Corp., 147 F.3d 165, 168 (2d Cir. 1998).

Even if we assume that taxicab service is a public (not a private) service or program, TLC's dispatch system will provide meaningful access to disabled passengers seeking to utilize taxicabs.  Passengers in wheelchairs seeking a taxicab in Manhattan will be able to telephone for an accessible taxicab which will be immediately dispatched to their location.  This will enable wheelchair-bound passengers to utilize the accessible taxicabs without needing to find one on the city streets.  Dispatched accessible taxicabs will be available anywhere in Manhattan during peak hours and off hours with reasonable wait times.  There will be no need for passengers in wheelchairs to go into the street, to compete with able-bodied individuals for taxicabs, or to wait outside during inclement weather (which is not only unpleasant but concededly a risk to motorized equipment, see Pl. Mem. at 10 [citing Dooha Dec.]).  See Chhabra Dec., ¶ 48.

That non-disabled passengers must hail a taxicab while disabled passengers must telephone for a taxicab is of no moment, as equal access is not required. Dispatch service provides different but meaningful access that is in some ways preferable to a street hail system. Title II of the ADA simply does not require the City to mandate that the entire medallion taxicab fleet be accessible when a dispatch system will not only provide meaningful access but save the medallion taxicab industry (and thus the taxicab riding public) almost a billion dollars. See Chhabra Dec., ¶¶ 68-79; Exhibit I.[7]

**D.   If Reached, Resolution of the Meaningful Access Question Should Be Held in Abeyance Until TLC's Accessible Dispatch Program is Up and Running.**

Plaintiffs ask the Court to grant their motion "solely as to the TLC's liability" and to "later address remedies." Pl. Mem. at 23. Plaintiffs note that the Court has broad powers and could, for example, "order the parties to propose a plan jointly, under the supervision of a magistrate judge." Id. We urge the Court to reject this approach.

Even assuming that the Court reaches the "meaningful access" question, it is expected that the dispatch system soon to be implemented by TLC will provide meaningful access. As early as March 2012, disabled passengers will have telephone access to wheelchair accessible taxicabs. TLC's program is not simply an idea on the drawing board. It is a program that has been in the works since 2008 and is imminent after the conduct of TLC's two-year accessible dispatch pilot program, the issuance of a detailed report on the pilot program as well as a Request for Information in December 2010, the issuance of a Request for Proposals in April

---

[7] In assessing the economic impact of converting to a fully accessible fleet, TLC reviewed the additional cost to the vehicle owner to purchase an accessible version of the Toyota Sienna or the Nissan NV200, which is $11,000 or $14,000 respectively, the increased cost for the additional fuel used by the heavier accessible vehicles, a conservative estimate of additional maintenance costs for the accessible vehicles which are widely believed to break down more often and have more parts to be serviced, and the lost income for the additional days that each accessible vehicle is estimated to be not in service as a taxi, and multiplied those costs by the number of current medallions not currently required to be used with accessible vehicles (13,006). For the additional annual maintenance costs and the annual lost income, TLC multiplied those costs over a five-year period, which is the average life span of an accessible taxicab on the New York City streets. See Chhabra Dec., ¶¶ 67-79.

2011, and the choice of a dispatch provider in early September 2011.  See Chhabra Dec., ¶¶ 30-42.  Indeed, this dispatch program could be in place by the time the Court rules on the instant motion.  Plaintiffs are asking this court to make a hasty decision when in several months, the dispatch program can be assessed using the meaningful access standard.  Moreover, it is anticipated that the number of accessible medallions will increase in the coming months to at least 800 as a result of state legislation.

Accordingly, we ask the Court to hold plaintiffs' motion in abeyance, or to deny it without prejudice to a new filing in mid-2012, when the dispatch program will be in place and the number of accessible medallions authorized by state legislation will be clear.  There is no need for this Court to expend judicial resources to fashion a remedy when the TLC is taking concrete and viable steps to ensure that disabled passengers have meaningful access to wheelchair accessible taxicabs.  Plaintiffs' attempt to rush this Court to judgment based on obsolete facts should not be countenanced.

## E.   Title II(B) is Not Applicable As TLC Is Not a Transportation Provider; Private Taxicab Operation is Governed by Title III.

In addition to the general prohibition against discrimination in public programs set forth in Subtitle A, Title II of the ADA sets forth specific provisions applicable to public transportation operated by public entities in Subtitle B.   See 42 U.S.C. § 12141, et seq.[8] Although the crux of plaintiffs' ADA claim is premised on TLC's alleged violation of Subtitle A of Title II of the ADA, plaintiffs also allege a violation of Subtitle B of Title II.  See Pl. Mem. at 20-21.  Plaintiffs' Subtitle B claim fails on its face.

