UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHRISTOPHER NOEL, SIMI LINTON, UNITED :
SPINAL, a nonprofit organization, THE TAXIS :
FOR ALL CAMPAIGN, a nonprofit organization, :
504 DEMOCRATIC CLUB, a nonprofit :
organization, DISABLED IN ACTION, a :
nonprofit organization, :
                                :
                  Plaintiffs, :       11 Civ. 0237 (GBD)
                                :
        - against - :
                                :
NEW YORK CITY TAXI AND LIMOUSINE :
COMMISSION, a charter mandated agency, and :
DAVID YASSKY, in his official capacity as :
chairman and commissioner of the New York City :
Taxi and Limousine Commission, :
                                :
                  Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STATEMENT OF INTEREST
## OF THE UNITED STATES OF AMERICA


                                     PREET BHARARA
                                     United States Attorney for the
                                     Southern District of New York
                                     86 Chambers Street, Third Floor
                                     New York, New York 10007
                                     Tel.: (212) 637-2741
                                     Fax:  (212) 637-2750
                                     Email: natalie.kuehler@usdoj.gov


NATALIE N. KUEHLER
Assistant United States Attorney
       - Of Counsel -

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................4

ARGUMENT ...........................................................................................................9

    THE TLC'S OPERATION OF NEW YORK CITY'S TAXICABS VIOLATES

    TITLE II OF THE ADA ......................................................................................9

        A.    Standard for Granting Summary Judgment .................................9

        B.    The ADA and Its Implementing Regulations ...........................10

            1.    Title II of the ADA .......................................................10

            2.    DOT's Implementing Regulations ...................................11

        C.    New York City's Taxicabs Are a Demand Responsive
            Public Transportation System ...................................................12

        D.    New York City's Taxicab System Is "Operated" by the TLC.................15

        E.    The TLC Violates Title II Because It Does Not Ensure That
            All New Taxicab Vehicles Are Wheelchair Accessible and It
            Does Not Provide an Equivalent Level of Service to Individuals
            With Disabilities.......................................................................22

CONCLUSION........................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................9

*Armstrong v. Schwarzenegger*,
   622 F.3d 1058 (9th Cir. 2010) ................................................................................21

*Celeste v. East Meadow Union Free School Dist.*,
   373 Fed. Appx. 85 (2d Cir. 2010)............................................................................18

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984)................................................................................................12

*Disabled Rights Action Committee v. Las Vegas Events, Inc.*,
   375 F.3d 861 (9th Cir. 2004) ..................................................................................20

*Fiedler v. Am. Multi-Cinema, Inc.*,
   871 F. Supp. 35 (D.D.C. 1994)................................................................................20

*Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2d Cir. 2003)...............................................................................4, 10

*Indep. Housing Servs. of San Francisco v. Fillmore Center Assocs.*,
   840 F. Supp. 1328 (N.D. Cal. 1993) .......................................................................22

*Innovative Health Systems, Inc. v. City of White Plains*,
   931 F. Supp. 222 (S.D.N.Y. 1996)...........................................................................10

*James v. Peter Pan Transit Mgmt., Inc*
   No. 5:97-CV-747-BO-1, 1999 WL 735173 (E.D.N.C. Jan. 20, 1999)......................20

*Kerr v. Heather Gardens Ass'n*,
   Civ. A. No. 09-cv-00409, 2010 WL 3791484 (D. Colo. Sept. 22, 2010)...................22

*Medina v. Valdez*,
   No. 1:08-CV-00456, 2011 WL 887553 (D. Idaho Mar. 10, 2011)............................20

*Metropolitan Taxicab Board of Trade v. City of New York*,
   08-Civ-7837 (PAC) (Docket No. 28)............................................................2, 14, 15

*Mormol v. Costco Wholesale Corp.*,
   364 F.3d 54 (2d Cir. 2004).......................................................................................9

*Paxton v. State Dept. of Tax and Revenue*
    451 S.E.2d 779 (W. Va. 1994)................................................................20, 21

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661 (2001)................................................................................10

*Reeves v. Queen City Transp.,*
    10 F. Supp. 2d 1181 (D. Colo. 1998)...........................................................21

*Sprint Spectrum L.P. v. Mills,*
    283 F.3d 404 (2d Cir. 2002)....................................................................14

*Tcherepnin v. Knight,*
    389 U.S. 332 (1967)................................................................................10

*Tyler v. City of Manhattan,*
    849 F. Supp. 1429 (D. Kan. 1994).............................................................21

## STATUTES

28 C.F.R. § 35.104 ..........................................................................................1

49 C.F.R. § 37 .....................................................................................2, 13, 14

49 C.F.R. § 37.23(a)...............................................................................12, 19, 22

49 C.F.R. § 37.3 .......................................................................................*passim*

49 C.F.R. § 37.37(a)......................................................................................15

49 C.F.R. § 37.77(a).................................................................................11, 23

28 U.S.C. § 517...............................................................................................1

42 U.S.C. § 12101 …………………………………………………………………...1

42 U.S.C. §§ 12134........................................................................................2

42 U.S.C. § 12141....................................................................................12, 14

42 U.S.C. § 12144 ...................................................................................*passim*

42 U.S.C. § 12149(a) ....................................................................................11

Fed. R. Civ. P. 56(c) ......................................................................................9

5 N.Y.C. Admin. Code § 19-501 ........................................................................... *passim*

5 N.Y.C. Admin. Code § 19-502 ...........................................................2, 5, 13

65 N.Y.C. Charter § 2300 ..............................................................2, 14, 15, 16

35 R.C.N.Y. Ch. 58 ..........................................................................16, 17, 18, 21

N.Y.C. Charter § 2300 ....................................................................2, 5, 6, 21

## OTHER

101st Cong., 1st Sess., 197 (1989) ...................................................................10

H.R. Rep. No. 101-485 ......................................................................................10

30 S. Rep. No. 101-116 (1989) .........................................................................10

The United States, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest, pursuant to 28 U.S.C. § 517,[1] in support of Plaintiffs' Motion for Partial Summary Judgment regarding the applicability of the Americans with Disabilities Act of 1990, as amended, ("ADA"), 42 U.S.C. § 12101, *et seq*., to Defendants' operation and regulation of New York City taxicabs.  Like Plaintiffs' motion for partial summary judgment, this Statement of Interest addresses only Defendants' liability under the ADA, and does not require the Court to consider an appropriate remedy at this time.

