**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                  :

CHRISTOPHER NOEL, SIMI LINTON, UNITED  :
SPINAL, a nonprofit organization, THE TAXIS  :
FOR ALL CAMPAIGN, a nonprofit organization,  :
DISABLED IN ACTION, a nonprofit organization, :
                                  :

                Plaintiffs,        :
                                  :

              -against-        :
                                  :

NEW YORK CITY TAXI AND LIMOUSINE     :
COMMISSION, a charter mandated agency, and  :
DAVID YASSKY, in his official capacity as    :
chairman and commissioner of the New York City :
Taxi Commission,                       :
                                  :

              Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GEORGE B. DANIELS, District Judge:

**MEMORANDUM DECISION AND ORDER**

11 Civ. 237 (GBD)

Plaintiffs Christopher Noel and Simi Linton, each disabled individuals who require the use of wheelchairs, and United Spinal, The Taxis for All Campaign, 504 Democratic Club, and Disabled in Action, each nonprofit organizations, (collectively, "Plaintiffs") bring this civil rights class action against the New York City Taxi and Limousine Commission ("NYCTLC") and David Yassky, in his official capacity as chairman and commissioner of the NYCTLC (collectively, the "TLC"). Plaintiffs allege that the TLC is violating Title II, subtitle A of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, Title II, subtitle B of the ADA, 42 U.S.C. § 12144, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-101 *et seq.* Plaintiffs claim that the lack of wheelchair accessible taxicabs are a result of the TLC's policies and regulations and thus, the TLC denies disabled persons, who use wheelchairs and scooters and reside in or visit

New York City, the opportunity to use and benefit from the New York City taxicab system.

Plaintiffs move for summary judgment that the TLC is liable for violating Title II, subtitle A and subtitle B of the ADA.  The United States filed a statement of interest in this litigation in support of Plaintiffs' motion for summary judgment that the TLC violates Title II, subtitle B of the ADA.  The TLC cross-moves for summary judgment dismissing all of Plaintiffs' claims on the grounds that it does not violate any of the applicable requirements of Title II of the ADA.

Plaintiffs' motion for summary judgment on their Title II, subtitle B claim is denied.  The TLC's cross-motion for summary judgment on its Title II, subtitle B claim is granted.  The TLC's cross-motion for summary judgment on its Title II, subtitle A, Rehabilitation Act, and NYCHRL claims is denied.

Plaintiffs' motion for summary judgment on their Title II, subtitle A claim is granted.  The TLC subjects disabled persons who must use wheelchairs and scooters to discrimination in violation of the Americans with Disabilities Act.  As a direct result of the TLC's policies and regulations, those disabled persons are not provided meaningful access to the benefits of New York City taxicab service.

**Background**

Street hail taxicab service provides a valuable benefit to numerous individuals who visit, live or work in New York City.  Declaration of Julia M. Pinover in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pinover Decl."), Ex. C. (Chhabra Tr.) at 169: 15-23, 222: 4-14.  Taxicabs provide readily available on-demand transportation for passengers to travel to and from jobs, school, political events, doctors, recreation, and

appointments.  Taxicabs allow for spontaneity in door to door travel, and for unplanned or unanticipated trips.  Declaration of Susan Dooha In Support of Plaintiffs' Motion for Partial Summary Judgment ("Dooha Decl.") ¶¶ 11, 20, 22; Declaration of Christopher Noel In Support of Plaintiffs' Motion for Partial Summary Judgment ("Noel Decl.") ¶¶ 6-7; Declaration of Simi Linton In Support of Plaintiffs' Motion for Partial Summary Judgment ("Linton Decl.") ¶¶ 5, 12, 16.  Taxicabs in New York City currently may only provide street hail response taxicab service if issued a medallion by the TLC.  Pinover Decl., Ex. C (Chhabra Tr.) at 53:16-54:12.

The TLC is an administrative body established by the New York City Charter which is a part of the government of the City of New York under the Deputy Mayor for Operations.  65 N.Y.C. Charter §§ 2300.  Pursuant to the Charter and local law, the TLC regulates the private taxicab industry in New York City through a licensing scheme whereby taxicab owners and drivers obtain licenses from the TLC, and as a condition of licensure, must comply with applicable laws and regulations.  Id. §§ 2300, 2303; New York City Administrative Code ("Admin. Code") § 19-504.