---

[8] Subtitle A of Title II is administered by the United States Department of Justice ("DOJ"); Subtitle B of Title II is administered by the United States Department of Transportation ("DOT").  42 U.S.C. §§ 12134, 12149.  DOJ's regulations implementing Subtitle A appear at 28 C.F.R. § 35.101 et seq.; DOT's regulations implementing Subtitle B appear at 49 C.F.R. § 37.1 et seq.

Subtitle B of Title II sets forth certain explicit parameters for public entities operating demand responsive systems[9] by providing that the failure to purchase or lease wheelchair accessible vehicles is considered discriminatory under certain circumstances, as follows:

> **Public entity operating a demand responsive system.** If a <u>public entity operates a demand responsive system</u>, it shall be <u>considered discrimination</u> for purposes of [the ADA, 42 U.S.C. § 12132] and [the Rehabilitation Act, 29 U.S.C. § 794] for such entity <u>to purchase or lease a new vehicle for use on such system,</u> for which a solicitation is not made after [August 25, 1990], that is <u>not readily accessible to</u> and usable by individuals with disabilities, including individuals who use <u>wheelchairs</u>, unless such system, when viewed in its entirety, provides a level of service to such individuals equivalent to the level of service such system provides to individuals with disabilities.

42 U.S.C. § 12144 (emphases added).

But the provision of taxicab service in New York City is governed not by Title II Subtitle B of the ADA, which is applicable to the provision of public transportation by <u>public</u> entities, but by Title III of the ADA, which is applicable to the provision of public transportation by <u>private</u> entities. As set forth in Title III:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of <u>specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people</u> and whose operations affect commerce.

---

[9] The transportation provisions set forth in Subtitle B of Title II differentiate between "fixed route systems" and "demand responsive systems." A "fixed route system" is "a system of providing designated public transportation on which a vehicle is operated along a prescribed route according to a fixed schedule." 42 U.S.C. § 12141(3). A "demand responsive system" is "any system of providing designated public transportation which is not a fixed route system." 42 U.S.C. § 12141(1). Taxi service is a form of "demand responsive service." 49 C.F.R. § 37.29.

42 U.S.C. § 12184(a) (emphasis added).[10]   Moreover, Title III's requirements for the purchase or

lease of wheelchair accessible vehicles do not extend to automobiles.  42 U.S.C. § 12184(b)(3).

Indeed, the regulations adopted by the United States Department of Transportation to implement

the provisions of Title II, Subtitle B and Title III relating to transportation [see 42 U.S.C.

§§ 12149, 12186] make clear both that "private entities providing taxicab service" are governed

by Title III and that such private entities are "not required to purchase or lease [wheelchair]

accessible automobiles," as follows:

> **Private entities providing taxi service.**
>
> (a) Providers of taxi service are subject to the requirements of this part for private entities primarily engaged in the business of transporting people which provide demand responsive service [governed by Title III of the ADA].
>
> (b) Providers of taxi service are not required to purchase or lease accessible automobiles.  When a provider of taxi service purchases or leases a vehicle other than an automobile, the vehicle is required to be accessible unless the provider demonstrates equivalency as provided in § 37.105 of this part.  A provider of taxi service is not required to purchase vehicles other than automobiles in order to have a number of accessible vehicles in its fleet.

49 C.F.R. § 37.29 (emphases added).[11]   See also Toomer v. Disabled Rights Action Committee,

443 F.3d 1191, 1195 (10th Cir. 2006) ("The ADA does not mandate that all private

---

[10] The C.F.R. defines "specified public transportation" as "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis."  28 C.F.R. § 36.104.

[11] 49 C.F.R. § 37.29(c) prohibits discrimination by private entities providing taxicab service against individuals with disabilities by such actions as refusing service or assistance or charging higher fares.  TLC similarly has regulations that explicitly prohibit licensed taxicab drivers from discriminating against individuals with disabilities.  See, e.g., 35 R.C.N.Y. § 54-20 (prohibiting taxicab driver from refusing service to disabled passenger or from refusing to transport wheelchair or other mobility aid) and § 54-17 (prohibiting taxicab driver from imposing additional charges for transporting person with disability, including any attendant or service animal accompanying disabled passenger).

transportation entities provide accessible vehicles—a taxi fleet consisting entirely of non-accessible vehicles would be in accord with the ADA," citing 42 U.S.C. § 12184(b)(3)).[12]

      Thus it is apparent that Congress has chosen not to require that private taxicab operators be required to undertake the expense of purchasing or leasing wheelchair accessible vehicles.  Similarly, TLC has not required that private taxicab owners undertake the expense of purchasing or leasing a wheelchair accessible taxicab unless he or she has chosen to undertake the additional expense, either by purchasing an accessible medallion at auction or by choosing to operate an accessible vehicle under an unrestricted medallion.