## PRELIMINARY STATEMENT

This litigation implicates, among other things, the proper interpretation and application of Title II of the ADA to the largest taxicab fleet in the country.  Specifically, the complaint alleges that the New York City Taxi and Limousine Commission ("TLC") and David Yassky, TLC's Chairman and Commissioner (collectively, "Defendants"), are discriminating against persons with disabilities in violation of Title II of the ADA by failing to ensure that New York City's iconic taxicab fleet is accessible to individuals with mobility disabilities who use wheelchairs.[2] In their pending Motion for Partial Summary Judgment, Plaintiffs seek an order establishing Defendants' liability for violating Title II of the ADA and its implementing regulations.

The Attorney General has authority to enforce Title II of the ADA, and pursuant to Congressional mandate, the Department of Justice has the authority to issue regulations implementing Subtitle A of Title II, while the Department of Transportation ("DOT") has the

---

[1]      28 U.S.C. § 517 states that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

[2]      A "wheelchair" for purposes of this submission is defined as any mobility aid with three or four wheels, whether operated manually or through the use of power.  *See also* 28 C.F.R. § 35.104.

authority to issue regulations implementing Subtitle B of Title II.  42 U.S.C §§ 12134, 12145.
The United States, therefore, has a strong interest in this matter.

New York City's taxicabs[3] are "affected with a public interest" and "a vital and integral
part of the transportation system of the city."  5 N.Y.C. Admin. Code § 19-501; *see also* 65
N.Y.C. Charter § 2300 (the TLC is charged with "establish[ing] an overall public transportation
policy governing taxi … services as it relates to the overall public transportation network of the
city"); Declaration of Andrew Salkin, First Deputy Commissioner of TLC, submitted on October
6, 2008 (the "Salkin Declaration"), at 5 ("Section 2300 of [the City's] Charter charges the TLC
with the mission of transforming the yellow taxicabs into an essential part of the City's public
transportation system.").[4]  New Yorkers use taxicabs as an essential addition to the City's
subway and bus systems because, among other reasons, taxicabs provide door-to-door
transportation, allow for the transportation of luggage and other heavy items, and have
significant safety and security advantages over buses and subways.  *See* Salkin Dec. ¶¶ 9, 10.

This important facet of the City's public transportation system is administered by the
TLC, a public entity as defined by the ADA, whose wide-ranging purpose is "the continuance,
further development and improvement of taxi and limousine service in the city of New York."
N.Y.C. Charter § 2300.  As such, the TLC is subject to Subtitle B of Title II of the ADA, as well
the implementing regulations issued by the United States Department of Transportation (the
"DOT Regulations").  *See* 42 U.S.C. § 12144, *et seq.*; 49 C.F.R. § 37 *et seq.*  Subtitle B of Title

---

[3]     Taxicabs are defined as "motor vehicle[s] carrying passengers for hire in the city, designed to
carry a maximum of five passengers, duly licensed as a taxi cab by the [TLC] and permitted to accept hails from
passengers in the street."  5 N.Y.C. Admin. Code § 19-502.  Taxicabs are not permitted to accept passengers by
prearranging service through a radio or dispatch system.  *See id.*

[4]     The Salkin Declaration was submitted by the City of New York in the lawsuit *Metropolitan
Taxicab Board of Trade v. City of New York*, 08 Civ. 7837 (PAC) (Docket No. 26), and is attached as Exhibit A to
the Declaration of Natalie N. Kuehler in Support of the United States' Statement of Interest (the "Kuehler
Declaration"), dated October 12, 2011.

II provides that any public entity that operates a demand responsive public transportation system, like the New York City taxicab fleet, discriminates against individuals with disabilities within the meaning of Section 12132 of Subtitle A if, in the absence of equivalent alternative service, new vehicles purchased for use on the system are not "readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12144.[5]

Despite the ADA's mandate, Defendants are not providing any alternative service for individuals who use wheelchairs and are currently administering New York City's taxicab fleet in a manner that has resulted in only 232 accessible vehicles in a fleet of 13,237 taxicabs. A determination by this Court that the TLC is obligated to comply with Subtitle B of Title II of the ADA will have a significant impact on the lives of disabled New York City residents and visitors, who, unlike persons without disabilities, already face increased difficulties when using New York's other modes of public transportation. Such a determination is also particularly timely now, as the City is in the final stages of its "Taxi of Tomorrow" initiative through which the City is selecting a single new vehicle that will be exclusively authorized for use as a New York taxicab as early as 2013.

Although Defendants acknowledge in their papers the need to address the lack of accessibility of New York City's taxicabs, Defendants take the untenable position that the Court should hold Plaintiffs' Motion in abeyance until "mid-2012," when Defendants expect to have implemented an accessible taxicab dispatch system and the state legislature to have passed a bill to increase the number of accessible medallions. *See* Defendants' Memorandum of Law in Support of their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion

---

[5]    The Government does not argue in this Statement of Interest that the Defendants are also liable under Title II's Subtitle A. The parties have already extensively briefed Defendants' liability under Subtitle A, and the Government respectfully refers the Court to the parties' submissions on this issue. This Statement of Interest focuses solely on Defendants' liability under Subtitle B.