Under the City Charter, the TLC "set[s] standards and criteria for the licensing of vehicles," "adjudicates charges of violation of the provisions of the administrative code and rules," and establishes "requirements of standards, safety, and design, comfort, convenience, noise, and air pollution control and efficiency."  Pinover Decl., Ex. I (City Charter) at 65 N.Y.C. Charter §§ 2300, 2303.  The TLC is also charged with the "development and effectuation of a broad public policy of transportation."  Pinover Decl. Ex. I, (City Charter) 65 N.Y.C. Charter §§ 2300, 2303.

The number of medallions that the TLC can license is currently limited by law to 13,237. 65 N.Y.C. City Charter § 2303(b); Declaration of TLC Deputy Commissioner Ashwini Chhabra ("Chhabra Decl.") ¶ 71. Of those, at least 231 must be must be wheelchair accessible. Id. at 20. The TLC thus issues that limited number of wheelchair accessible medallions, which require, as a condition of its use, that the owner of the medallion obtain and utilize a wheelchair accessible vehicle in providing taxicab service. Id. at ¶ 20; Pinover Decl., Ex. A at 2. Taxicab medallion owners can elect to purchase and utilize a wheelchair accessible taxicab even if they do not have an accessible medallion.[1] Pinover Decl., Ex. C (Chhabra Tr.) at 52:24-53:6.

The TLC does not own, lease or operate taxicab vehicles. Chhabra Decl. at ¶ 19. However, the TLC regulations establish the exact specifications for vehicles that may serve as taxicabs. Pinover Decl., Ex. J (TLC Rules) at 35 R.C.N.Y. § 67-05.1 (2011). The TLC has created an approved list vehicles which TLC has verified as meeting the relevant specifications. Id. Of those vehicles, only two are wheelchair accessible. See Transcript of November 22, 2011 Oral Argument at 44: 21-25.

Currently only 233 of the 13, 237 medallion taxicabs in New York City are wheelchair accessible. Chhabra Decl. ¶ 20. Thus, only 1.8% of the medallion taxicab fleet is wheelchair accessible and over 98% is inaccessible. Pinover Decl., Ex. E at 4; Pinover Decl., Ex. C. (Chhabra Tr.) at 70:16-22. As a result, availability is scarce, and wait times for wheelchair accessible taxicabs are much higher than wait times for non-accessible taxicabs. Declaration of Doug Kruse in Support of Plaintiffs' Motion for Summary Judgment ("Kruse Decl.") ¶ 12. A non-disabled person is over twenty-five (25) times

---

[1] New legislation recently passed increasing the number of taxicab medallions available for licensing and sale by the TLC.

more likely to hail a taxicab within ten minutes than is a person who uses a wheelchair.  Id.

The likelihood of successfully hailing any taxicab in Manhattan within 10 minutes is

87.33%, whereas the likelihood of hailing a handicap accessible cab is 3.31%.  Kruse Decl.

¶ 14.

      The TLC has taken no steps to require, promote, or provide a financial incentive to

non-accessible medallion owners to purchase accessible vehicles.  Pinover Decl., Ex. C

(Chhabra Tr.) at 61:22-62:6; 63:7-13, 83:20-24.  The TLC admits that there is no reason

why the TLC could not effectuate an increase in wheelchair accessible taxicabs.  Id. at

55:12-15.  The TLC is in the process of planning a Medallion Taxicab Wheelchair

Accessible Dispatch Program.  Chhabra Decl. ¶ 30.  Under that program, passengers will

be able to call 311 and be connected to a dispatcher who will be able to determine the

closest wheelchair accessible taxicab and dispatch that taxicab to the passenger's location.

Id. ¶ 35.  The exact date on which this program will be available, and the associated

response times for taxi dispatch are not yet known.  Id. ¶¶ 31, 47.

**Summary Judgment Standard**

      Summary judgment is appropriate where the evidence, viewed in the light most

favorable to the non-moving party, shows "that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c); Vacold, L.L.C. v. Cerami, 545 F.3d 114, 121 (2d Cir. 2008).  The burden rests upon

the moving party to show that there is no genuine issue of material fact.  See Celotex Corp.

v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is "material" only where it will affect the

outcome of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  For there to be a "genuine" issue about the fact, the evidence must be such

"that a reasonable jury could return a verdict for the nonmoving party." Id.  In determining

whether there is a genuine issue of material fact, the Court is required to resolve all

ambiguities and draw all inferences in favor of the non-moving party. Sec. Ins. Co. of

Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  Where there

is no evidence in the record "from which a reasonable inference could be drawn in favor of

the non-moving party on a material issue of fact," summary judgment is proper. Catlin v.