      Plaintiffs' reading of 42 U.S.C. § 12144 in Title II, Subtitle B of the ADA as requiring a fully accessible taxicab fleet cannot be reconciled with the exemption for private taxicab operators set forth in Title III.  While we agree that the ADA holds public entities operating transportation systems to a higher standard than private entities operating such systems, Pl. Mem. at 16, this does not mean that private entities must be held to the higher standard simply because they are subject to a comprehensive regulatory scheme adopted by a public entity.[13]  Were that the case, then the Title III exemption for taxicabs would be meaningless, as the taxicab industry is heavily regulated throughout the country.  See, e.g., Minneapolis Taxi Owners Coalition v. City of Minneapolis, 572 F.3d 502, 509 (8th Cir. 2009) (discussing the "highly regulated taxicab market" in Minneapolis); In re Las Vegas Monorail

---

[12] While Title III's wheelchair accessibility requirements do not extend to automobiles, Title III provides that new vans purchased or leased by private taxicab operators must be wheelchair accessible (unless equivalent service is provided). 42 U.S.C. § 12184(b)(3),(5); 49 C.F.R. § 37.29(b).  Thus, private taxicab owners who purchase or lease new vans are required by federal law to purchase or lease wheelchair accessible vans (unless equivalent service is provided), independent of any requirements imposed by TLC.

[13] Courts in this Circuit have repeatedly recognized that the "New York City taxicab industry is a private industry, closely regulated by [TLC]. Friedman v. GMC, 721 F. Supp.2d 218, 220 (S.D.N.Y. 2010).  The "taxi industry is pervasively regulated by the [TLC]." Statharos v. Taxi and Limousine Comm'n, 198 F.3d 317, 324 (2d Cir. 1999).  Indeed, all for-hire transportation in New York State is regulated either by the State itself or by municipalities within the State. See N.Y.S. Transportation Law §§ 150, 151(11) (governing vehicles operated as "a taxi or livery service" subject to "the jurisdiction or regulatory control of a city, town or village").

<u>Co.</u>, 429 B.R. 770, 785-86, 2010 Bankr. LEXIS 2285, * 38-39 (D. Bankr. Nev. Apr. 26, 2010) ("[P]ublic control, regulation, or oversight simply does not, by itself, make an entity a public agency.  Otherwise, heavily regulated industries, such as casinos and taxi cabs, would be municipalities."); <u>Mazanderan v. Independent Taxi Owners Ass'n</u>, 700 F. Supp. 588, 590 (D.D.C. 1988) (discussing taxicabs in Washington D.C. as highly regulated).  Thus, 42 U.S.C. § 12144 must be read literally to apply only to those public entities that themselves operate demand responsive transportation systems and purchase and lease vehicles in connection with such operation (and not to those public entities that are merely regulating private taxicab operators).

To summarize, Subtitle B of Title II of the ADA is not applicable to TLC.  While Subtitle A of Title II is applicable to all public entities including TLC, its requirements extend only to TLC's licensing and regulatory programs.  But even if Subtitle A of Title II obligates TLC to ensure that the private taxicab system it regulates does not discriminate against qualified persons with disabilities, TLC is about to implement a dispatch program that will provide wheelchair-bound passengers with meaningful access to the taxicab system, and thus meet ADA standards.  If the meaningful-access question is reached, the parties' cross-motions should be held in abeyance until the dispatch program is underway.

## POINT II

### TO THE EXTENT THAT PLAINTIFFS STATE A CLAIM UNDER THE REHABILITATION ACT, THE MEANINGFUL ACCESS STANDARD GOVERNS AS WELL.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance." Where public programs or activities are federally funded, the standards and requirements imposed by the Rehabilitation Act are essentially the same as those imposed on public entities by Title II of the ADA.  See Henrietta D. v. Bloomberg, 331 F.3d at 272; Civic Ass'n of the Deaf, 2011 U.S. Dist. LEXIS 90645 at *31.