for Partial Summary Judgment ("Defendants' Opp. Mem."), dated September 23, 2011, (Docket No. 40), at 11-12.  As an initial matter, Defendants' argument is based on the assumption that it could be liable under Subtitle A only, which requires "meaningful access" for individuals with disabilities, and not Subtitle B, which requires all taxicab vehicles to be wheelchair accessible or an equivalent alternative system to have been implemented.  *Cf. Henrietta D. v. Bloomberg*, 331 F.3d 261, 275 (2d Cir. 2003) (Subtitle A requires "meaningful access" for persons with disabilities to public services) and 42 U.S.C. § 12144 (requiring the purchase of accessible vehicles for use in a demand responsive system unless the system provides "equivalent" service to persons with disabilities).  More significantly, Defendants' future plans have no bearing on whether or not they are in violation of the ADA today, and their expectation that the planned dispatch system will be in place by March 2012 – much less that the TLC will have gathered sufficient data to permit a full analysis of its impact and operations by mid-2012 – is, at best, speculative.  Defendants should not be allowed to continue to violate the ADA for an indeterminate amount of time based on their hope that the dispatch system will operate smoothly and the state legislature will pass a bill.  Rather, a ruling by this Court now that the City is obligated to ensure that all new taxicabs are wheelchair accessible is all the more important because it will likely have a significant impact on both the City's implementation of an accessible taxicab dispatch system and its selection of the vehicle that will become the "Taxi of Tomorrow."

## STATEMENT OF FACTS

New York City's yellow taxicabs are an internationally recognized symbol of the City, and yet they are inaccessible to the tens of thousands of disabled New Yorkers and countless visitors each year who rely on wheelchairs and other mobility devices.  As Commissioner

4

Yassky recently stated, "[t]axis are a key part of our City's transportation network, and provide over half a million trips … each day.  New Yorkers depend on cabs to pick up groceries, make it to an afternoon meeting, or enjoy a night out on the town."  Testimony of David Yassky to the City Council Transportation Committee, dated April 27, 2011 (attached as Exhibit B to the Kuehler Declaration).  Given the essential services provided by the taxicab fleet, New York City's charter declares that the fleet "is affected with a public interest, is a vital and integral part of the transportation system of the city, and must therefore be supervised, regulated and controlled by the city."  5 N.Y.C. Admin. Code § 19-501.  The TLC was created to fulfill that role.  *See* Salkin Dec. ¶ 4.

The TLC "does more than merely regulate yellow cabs."  Salkin Decl. ¶ 5.  Instead, it is charged with "the mission of transforming the yellow taxicabs into an essential part of the City's public transportation system," as well as with the development and effectuation of a broad public policy" "in aid of the continuation, development and improvement of service and safety and convenience of the public."  *Id.*  (citing N.Y.C. Charter §§ 2300 and 2303).  The TLC exercises this mandate by exclusively licensing medallion owners, vehicles, and drivers, and "comprehensively regulat[ing] them, in effect allowing TLC to control all facets of taxicab use." *Id.* ¶ 7.  TLC has chosen to operate the City's taxicabs in this manner because it "has proven the most effective way to provide taxicab service as part of the City's public transportation network."  *Id.* ¶ 8.

One of the many ways in which the TLC tightly controls New York City's taxicabs is through the issuance of medallions.  Deposition of Ashwini Chhabra ("Chhabra Tr."), attached as Exhibit C to the Declaration of Julia Pinover in Support of Plaintiff's Motion for Partial Summary Judgment (the "Pinover Dec.") (Docket No. 39-3), at 53:16-54:12.  All New York

taxicabs must have valid, TLC-issued medallions, or licenses, authorizing them to pick up passengers for hire. *Id.* To bid for a new medallion, or purchase an existing one, potential buyers must, among other things, certify compliance with the TLC's rules as a condition of receiving and retaining the medallion. *See*, *e.g.*, the TLC's Affidavit of Non-Reliance, available at www.nyc.gov/html/tlc/downloads/pdf/nonreliance_aff.pdf, and the TLC's Official Bid Form for Corporate (Minifleet) Accessible Medallions, available at www.nyc.gov/html/tlc/medallion/downloads/pdf/bid_form_corp_mini_accessible.pdf, attached as Exhibits C and D to the Kuehler Dec. Potential buyers also have to certify that they have not relied on any statements or representations by the TLC in connection with their bid for, or purchase of, a medallion, and hold the TLC harmless from any claims arising out of the ownership of the medallion. *See id.*

The TLC's control over the City's taxicab fleet is also demonstrated by its planned dispatch program for the few accessible taxicabs that exist. *See* Chhabra Dec. ¶¶ 30-43. This dispatch system is being configured by the TLC and will be controlled by it. *See id.* Among other things, the TLC issued requests for proposals for the dispatch system from private contractors, the TLC determined how the dispatch system should operate and what improvements are required over a pilot program that was in place through June 2010, the TLC selected the vendor who will provide the dispatch service and will enter into a contract with that vendor, and users of the dispatch system will have to call the City's own 311 telephone number to order an accessible vehicle for pick-up. *See id.* ¶¶ 30-31; 33-35, 37, 42. The TLC will also enforce compliance with the dispatch program by, among other things, issuing summonses with high monetary penalties and the threat of licenses revocations. *Id.* ¶ 39.

There are currently 13,237 medallion taxicabs in New York City, and 26 different vehicles that TLC has approved for use as taxicabs. Defendants' Answer ¶ 33; Declaration of Ashwini Chhabra, dated September 23, 2011 (the "Chhabra Dec."), Docket No. 46, ¶¶50-51; *For a Minute, Ford Transit Connect Is a Taxi of Tomorrow*, N.Y. Times, July 21, 2011, attached as Exhibit L to the Pinover Dec. (Docket No. 39-12). However, only 231 of the 13,237 medallions issued require the use of an accessible vehicle, and only one of the 19 vehicle models authorized for use as a taxicab is accessible. *Id.*; Defendants' Answer ¶ 33; Pinover Dec. Ex. C (Chhabra Tr.) at 61:2-9. Of the 13,006 taxicabs with unrestricted medallions, only one owner has decided to purchase an accessible vehicle, bringing the total number of accessible taxicabs in New York to 232. Pinover Dec. Ex. C (Chhabra Tr.) at 61:2-9. In other words, 98.2% of the City's taxicabs are not accessible to wheelchair users. Pinover Dec. Ex. C (Chhabra Tr.) at 70:16-22; *Closing the Accessibility Gap: A Report on the TLC's Wheelchair-Accessibility Policies and Recommendations for Improving Accessible Taxi and For-Hire Vehicle Service in New York City*, attached as Exhibit E to the Pinover Dec. (Docket No. 39-5).