Sobol, 93 F.3d 1112, 1116 (2d Cir. 1996).

      Here, there is no material factual dispute among the parties.  In fact, the TLC

acknowledges that it neither ensures that all taxicabs be wheelchair accessible, nor does the

TLC provide meaningful access to such services as defined by the ADA.  The TLC simply

argues that it has no legal obligation under Title II of the ADA to do so.  See Transcript of

November 22, 2011 Oral Argument at 48:25, 53:13-20 ("We've conceded, if your Honor

reaches that question [of meaningful access], we lose . . .")

**Statutory and Regulatory Framework**

      Congress passed the ADA to provide "a clear and comprehensive national mandate

for the elimination of discrimination against individuals with disabilities."  42 U.S.C. §

12101(b)(1).  In order to establish a violation under the ADA, the plaintiffs must

demonstrate that (1) they are "qualified individuals" with a disability; (2) that the

defendants are subject to the ADA; and (3) that the plaintiffs were denied the opportunity

to participate in or benefit from defendants' services, programs, or activities, or were

otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.

Henrietta D. v. Bloomberg, 331 F.3d. 261, 272 (2d Cir. 2003); See Doe v. Pfrommer, 148

F.3d 73, 82 (2d Cir. 1998).  The parties dispute whether the TLC's activities are subject to

the relevant requirements of subtitles A and B of Title II of the ADA.

Title II of the ADA prohibits discrimination by public entities in the provision of

public services. 42 U.S.C. § 12131 *et seq*; Abrahams v. MTA Long Island Bus, 644 F.3d

110, 115 (2d Cir. 2011).  It is divided into subtitles A and B.  Subtitle A governs public

services generally.  It provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity." 42 U.S.C. § 12132.  The Attorney General has the authority to promulgate

regulations to implement subtitle A.  42 U.S.C. § 12134(a).  Those regulations are codified

at 28 C.F.R. § 35 *et. seq.*

Subtitle B of Title II specifically governs the provision of public transportation

services by public entities.  See 42 U.S.C. §§ 12141-12165.  The Secretary of

Transportation has the authority to issue final regulations implementing subtitle B.

Abrahams, 644 F.3d at 115.  Section 12144 of subtitle B governs public entities operating

a demand responsive system.  A demand responsive system is any system of providing

designated public transportation which is not a fixed route system. 42 U.S.C. § 12141.  A

public entity may not purchase or lease a new vehicle for use that is not readily accessible

to and usable by individuals with disabilities, unless the system otherwise provides an

equivalent level of service.[2] 42 U.S.C. § 12144.

---

[2] "If a public entity operates a demand responsive system, it shall be considered
discrimination for the purposes of [42 U.S.C. § 12132 and 29 U.S.C. § 794], for such
entity to purchase or lease a new vehicle for use on such system . . . that is not readily
accessible to and usable by individuals with disabilities, including individuals who use
wheelchairs, unless such system, when viewed in its entirety, provides a level of service to

## I.   THE TLC IS NOT SUBJECT TO TITLE II, SUBTITLE B

The parties agree that the New York City taxicab system is a demand responsive system that is a part of the city's public transportation system.  The parties dispute whether the TLC "operates" the taxicab transportation system such that the TLC is subject to subtitle B of Title II.

To determine whether the TLC "operates" the taxicab transportation system, one must first analyze the plain language of the statute.  Wiley & Sons, Inc. v. Kirtsaeng, 654 F.3d 210, 218-19 (2d Cir. 2011) (internal citations omitted).  Title II provides no guidance in defining "operate."  The Second Circuit, however, has suggested that it would be appropriate to adopt the definition from Title III in the context of Title II.  See Celeste v. East Meadow Union Free School District, 373 Fed. Appx. 85, 91 (2d Cir. 2010).  Under Title III, "'to operate' means 'to put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of or manage.'"[3]  Id.  These definitions are also appropriate here. See CSX Corp. v. Children's Inv. Fund Mgt. (UK) LLP, 654 F.3d 276, 290 (2d Cir. 2011) (quoting Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994) ("The normal rule of statutory construction is that 'identical words used in different parts of the same act are intended to have the same meaning.'"))