Indeed, the United States Supreme Court has discussed the nature and genesis of the "meaningful access" standard in the context of the Rehabilitation Act.  In Alexander v. Choate, 469 U.S. 287, 301 (1985), the Supreme Court held that the extent to which disabled individuals are entitled to "meaningful access" is contingent on "two powerful but countervailing considerations – the need to give effect to the statutory objectives and the desire to keep § 504 [of the Rehabilitation Act] within manageable bounds."  In the latter respect, "accommodations to permit access to handicapped persons should not impose undue financial and administration burdens."  Brief v. Albert Einstein College of Medicine, 2011 U.S. App. LEXIS 11120 (2d Cir. 2011), citing Rothschild v. Grottenthaler, 907 F.2d 286, 292 (2d Cir. 1990) (internal quotation marks omitted).

The only federal funding received by TLC in recent years was a grant from the Federal Emergency Management Agency ("FEMA") to reimburse it for the cost of snow removal from the exterior of their inspection facilities after the Christmas blizzard of December 2010.  Chhabra Dec., ¶ 82.  In addition, TLC has requested FEMA reimbursement in connection with damages recently sustained at its facilities from Hurricane Irene.  Id., ¶ 83.  Even assuming that this FEMA grant is sufficient to trigger review of TLC's regulatory programs under the Rehabilitation Act, plaintiffs' Rehabilitation Act claims fail for the reasons set forth above.

To the extent that federal law requires TLC to provide qualified individuals with disabilities with meaningful access to taxicab services, it is in the process of doing just that.

- 17 -

Contrary to plaintiffs' assertions, neither the ADA nor the Rehabilitation Act requires TLC to mandate that all private taxicab owners to purchase or lease wheelchair accessible taxicabs when TLC's dispatch program will provide meaningful access while ensuring minimal economic and environmental costs to the City of New York and its citizens.

## POINT III

**THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' HUMAN RIGHTS LAW CLAIM AND SUCH CLAIM FAILS AS A MATTER OF LAW.**

In addition to their claims under federal law, plaintiffs bring a claim under the New York City Human Rights Law, which provides as follows:

> It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation, because of the actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof ....

Admin. Code § 8-107(4)(a) (emphases added).   The term "place or provider of public accommodation" is defined to "include providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold, or otherwise made available." Admin. Code § 8-102(9) (emphasis added).

If defendants are granted summary judgment on plaintiffs' federal claims, the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claim. See,

- 18 -

e.g., WWBITV, Inc. v. Village of Rouses Point, 589 F.3d 46, 52 (2d Cir. 2009) ("Given the eventual dismissal of all of plaintiffs' federal claims, we find that the district court acted well within its discretion in declining to assert supplemental jurisdiction over plaintiffs' state law claim."); Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

      In any event, plaintiffs' state law claim fails for the same reasons as their federal claims fail.  First, TLC is not a governmental provider of taxicab services but a governmental body that licenses and regulates private providers of taxicab services.  Thus, plaintiffs' claim that TLC is required by the Human Rights Law to ensure access to medallion taxicabs is entirely without basis.  Rather, the Human Rights Law simply prohibits private providers of taxicab service from discriminating against disabled passengers, and that requirement is consistent with both federal law and TLC Regulations.  See 49 C.F.R. § 37.29(c) (DOT regulation prohibiting discrimination by private entities providing taxicab service against individuals with disabilities by such actions as refusing service or assistance or charging higher fares); 35 R.C.N.Y. §§ 5-02(e), 5-20 (TLC Rules prohibiting taxicab drivers from refusing service to disabled passengers, refusing to transport wheelchairs or other mobility aids, or imposing additional charges for transporting any person with a disability).

      Second, and in any event, while the definition of disability under the Human Rights Law is less restrictive than under the ADA, the elements of a discrimination claim under the Human Rights Law are identical to one pursuant to the ADA.  See Ehrlich v. Gatta, 2009 U.S. Dist. LEXIS 92389 (S.D.N.Y. Oct. 2, 2009), citing Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d. 108, 212 n. 3 (2d Cir. 1998); Shannon v. Verizon New York, Inc., 519 F. Supp. 2d 304, 310-11 (N.D.N.Y. 2007).  Thus, plaintiffs' claim under the New York City Human Rights Law fails for the same reason as their ADA claim fails.

## <u>CONCLUSION</u>

In light of the foregoing, plaintiffs' motion for partial summary judgment should be denied and defendants' cross-motion for summary judgment should be granted. In the alternative, both motions should be held in abeyance or denied without prejudice for the reasons discussed above.

Dated:       New York, New York
              September 23, 2011

                                Respectfully submitted,

                                MICHAEL A. CARDOZO
                                Corporation Counsel of the City of New York
                                Attorney for Defendants
                                100 Church Street
                                New York, New York  10007
                                (212) 788-0818

                                By: _____
                                       ROBIN BINDER (RB5027)

GABRIEL TAUSSIG,
MICHELLE GOLDBERG-CAHN,

            of counsel.