Moreover, the 232 accessible taxicabs are, of course, not always in the service at the same time, and wheelchair users have to compete with persons without mobility impairments, who "can use accessible cabs whenever wheelchair cabs are available." Pinover Dec. Ex. C (Chhabra Tr.) at 53:7-15. As a result, while the likelihood of a non-disabled person hailing a cab within ten minutes is 87.33%, the likelihood that a person with a disability will be able to secure an accessible cab is a mere 3.31%. *See* Declaration of Douglas Kruse in Support of Plaintiff's Motion for Partial Summary Judgment (Docket No. 41), ¶¶ 14-15. At the same time, individuals who use wheelchairs are more heavily dependent on taxicab service than non-disabled persons. *See* Declaration of Susan Dooha, dated August 11, 2011, ¶¶ 11, 21. For example, during last

7

month's mandatory evacuation of certain flood-prone areas of New York City in advance of
Hurricane Irene, the TLC had to make special arrangements for the use of accessible taxicabs to
evacuate individuals with mobility impairments who were not able to get to safety using the
City's bus or subway systems, or the other special means of evacuation the City provided.  *See*
Emails among Ashwini Chhabra, Gene Freidman and Ethan Gerber, dated August 27, 2001
through September 1, 2011 (attached as Exs. E through G to the Kuehler Declaration).  Even in
everyday situations, however, individuals who use wheelchairs are unable to depend on
alternative means of transportation, such as the subway and bus systems, to the same extent as
non-disabled persons.  *See* Declaration of Chris Noel, dated August 9, 2011 (Docket No. 42), ¶¶
9-12 (noting that the subway system is less preferable for individuals who use wheelchairs
because "an overwhelming number" of subway stations do not have functioning elevators and
the bus system does "not serve many of the geographic areas of the City"); Declaration of Simi
Linton, dated August 10, 2011 (Docket No. 43), ¶¶ 9-18 (noting that the subway system is a less
preferable form of accessible transportation because most stations do not have functioning
elevators, and utilizing bus service is difficult and impracticable because direct lines are often
unavailable).  In short, the TLC does not provide to individuals with mobility impairments
alternate service equivalent to that provided by the City's taxicabs.  Pinover Dec. Ex. C (Chhabra
Tr.) at 16:23-17:6; 104:3-16.

    The TLC itself has recognized that this situation is untenable, and one of its "long-term
goals [is] 100% accessibility of all our fleets."  Testimony of David Yassky to Assembly
Committees, dated July 14, 2010 (attached as Exhibit H to the Kuehler Declaration).
Nevertheless, the TLC does not require any of the approximately 2,600 new taxicab vehicles that
are placed into service every year to be wheelchair accessible unless they are operated under one

of the 231 accessible medallions, and in fact just this year the TLC approved at least three new inaccessible vehicles for use as taxicabs in New York City.  Pinover Decl. Exs. C (Chhabra Tr.) at 163:21-164:24 and L.  As a result, only 232 accessible taxicabs are currently in service in New York City.  Pinover Decl. Ex. C (Chhabra Tr.) at 61:2-9; 164:15-17; Letter from Robin Binder, Assistant Corp. Counsel for the City of New York, to Sally Conway, Deputy Chief of the U.S. Department of Justice's Disability Rights Section, dated April 18, 2011, attached as Exhibit A to the Pinover Dec. (Docket No. 39-1).

**ARGUMENT**

**THE TLC'S OPERATION OF NEW YORK CITY'S TAXICABS VIOLATES TITLE II OF THE ADA.**

The TLC's failure to ensure that each new vehicle purchased for use in the City's taxicab fleet is accessible to wheelchair users or to provide equivalent alternative service to individuals with disabilities violates Title II of the ADA.  The Court should therefore grant Plaintiffs' motion for partial summary judgment.

**A.**     **Standard for Granting Summary Judgment**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, a court must view all facts, and draw all reasonable inferences, in the light most favorable to the non-moving party.  *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004).  However, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Anderson v.*

9

*Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

### B.    The ADA and Its Implementing Regulations

Two decades ago, Congress determined that there was a "compelling need" to remedy widespread discrimination against disabled individuals through a "clear and comprehensive national mandate."  30 S. Rep. No. 101-116, at 20 (1989); H.R. Rep. No. 101-485, pt. 2, at 50 (1990).  In 1990, Congress enacted the ADA to implement that broad mandate.  *See* 42 U.S.C. § 12101(b).  The ADA has a "sweeping purpose," and "forbids discrimination against disabled individuals in major areas of public life."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).  As a remedial statute, moreover, the ADA "should be construed broadly to effectuate its purposes."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003).  Indeed, the ADA's "comprehensive character" is one of its "most impressive strengths."  Hearings on S. 933 before the Senate Committee on Labor and Human Resources and the Subcommittee on the Handicapped, 101st Cong., 1st Sess., 197 (1989) (statement of Attorney General).

### 1.  Title II of the ADA

Title II of the ADA has been interpreted to reach "all actions by public entities." *Innovative Health Systems, Inc. v. City of White Plains*, 931 F. Supp. 222, 232 (S.D.N.Y. 1996). Subtitle B of Title II specifically addresses "actions applicable to public transportation provided by public entities considered discriminatory."  42 U.S.C. Subchapter II, Subtitle B.  With respect to demand-responsive transportation systems, *i.e.* public transportation that does not run on a fixed schedule, Title II provides as follows:

> If a public entity operates a demand responsive system, it shall be
> considered discrimination … for such entity to purchase or lease a
> new vehicle for use on such system … that is not readily accessible
> to and usable by individuals with disabilities, including individuals

who use wheelchairs, unless such system, when viewed in its
entirety, provides a level of service to such individuals equivalent
to the level of service such system provides to individuals without
disabilities.