The term "operate" must be read in context with the remainder of the statute.  See In re Ames Dep't Stores, 582 F.3d 422, 427 (2d Cir. 2009) (noting that statutory

---

such individuals equivalent to the level of service such system provides to individuals without disabilities."  42 U.S.C. § 12144.

[3] Based upon a witness's testimony that a local government entity was required to maintain a sidewalk which was not accessible to disabled individuals, the Second Circuit held that the government entity may have been liable under Title II if the entity "effectively control[led] the area" and remanded the case to the District Court to make that determination.  The Second Circuit made no findings on what amount or type of control was necessary to subject the government entity to liability.

interpretation calls for an examination of "the specific context in which [the] language is used, and the broader context of the statute as a whole") (internal quotation marks omitted)). Relevant to the evaluation are the functions and responsibilities a public entity generally performs in order to either "put or keep in operation, control or direct the functioning of, conduct the affairs of, or manage" a transportation system.

There are certain traditional indications that a public entity is operating a transportation system. For example, generally the entity performs as a business directly providing transportation services to the public. It usually collects fares and receipts from its passenger-customers in exchange for providing transportation services. The entity usually will purchase or lease and maintain the necessary equipment, including vehicles, to run that system. Further, the entity may plan service routes and schedules to ensure reliable service on the system. The entity also generally hires, fires, and manages the employees who drive and maintain the vehicles on the system. It is clear that the TLC does not operate a taxicab transportation system in any traditional business model sense.

However, a public entity need not operate its transportation system itself to be subject to the provisions of Title II, subtitle B. Subtitle B defines "the term "operates" as used with respect to a . . .demand responsive system [to] include[] operation of such system by a person under a contractual or other arrangement or relationship with a public entity." 42 U.S.C. § 12141. A common example of such a relationship is when a public entity contracts with a private entity to provide public transportation services that the public entity would otherwise provide directly to the public. In that case, the private entity would stand in the shoes of the public entity and assume all of the responsibilities of the public entity. The public entity thus would have to ensure that the private entity complies

with the public entity requirements of subtitle B of Title II.  The TLC has no such standard

contractual relationship with a private entity to operate a transportation system that

provides public transportation services.

Plaintiffs and the United States contend that the TLC "operates" the New York City

taxicab fleet under such "other arrangement or relationship" with private medallion

owners.  Rather than merely regulate the fleet, it is argued that the TLC exercises extensive

control over it.  The United States argues that the TLC is using private medallion holders it

controls to provide taxicab service as a part of the city's public transportation network.

Accordingly, the United States argues that the TLC is required to ensure all individual

medallion holders comply with all requirements applicable to public entities under subtitle

B of Title II.  Plaintiffs and the United States, however, offer no case law in support of

their argument that extensive regulation alone should be interpreted as "operation" of the

system.[4]

The TLC is a public regulatory agency.  The TLC's regulation of the taxicab

industry does not legally equate to the TLC "operating" the taxicab transportation system.

The TLC has extensive regulatory powers to, among other things, license medallion

owners, vehicles and drivers, establish rates, standards of service and safety.  However, the

---

[4] Plaintiffs and the United States cited only James v. Peter Pan Transit System in support of their novel theory that the TLC is subject to subtitle B of Title II as a result of their regulatory control of the taxicab system. See Tr. 36:12-23; James v. Peter Pan Transit System, No. 97 CV 747, 1999 WL 735173, at *2 (E.D.N.C. January 20, 1999). However, that court explicitly noted that Plaintiffs' claim against the city defendant arose under subtitle A of Title II, not subtitle B. Id. There, in evaluating whether the city defendant was subject to subtitle A, the court discussed the division of responsibilities between a public and private entity in operating a demand responsive transportation system, which included route and schedule planning, hiring, firing, and training employees, and purchasing and maintaining vehicles.

TLC has no authority to provide services, and does not function as a transportation services provider, to the public. Nor does any private entity carry out such functions on its behalf.

Most significantly, the legal obligation imposed by Title II, subtitle B is the requirement that the public entity operating a transportation system purchase only wheelchair accessible vehicles for use in that system. Neither the TLC, nor any private entity with which it has a contractual or any other arrangement or relationship to "operate" such a system, purchases or leases vehicles at all.[5] Instead, taxicab drivers or fleet owners privately purchase their own vehicles, and make independent decisions on whether to operate a taxicab at any given time, day, or location within New York City.