42 U.S.C. § 12144.  The term "operates," in turn, with respect to a demand responsive system,

"includes operation of such system by a person under a contractual or other arrangement or

relationship with a public entity."  42 U.S.C. § 12141(4)[6].  A violation of Subtitle B's Section

12144 constitutes discrimination under Subtitle A's Section 12132.  42 U.S.C. § 12144.

Responsibility for implementing regulations necessary for carrying out Subtitle B is vested in the

U.S. Department of Transportation ("DOT").  42 U.S.C. § 12149(a).

    2.  <u>DOT's Implementing Regulations</u>

DOT's implementing regulations require public entities operating a demand responsive

system for the general public who "purchase or lease a new bus or other new vehicle for use on

the system" to "ensure that the vehicle is readily accessible to and usable by individuals with

disabilities, including individuals who use wheelchairs."  49 C.F.R. § 37.77(a).  The only

exception to the general rule that all new vehicles must be wheelchair accessible is if the system

"provides a level of service to individuals with disabilities, including individuals who use

wheelchairs, equivalent to the level of service it provides to individuals without disabilities."  *Id.*

§ 37.77(b). [7]  Like Title II itself, DOT's regulations define the term "operate" to include "the

---

[6]    DOT has proposed amending this rule to add the words "(including, but not limited to, a grant, subgrant, or cooperative agreement)" after the word "arrangement".  This proposed change was published in the Federal Register on September 19, 2011, and is expected to go into effect by October 19, 2011.

[7]    To be "equivalent," the service available to individuals with disabilities must be "provided in the most integrated setting appropriate to the needs of the individual" and must be "equivalent to the service provided other individuals with respect to … (1) response time; (2) fares; (3) geographic area of service; (4) hours and days of service; (5) restrictions or priorities based on trip purpose; (6) availability of information and reservations capability; and (7) any constraints on capacity or service availability."  49 C.F.R. § 37.77(c).

provision of transportation service by a public or private entity itself or by a person under a contractual or other arrangement or relationship with the entity."  49 C.F.R. § 37.3.

Indeed, DOT's implementing regulations expressly provide that, "[w]hen a public entity enters into a contractual or other arrangement or relationship with a private entity to operate … demand responsive service, the public entity shall ensure that the private entity meets the requirements of this part that would apply to the public entity if the public entity itself provided the service."  49 C.F.R. § 37.23(a).  This includes the requirement for private entities under contract with public entities to "acquire accessible vehicles in all situations in which the public entity itself would be required to do so."  49 C.F.R. § 37.23(b).  DOT's implementing regulations are entitled to controlling weight unless they are "arbitrary, capricious, or manifestly contrary to the statute."  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).

**C.**    **New York City's Taxicabs Are a Demand Responsive Public Transportation System**

New York City's taxicabs operate as a demand responsive public transportation system as defined by the ADA.  A "demand responsive system" within the meaning of Title II's Subtitle B is "any system of providing designated public transportation which is not a fixed route system."  42 U.S.C. § 12141.  A fixed route system, in turn, is defined as "a system of providing designated public transportation on which a vehicle is operated along a prescribed route according to a fixed schedule."  *Id.*  In other words, any public transportation service that is not confined to specific routes or schedules is a demand responsive service.

DOT's implementing regulations further clarify that a demand responsive system "means any system of transporting individuals, including the provision of designated public transportation service … including but not limited to specified public transportation service,

which is not a fixed route system." 49 C.F.R. § 37.3. A designated public transportation service,

in turn, means "transportation provided by a public entity … that provides the general public

with general or special service, including charter service, on a regular and continuing basis." *Id.*

The regulations, moreover, adopt Title II's definition of a fixed route service as one "on which a

vehicle is operated along a prescribed route according to a fixed schedule." *Id.*

DOT's guidance on the construction and interpretation of its implementing regulations

explains:

> Some systems, like a typical city bus system or a dial-a-ride van
> system, fit clearly into one category or the other. Other systems
> may not so clearly fall into one of the categories … [so] entities
> must determine, on a case-by-case basis, into which category their
> systems fall. In making this determination, one of the key factors
> to be considered is whether the individual, in order to use the
> service, must request the service, typically by making a call. With
> fixed route service, no action by the individual is needed to initiate
> public transportation. If an individual is at a bus stop at the time
> the bus is scheduled to appear, then that individual will be able to
> access the transportation system. With demand-responsive service,
> an additional step must be taken by the individual before he or she
> can ride the bus, i.e., the individual must make a telephone call.
> . . . We would regard a system that permits user-initiated
> deviations from routes or schedules as demand-responsive.

49 C.F.R. § 37, Appendix D, "Section 37.3 Definitions."

New York City's taxicab fleet is a "demand responsive system" because, rather than

operate on a fixed schedule or along a fixed route, taxicabs roam all five boroughs of the City at

will, and must be affirmatively hailed by customers on the street. 5 N.Y.C. Admin. Code § 19-

502. In fact, the only manner in which taxicabs are permitted to accept passengers is by street

hails. *Id.* Because taxicabs provide transportation service that is not confined to specific routes

or schedules, and because passengers "in order to use the service, must request the service" by

hailing the taxicabs on the street, New York City's taxicab fleet clearly provides demand

responsive transportation services.  49 C.F.R. § 37, Appendix D, "Section 37.3 Definitions"; *see also* 42 U.S.C. § 12141.[8]

The fact that this service is part of the City's public transportation system is also well established.  The taxicab fleet's public transportation purpose was, for example, legislatively codified in the New York City Administrative Code, which states:

> It is hereby declared and found that the business of transporting passengers for hire by motor vehicle in the city of New York is affected with a public interest, is a vital and integral part of the transportation system of the city….