Given the TLC's lack of independent authority to operate a system absent private individuals' decisions to provide transportation service, one cannot construe the TLC's regulatory authority to be a public entity's power "to put or keep in operation, to control or direct the functioning of, to conduct the affairs of, or manage" a public transportation system. Instead, the TLC licenses and regulates the manner in which private individuals and entities provide private transportation services on their own behalf, to ensure that the New York City taxicab industry is safe and efficient for the public.

The regulations promulgated by the DOT directly support the conclusion that the TLC does not operate the transportation system as defined in subtitle B of Title II.[6]

---

[5] Plaintiffs and the United States argue that no actual purchase or lease of vehicles by an entity is necessary for it to be subject to subtitle B, but instead the power to control which cars are purchased or leased is sufficient. However, neither party offers legal support for this position. Given the plain language of subsection B of Title II that it is discrimination for a public entity that operates a demand responsive system "*to purchase or lease a new vehicle*" for use on the system which is not wheelchair accessible, this argument must be rejected.

[6] The DOT's agency regulations are entitled to controlling weight unless they are "arbitrary, capricious, or manifestly contrary to the statute, and its manual is given substantial deference unless another reading is compelled by the regulation's plain language." Innovative Health Sys. Inc. v. White Plains, 117 F.3d 37, 45 (2d Cir. 1997); See Chevron U.S.A., Inc. v. Natural

Pursuant to 49 C.F.R. § 37.37, "[a] private entity does not become subject to the requirements of [49 C.F.R. § 37] for public entities, because it . . . is regulated by, or is granted a franchise or permit to operate by a public entity."

Plaintiffs and the United States argue that subtitle B of Title II requires the TLC to mandate that all taxicabs purchased by medallion owners be wheelchair accessible. However, such a reading of Title II, subtitle B would conflict with Title III and the DOT's regulation exempting private providers of taxi service from purchasing wheelchair accessible cabs. See 42 USC § 12184 (requiring that private entities providing public transportation to purchase wheelchair accessible vehicles *other than automobiles*) (emphasis added); 37 C.F.R. § 37.29(b) ("Providers of taxi service are not required to purchase or lease accessible automobiles").

Plaintiffs argue that because the TLC exercises such control over the taxicab system that they have an obligation to make that system compliant with the provisions of subtitle B of Title II. Title III cannot be read as exempting taxicab owners from any requirement that they purchase wheelchair accessible automobiles, but at the same time have intended that subtitle B of Title II impose such a personal obligation based solely on the extent of the control of the public regulatory agency. The effect would be to impose an obligation on those private owners under subtitle B of Title II that Congress explicitly intended to exempt under Title III. Congress had the same power to require regulated private owners providing taxi service to purchase wheelchair accessible automobiles under Title III, and chose not to do so. Thus, the reasonable interpretation of subtitle B of Title II, applicable to public entities, is that, where the city itself is providing transportation

Resources Defense Council Inc, 467 U.S. 837, 844 (1984); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 510-12 (1994).

service, or has a private entity stand in its shoes[7] to provide that service, subtitle B of Title

II requires that wheelchair accessible vehicles be purchased or leased for the provision of

those transportation services to the public.

Subtitle B of Title II does not mandate the purchase of wheelchair accessible

taxicabs because the TLC is a regulatory agency which neither operates a taxi

transportation system, nor purchases new vehicles for such purpose.

## II. THE TLC VIOLATES SUBTITLE A OF TITLE II

### All of the TLC's Activities are Subject to Subtitle A

"As a remedial statute, the ADA must be broadly construed to effectuate its

purpose" of providing a clear and comprehensive mandate for the elimination of

discrimination against individuals with disabilities.  Innovative Health Sys. v. White

Plains, 931 F. Supp. 222, 232 (S.D.N.Y. 1996), aff'd in part, 117 F.3d 37, 45 (2d Cir.