N.Y.C. Admin. Code § 19-501 (emphasis added).  The New York City Charter, moreover, provides that the TLC was created for the very purpose of "establish[ing] an overall public transportation policy governing taxi … services as it relates to the overall public transportation network of the city."  65 N.Y.C. Charter § 2300.  Indeed, TLC's First Deputy Commissioner has testified that "Section 2300 of [the City's] Charter charges the TLC with the mission of transforming the yellow taxicabs into an essential part of the City's public transportation system" and that "TLC exercises its public transportation mandate through its power to exclusively license medallion owners, yellowcabs, and drivers, and comprehensively regulate them, in effect allowing TLC to control all facets of taxicab use."  Salkin Dec. at 4-5.  In fact, First Deputy Commissioner Salkin recognized that TLC's current administration of the City's taxicab fleet "has proven the most effective way to provide taxicab service as part of the City's public transportation network."  *Id.* at 5.[9]

---

[8]    The City does not dispute that taxicabs are a demand responsive transportation system.  *See* Defendants' Opp. Mem. at 13 and n. 9 (noting that "[t]axi service is a form of 'demand responsive service.'").

[9]    Indeed, the City has previously argued that it is so heavily intertwined with the taxicab fleet as to have a "proprietary interest" in its vehicles despite the fact that those vehicles are purchased by individual medallion holders.  *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary or Permanent Injunction or a Summary Declaratory Judgment dated October 6, 2008, submitted in *Metropolitan Taxicab Board of Trade v. City of New York*, 08-Civ-7837 (PAC) (S.D.N.Y.), Docket No. 28.  In that action, the City argued that the

Accordingly, because the New York City taxicab fleet is "affected with a public interest," is "a vital and integral part of the transportation system of the city," and is controlled by the TLC "as part of the City's public transportation network," the City's taxicabs provide demand responsive public transportation service within the meaning of Title II.  5 N.Y.C. Admin. Code § 19-501; 65 N.Y.C. Charter § 2300; Salkin Dec. ¶ 5.

**D.    New York City's Taxicab System Is "Operated" by the TLC**

The TLC, moreover, is subject to liability under Subtitle B of Title II and DOT's implementing regulations because it "operates" New York City's taxicab fleet.  Title II encompasses a public transportation system like New York City's taxicab fleet, in which the vehicles are not themselves operated by public employees, but rather "by a person *under a contractual or other arrangement or relationship* with [the] public entity."  42 U.S.C. § 12141(4) (emphasis added); *see also* 49 C.F.R. § 37.3 (the term "operates" includes "the provision of transportation service by a public or private entity itself or by a person under a contractual or other arrangement or relationship with the entity").  The implementing regulations distinguish public entities, such as the TLC, that "operate" a transportation system from private entities that merely receive subsidies, are regulated by, or are granted franchises or permits to operate by public entities' transportation systems.  *See* 49 C.F.R. § 37.37(a).

Here, TLC operates the City's taxicab fleet because rather than merely regulate the fleet, the TLC exercises extensive control over it.  Indeed, the TLC itself has recognized that "the TLC does more than merely regulate yellow cabs."  Salkin Dec. ¶ 5.  Instead, it uses the New York

---

TLC was engaged in proprietary conduct when it imposed emission standards on vehicles used at taxicabs because it was "manag[ing] its own property".  *Id.* at 15-16 (citing *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 419 (2d Cir. 2002).  Although the City's arguments were ultimately unsuccessful because, in setting emissions standards, the City was acting as a regulator not a proprietor, the *Metropolitan Taxicab Board of Trade* Court acknowledged that "taxicabs may be part of the public transportation system" of New York City.  *Met. Taxicab Bd. of Trade*, Opinion and Order dated October 31, 2008, Docket No. 51.

City taxicab fleet to provide taxicab service as "an essential part of the City's public transportation system" through licensed private entities and individuals because that "has proven the most effective way to provide taxicab service as part of the City's public transportation network."  Salkin Decl. ¶¶ 5, 8.  The TLC, therefore, "operates" New York City's taxicabs within the meaning of Subtitle B.

In fact, the TLC was created for the very purpose of "establish[ing] an overall public transportation policy governing taxi … services."  65 N.Y.C. Charter § 2300.  The TLC's role in operating the City's taxicab system is also codified in the New York City Administrative Code, which provides that "the business of transporting passengers for hire by motor vehicle in the city of New York … must … be *supervised, regulated* and *controlled* by the city."  N.Y.C. Admin. Code § 19-501 (emphasis added).  The TLC exercises its control over New York City's taxicab fleet by, among other things:

> establish[ing] certain rates, standards of service, standards of insurance and minimum coverage; standards for driver safety, standards for equipment safety and design; standards for noise and air pollution control; and to set standards and criteria for the licensing of vehicles, drivers and chauffeurs, owners and operators engaged in such services.

65 N.Y.C. Charter § 2300.  The TLC, moreover, is empowered to adjudicate "violations of the provisions of the administrative code and rules" it promulgates through an "administrative tribunal established by the commission and governed by the citywide administrative procedure act."  *Id.* § 2303.

The TLC has made expansive use of its ability to control New York City's taxicab fleet through the promulgation of rules.  For example, Chapter 58 of the Rules for the City of New York ("RCNY") establishes (i) the procedures and requirements for obtaining a taxicab license; (ii) the rules and regulations for operating a taxicab; and (iii) the penalties for any violations.  35

16

R.C.N.Y. Ch. 58.  Chapter 58 spans 95 pages.  The TLC has also issued separate rules, spanning

49 pages and codified in Chapter 54 of the RCNY, that establish (i) procedures for the licensing,

monitoring and regulation of taxicab drivers; (ii) operating rules to protect the customers and the

public; and (iii) penalties for any violations.  35 R.C.N.Y. Ch. 54.  Finally, the TLC has issued

rules governing taxicab brokers (35 R.C.N.Y. Ch. 62; 15 pages); taxicab agents (35 R.C.N.Y.

Ch. 63; 12 pages); taximeter businesses and manufacturers (35 R.C.N.Y. Ch. 64; 26 pages); the

sale of taxicab medallions (35 R.C.N.Y. Ch. 65; 14 pages); and the hack-up and maintenance of

taxicabs (35 R.C.N.Y. Ch. 67; 21 pages).