1997).  Consistent with this intent, the Second Circuit Court of Appeals has interpreted the

phrase "programs, services, or activities" in Title II, subtitle A to be "a catch-all phrase that

prohibits discrimination by a public entity, regardless of the context."  Id.  In interpreting

the provision, the Second Circuit recognized that the legislative history explains that [Title

II] "simply extends the anti-discrimination prohibition in [the Rehabilitation Act] to all

---

[7] Notably, the commentary to the final DOT rule discusses this "stand in shoes" concept both in explaining the addition of private entities in the definition of "operate" and the rationale behind the "by contract, or other arrangement" language clarified in 37 C.F.R. § 23.  The commentary notes that the addition of the reference to private entities into the definition of "operate," forms the basis for the "stand in the shoes" provision affecting contractors to other transportation providers.  The commentary also explains that 37 C.F.R. § 23 embodies the "stand in the shoes" concept which requires that where a public entity contracts with a private entity to *provide* transportation service, the private entity must play by the public entity's rules with respect to vehicle acquisition and transportation services.  It further gives an example of an "other arrangement" that falls into the "stand in shoes" rationale—where a utility company is required by law to provide transit service on behalf of the city government and the city government in turn provides that utility with federal funds received to run the transportation service. 56 FR 45584-01 (Sept. 6, 1991).

actions of state local governments." Id.  It further noted that the preamble to the

Department of Justice regulations explain that "[a]ll governmental activities of public

entities are covered." Id. (quoting 28 C.F.R. § 35, app. A at 456 (1996)).

The Department of Justice regulations implementing subtitle A of Title II further

clarify what activities performed by public entities are covered.  For example, "a public

entity in providing any aid, benefit or service, may not, directly, or through contractual,

licensing, or other arrangements, on the basis of disability, deny a qualified individual with

a disability the opportunity to participate in or benefit from the aid, benefit or service."  28

C.F.R. § 35.130(b)(1)(i)  Public entities may not "utilize criteria or methods of

administration. . . that have the effect of subjecting qualified individuals with disabilities to

discrimination on the basis of disability. . ." 28 C.F.R. § 35.130(b)(3)(i) Public entities are

also prohibited from "establishing requirements for programs or activities of licensees that

subject qualified individuals with disabilities to discrimination on the basis of disability.

28 C.F.R. § 35.130(b)(6).

The TLC concedes that it is a public entity subject to subtitle A of Title II of the

ADA.  However, it argues that the "service, program, or activity" that it provides is merely

the licensing of taxicab owners and drivers.  Therefore, the TLC argues that subtitle A only

prohibits the TLC from discriminating against disabled individuals who seek TLC licenses.

Its argument appears to be that any other regulatory activities that may have an adverse

discriminatory effect on disabled taxicab riders are not subject to subtitle A.

During oral argument, the TLC claimed that it has no legal responsibility under the

ADA even where their regulations would otherwise have discriminatory effects on

disabled taxicab riders.  It claimed no obligation to provide any wheelchair accessible

14

vehicles, despite its authority to choose exactly which taxicabs are permitted for service in the New York City taxicab system. The TLC argued that it may have a moral obligation, but not a legal obligation, to provide wheelchair accessible service to disabled persons. The TLC voluntarily intends to pursue significant improvements in the near future. However, the TLC's arguments of no legal obligation are unsupported by, and directly conflict with, this Circuit's interpretation of the ADA generally, and subtitle A of Title II specifically.

The TLC is a public entity carrying out a public regulatory function that affects and confers a benefit on New York City taxicab riders. They directly establish requirements for the programs and activities of private taxicab licensees. Under the Second Circuit's expansive interpretation of "programs, services or activities," and corresponding DOJ regulations, there can be no doubt that the TLC's regulatory activities are governmental activities of a public entity. Thus, the TLC cannot discriminate in any of those activities. "Th[is] prohibition [against discrimination] applies to action that carries a discriminatory effect, regardless of the government's motive or intent." Henrietta D. v. Guiliani, 119 F. Supp. 2d 181, 206 (E.D.N.Y. 2000). The TLC is legally obligated by subtitle A of Title II of the ADA to ensure that the exercise of its regulatory powers does not discriminate against disabled passengers.

### The TLC Denies Disabled Persons Who Require Wheelchairs Meaningful Access to the New York City Taxicab System

To determine whether the TLC discriminates in violation of subtitle A of Title II, "the relevant inquiry is not whether the benefits available to persons with disabilities and to others are actually equal, but whether individuals with disabilities have 'meaningful access' to the benefit that the grantee offers." Henrietta D., 331 F.3d at 273 (citing

15

Alexander v. Choate,  469 U.S. 287, 301 (1985)).  To ensure meaningful access,

reasonable accommodations for access to the grantee's program or benefit may have to be

made.[8]  Id.