   The TLC's control over the New York taxicab fleet is exemplified by its proposed

accessible taxicab dispatch system, which was fully designed by the TLC and is being

implemented by it.  *See* Chhabra Dec. ¶¶ 30-43.  In fact, the TLC not only ran a two-year pilot

program, it also selected the vendor who will be dispatching the accessible cabs, will be

enforcing compliance with the program through the issuance of summonses, and even will direct

all telephone calls for users of the dispatch program through the City's 311 number.  *Id.*

   It therefore comes as no surprise that TLC's First Deputy Commissioner himself has

testified that the "TLC does more than merely regulate yellow cabs" and, indeed, that the TLC

"in effect … control[s] all facets of taxicab use."  Salkin Dec. ¶¶ 5, 7.  In doing so, the TLC is

complying with its obligations under the New York City Administrative Code to not only

regulate, but also to supervise and control the City's taxicab system.  *See* N.Y.C. Admin. Code

§ 19-501.  Through its extensive rules, the TLC directs virtually every aspect of New York

City's taxicab operations, from the drivers' personal appearance and attire, 35 R.C.N.Y. § 54-

15(a) ("[a] Driver must be clean and neat in dress and person and present a professional

appearance"), to the lease rates owners may charge taxicab drivers, 35 R.C.N.Y. § 58-21(c)(1)

("[a]n Owner of a Taxicab can charge a lease rate to a Driver that is not greater than the [ ] Standard Lease Caps" set by the TLC for specific days and shifts).

Significantly for this case, the TLC's rules also specify that only specific vehicles authorized by the TLC may be used for taxicab service. 35 R.C.N.Y. § 67-05.1. Currently, 26 types of vehicles are authorized by TLC for use as taxicabs, 25 of which are not wheelchair accessible. Pinover Decl. Ex. C (Chhabra Tr. at 95:6-23; 96:2-7; 163:21-164:24); Pinover Decl. Exs. K and L; Chhabra Dec. ¶¶ 50-51. The Government recognizes that the mere issuance of medallions or licenses by a city to private taxi companies, and implementing regulations governing the operation of licensed taxicabs, may not be sufficient to subject a public entity to the requirements of Subtitle B of Title II. It is the extent of TLC's control of New York City's taxicab fleet that demonstrates that the New York City taxi system is operated, rather than merely regulated, by the TLC. Of particular note is the fact that the medallion holders are not free to choose the type of vehicle they purchase, and that the "Taxi of Tomorrow" selection is being made by the TLC, not the individual medallion holders. That level of control, combined with the many other TLC rules described herein and the incorporation of the taxi system into the City's Charter, demonstrates that New York City's taxis services are operated by the TLC within the meaning of Title II.

The Second Circuit has indicated that public entities that exercise the "requisite control" over private entities through which they operate their services can be subject to Title II liability. *Celeste v. East Meadow Union Free School Dist.*, 373 Fed. Appx. 85, 91 (2d Cir. 2010). Here, given how "heavily integrated with the TLC the New York City taxicab industry is," Salkin Decl. ¶ 8, the TLC is not merely regulating the City's taxicabs, but instead is using private medallion holders it controls "*to provide* taxicab service as part of the City's public

transportation network."  *Id.* (emphasis added).  The TLC, therefore, operates public demand

responsive transportation within the meaning of Title II and its implementing regulations.  *See* 49

C.F.R. § 37.3 ("*Operates* includes … *the provision of* transportation service by a public … entity

itself or by a person under a contractual or other arrangement or relationship with the entity")

(emphasis added).  Accordingly, the TLC is required to ensure that individual medallion holders

comply with all requirements applicable to public entities under Title II.  *See* 49 C.F.R.

§ 37.23(a).

Defendants argue that Title III's requirements, which extend only to purely private

entities providing taxicab service and only require the purchase of accessible vehicles for use at

taxicabs if those vehicles are vans, somehow expunge the TLC's obligation to ensure its fleet

complies with the requirements imposed by Title II.  *See* Defendants' Opp. Mem. at 14-15.  That

argument is misplaced.  As the Department of Justice has recognized, "[i]n many situations …

public entities have a close relationship to private entities that are covered by title III, with the

result that certain activities may be at least indirectly affected by both titles."  DOJ ADA

Technical Assistance Manual § II-1.3000 (1993).  Accordingly, DOJ's Technical Assistance

Manual explains that, for example:

> A privately owned restaurant in a State park operates for the
> convenience of park users under a concession agreement with a
> State department of parks.  As a public accommodation, the
> restaurant is subject to title III and must meet those obligations.
> The State department of parks, a public entity, is subject to title II.
> The parks department is obligated to ensure by contract that the
> restaurant is operated in a manner that enables the parks
> department to meet its title II obligations, even though the
> restaurant is not directly subject of title II.

*Id.*  Indeed, "the possibility that the government might be subject to different obligations than [a

private entity] with respect to the same property" has been widely recognized because "the ADA

itself expressly contemplates that entities to which it applies might be subject to two or more separate sets of obligations…" *Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 877 (9th Cir. 2004) (quoting *Fiedler v. Am. Multi-Cinema, Inc.*, 871 F. Supp. 35, 37 (D.D.C. 1994)).  Here, while individual medallion owners are also governed under Title III, the TLC is independently required to ensure that the medallion owners purchase vehicles that comply with the TLC's obligations under Title II because those vehicles are a component of the TLC's taxicab system.