Here, the TLC regulates in order to "transform the yellow taxicabs into an essential

part of New York City's public transportation system," and effectuate a broad public

policy in aid of the continuation, development, and improvement of the service and safety

and convenience of the public.  Through its extensive regulation, the TLC ensures the

public benefit of safe and efficient New York City taxicab service.  The TLC does not

presently[9] provide meaningful access to this public benefit for disabled individuals who

require wheelchairs.

The TLC mandates precisely which types of vehicles may be driven as New York

City taxicabs.  The TLC has designated sixteen potential vehicles for use as taxicabs, only

two of which are wheelchair accessible.  The TLC has admitted that it has both the ability

and authority to provide more wheelchair accessible vehicles, but it has chosen not to do

so.  As a result of the TLC's regulations and policies, only 232 New York City taxicabs,

out of a total of 13,237 are accessible to individuals using wheelchairs.  As a result, a non-

---

[8] Amicus, the Taxicab, Limousine, and Paratransit Association ("TLPA") argues that Plaintiffs
have an initial burden to prove a lack of program accessibility and to propose a plausible
accommodation, the costs of which facially do not outweigh the benefits.  Only then, they argue,
does the burden shift to the defendants to demonstrate that the plausible accommodation imposes
an undue hardship.  See TLPA Amicus Br. At 5-6.  None of the cases which the TLPA cites stand
for this proposition.  Further, even if such a burden were imposed on the Plaintiffs, they have made
clear that the reasonable accommodation they seek is additional wheelchair accessible vehicles.
The TLC, the only party with standing, has made no arguments that this accommodation would
pose an undue hardship on them.
[9] The recent legislation signed by Governor Cuomo providing for a greater number of wheelchair
accessible taxicabs and livery cabs, and the TLC's proposed dispatch system may be steps towards
providing meaningful access to the New York City taxicab system to disabled persons who require
wheelchairs.  However, meaningful access for the disabled to public transportation services is not a
utopian goal or political promise, it is a basic civil right.  Title II requires immediate and full
compliance.

disabled person is over twenty-five (25) times more likely to hail a taxi within ten minutes than is a person who uses a wheelchair.

On this record, what would constitute meaningful access need not be determined. It is clear, however, that less than 2% of the city's fleet being wheelchair accessible, resulting in the unavailability of taxi transportation and significantly increased wait times for disabled persons who require wheelchairs, is not meaningful access. In fact, during oral argument, the TLC conceded that its regulations do not provide meaningful access to individuals who require wheelchairs. It must do so. Until it does, the TLC is in violation of subtitle A of Title II of the ADA.

The acknowledged lack of meaningful access is a direct result of the policies, practices, and regulations of the TLC. The TLC's exercise of its regulatory authority alone has created the discriminatory effects on disabled riders who require the use of wheelchairs. Only the proper exercise of that authority can fix the problem that it created and neglected in the past. The disabled who seek meaningful access to taxicab services have nowhere else to turn to enforce their civil rights.

The TLC must propose a comprehensive plan to provide meaningful access to taxicab service for disabled wheelchair bound passengers. Such a plan must include targeted goals and standards, as well as anticipated measurable results. Until such a plan is proposed and approved by this Court, all new taxi medallions sold or new street-hail livery licenses or permits issued by the TLC must be for wheelchair accessible vehicles.

## Conclusion

Plaintiffs' motion for summary judgment on their Title II, subtitle B claim is denied. The TLC's cross-motion for summary judgment on its Title II, subtitle B claim is

granted. The TLC's cross-motion for summary judgment on its Title II, subtitle A,

Rehabilitation Act, and NYCHRL claims is denied.[10]

      Plaintiffs' motion for summary judgment on their Title II, subtitle A claim is

granted.


      Dated: December 23, 2011
      New York, New York

                            SO ORDERED:

                            *George B. Daniels*

                            GEORGE B. DANIELS
                            United States District Judge

---

[10] The TLC moved for summary judgment on its Rehabilitation Act and NYCHRL claims on the same grounds as its Title II, subtitle A claims. Thus, the Title II, subtitle A analysis applies to those claims as well. See Henrietta D., 331 F.3d 261, 272 (2d Cir.2003); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 n. 3 (2d Cir. 1998).