Accordingly, courts in similar circumstances have found that public entities licensing private individuals are required to ensure the private individuals' compliance with obligations imposed on public entities under Title II.  In particular, courts have found that the mere fact that individual medallion holders may themselves have independent obligations under the ADA is of no import to the TLC's obligations under Title II.  This very issue was litigated in *James v. Peter Pan Transit Mgmt., Inc.*, in which the court held that "the City is not relieved of its [T]itle II obligations merely because [the private entity providing transportation services] is an independent contractor."  No. 5:97-CV-747-BO-1, 1999 WL 735173, at *9 (E.D.N.C. Jan. 20, 1999);  *see also Medina v. Valdez*, No. 1:08-CV-00456, 2011 WL 887553, at *5 (D. Idaho Mar. 10, 2011) (same); Civil Rights Division, U.S. Dep't of Justice, *The Americans with Disabilities Act Title III Technical Assistance Manual* III-1.7000, at 7 (1993) (when "public entities stand in very close relation to private entities that are covered by title III ... certain activities may be affected, at least indirectly, by both titles.")  Similarly, in *Paxton v. State Dept. of Tax and Revenue*, the Supreme Court of West Virginia held that the state's Lottery Commission was required to ensure that its licensees' premises were accessible under the ADA.  451 S.E.2d 779, 784-85 (W. Va. 1994).  The *Paxton* court came to this conclusion because the Lottery

20

Commission "does more than merely license lottery locations.  It controls and obtains substantial money from the lottery system." *Id.* at 785.  Here, similarly, "the TLC does more than merely regulate yellow cabs," Salkin Dec. ¶ 5, it "control[s] all facets of taxicab use," *id.* ¶ 7, and obtains substantial revenue from medallion sales.

Any argument by the TLC that it does no more than a regulatory agency that, for example, issues liquor licenses, is simply wrong.  *See*, *e.g.*, *Tyler v. City of Manhattan*, 849 F. Supp. 1429, 1442, n.24 (D. Kan. 1994) (holding that the City of Manhattan did not violate Title II by issuing liquor licenses and building permits to inaccessible facilities because the City of Manhattan "has not contracted with any establishment licensed to sell or serve liquor for the purpose of providing any kind of government service or benefit to those who frequent such establishments."); *see also Reeves v. Queen City Transp.*, 10 F. Supp. 2d 1181, 1184, 1187-88 (D. Colo. 1998) (declining to impose liability under Title II on a public agency that "does not offer, directly or indirectly, … any services or programs to the public" because its function was "limited to regulation of private entities and public utilities that offer such services").

Here, New York City's legislature "declared and found" that the City's taxicab fleet "must … be supervised, regulated and controlled by the city."  N.Y.C. Admin. Code § 19-501.  The TLC, moreover, was specifically created to "establish an overall public transportation policy governing taxi … services as it relates to the overall public transportation network of the city," NYC Charter § 2300, and it controls virtually every aspect of the taxifleet's operations.  *See* 35 R.C.N.Y. §§ 54-15(a), 58-21(c)(1), 67-05.1; Salkin Dec. ¶¶ 5, 7.  Under these circumstances, the individual medallion holders are part of the program or activity of the TLC to provide public transportation, and the TLC must ensure their compliance with the TLC's obligations under the ADA.  *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) (holding that

state defendants were required under Title II to ensure that county jails run by private entities under contract with the state were ADA compliant); *see also Kerr v. Heather Gardens Ass'n*, Civ. A. No. 09-cv-00409, 2010 WL 3791484, at *11 (D. Colo. Sept. 22, 2010) (holding that "a public entity, who contracts with another entity to perform its duties, remains liable to ensure that the other entity performs those duties in compliance with Title II"); *Indep. Housing Servs. of San Francisco v. Fillmore Center Assocs.*, 840 F. Supp. 1328, 1344 (N.D. Cal. 1993) (holding that private entity providing bond financing under contract with the city's redevelopment agency was "part of a program or activity of the Agency – the program or activity of urban renewal" and as such was itself subject to liability under Title II). In sum, the TLC must ensure that the New York City taxicab fleet complies with the TLC's obligations under Title II.

**E.      The TLC Violates Title II Because It Does Not Ensure That All New Taxicab Vehicles Are Wheelchair Accessible and It Does Not Provide an Equivalent Level of Service to Individuals With Disabilities**

Under the ADA, the TLC must ensure that individual medallion holders licensed by the TLC as part of the City's public transportation network meet the same requirements under Subtitle B of Title II that would apply to the TLC if the TLC provided the service itself. *See* 49 C.F.R. § 37.23(a). Accordingly, the TLC must ensure that individual medallion holders buy and use accessible vehicles in all situations in which the TLC itself would be required to purchase accessible vehicles. *See id.* § 37.23(b). The TLC, however, has failed to do so.

Under the implementing regulations, in the absence of an alternative equivalent service for disabled individuals, the TLC must require that all new vehicles purchased or leased for use as taxicabs after August 25, 1990 are "readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." *Id.* § 37.77(a). As mentioned above, the TLC does not provide any alternative service to the licensed taxicabs for disabled

individuals.  Pinover Dec. Ex. C (Chhabra Tr.) at 16:23-17:6; 104:3-16.  The TLC, moreover,

has issued only 231 medallions requiring the use of accessible vehicles, and it continues to

permit medallion holders to purchase 25 types of inaccessible vehicles for use as taxicabs in New

York City.  Defendants' Answer ¶ 33; Pinover Dec. Ex. C (Chhabra Tr.) at 61:2-9; Chhabra Dec.

¶¶ 50-51.  As a result, only 232 of the City's 13,237 taxicabs are currently wheelchair accessible.

     To comply with its obligations under Title II, unless and until the TLC implements

equivalent alternative service, it must mandate that all medallion holders who purchase new

vehicles for use as taxicabs buy the wheelchair accessible vehicle already authorized by TLC, or

any other wheelchair accessible vehicle authorized by TLC for use as a taxicab in the future.  *See*

49 C.F.R. § 37.77(a).  By failing to require that all new vehicles purchased for use as taxicabs in

New York City are wheelchair accessible, the TLC is violating its obligations under Title II of

the ADA.  *See* 42 U.S.C. § 12144.

## CONCLUSION

     Accordingly, the Court should grant the Plaintiffs' Partial Motion for Summary Judgment

with respect to the applicability of Title II of the ADA to Defendants' operation of New York

City's taxicabs.

Dated: October 13, 2011

                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for the United States

By:    NATALIE N. KUEHLER
                                    Assistant United States Attorney
                                    86 Chambers Street
                                    New York, New York 10007
                                    Tel.: (212) 637-2741
                                    Fax:  (212) 637-2750