UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------ x

CHRISTOPHER NOEL, SIMI LINTON, : 
UNITED SPINAL, a nonprofit organization, 
THE TAXIS FOR ALL CAMPAIGN, a : 
nonprofit organization, 504 DEMOCRATIC 
CLUB, a nonprofit organization, DISABLED : 
IN ACTION, a nonprofit organization, 
 : 

              Plaintiffs,   :   Case No. 11-cv-0237 (GBD)

          -against-      :

NEW YORK CITY TAXI AND : 
LIMOUSINE COMMISSION, a charter 
mandated agency, and DAVID YASSKY, in : 
his official capacity as chairman and 
commissioner of the New York City Taxi : 
and Limousine Commission, 

              Defendants.   :

------------------------------------------------ x

## SUPPLEMENTAL AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs submit this Supplemental Amended Complaint pursuant to Rule 15(a)(2) and Rule 15(d) of the Federal Rules of Civil Procedure to challenge the New York City Taxi and Limousine Commission's ("TLC") affirmative discriminatory policies which have caused, and continue to cause, taxi service in New York City to be inaccessible to men, women and children who use wheelchairs.

2.     In spite of repeated broken promises of improvement by defendants, less than 2% of medallion taxis in New York City are currently accessible to wheelchair users. With the so-called Taxi of Tomorrow arriving on the streets in 2013 absent judicial action, this inaccessibility will be perpetuated for the next decade. The TLC's agreement with Nissan to provide the Taxi

of Tomorrow requires, for the next ten (10) years, that unrestricted medallion holders must

purchase the Nissan NV200 van ("Nissan Van") but does not require that the Nissan Van include

a ramp or a lift which would make it useable by wheelchair users.

      3.      As a licensing and regulatory agency, the TLC has an obligation to issue rules

which comply with the law.  However, the TLC's approval of the non-accessible version of the

Nissan Van means that taxi medallion owners who follow the TLC's rules will be in violation of

Title III of the ADA.

      4.      Using a non-accessible version of the Nissan Van is a direct violation of Title III of

the ADA.  When a provider of taxi service purchases or leases a vehicle *other than an*

*automobile* (such as a van), the vehicle is required to be accessible. 49 C.F.R. § 37.29(b).  The

ADA is clear: it constitutes discrimination for a private provider of public transportation to

purchase or lease a new van with a seating capacity of less than eight persons, including the

driver, which is not readily accessible to or usable by individuals with disabilities unless

equivalent service is provided to persons with disabilities. 42 U.S.C. § 12184(b)(5); *see also* 49

C.F.R. § 37.103(d).

      5.      Moreover, under the Vehicle Supply Agreement with Nissan and the new rules

promulgated to effect that Agreement, the TLC's control of New York City's taxi fleet has

become more extensive and more restrictive than at any time in the history of New York.  In fact,

the TLC is now far more than a mere regulator or licensor.

      6.      In 2007, the TLC announced the Taxi of Tomorrow Initiative in order to pursue the

creation of the first purpose-built vehicle to serve as New York City's exclusive taxi.

      7.      In May of 2011, the TLC selected the Nissan Van as the Taxi of Tomorrow.  On

September 20, 2012, the TLC promulgated rules designating the Nissan Van as the "Official

Taxicab Vehicle."  On October 20, 2012, the new TLC Rules went into effect.

      8.      ~~These rules require purchase of the identical vehicle for all taxis, taking away one~~

of the very few individual decisions a taxi medallion owner can make under the TLC's vast web

of regulations.

9.    The TLC has committed to Nissan that private taxi medallion owners will purchase Nissan's vans upon retirement of their current vehicles, beginning on October 31, 2013.

10.    With this increasingly pervasive control, the TLC had the practical opportunity to make New York City's taxi fleet fully accessible.  However it deliberately chose not to do so. Indeed, it has taken affirmative steps to discourage and perpetuate accessibility.

11.    Never before has the TLC so inhibited the purchase of accessible vehicles by making such vehicles undesirable.  The TLC claims that unrestricted medallion owners may "choose" to purchase an accessible version of the Nissan Van.  However, in fact, there is no real choice.

12.    The TLC has set the price for the accessible Nissan Van to be 50% higher than that for non-accessible Nissan Vans, in effect imposing a substantial penalty on those who wish to purchase accessible vehicles.

13.    The TLC has approved an accessible model that can only carry one additional passenger in addition to the wheelchair user, thus limiting the pool of potential fare-paying riders for the owners of such a vehicle.

14.    The TLC has also selected an accessible vehicle that does not come directly from the factory but must be retrofitted by a third party converter to enable a ramp to be added to the rear of the vehicle.  The retrofitting is also viewed by medallion owners as resulting in a structurally inferior vehicle.

15.    The decision to maintain an inaccessible taxi fleet and approve the use of a van which is not accessible to men, women and children who rely on wheelchairs has profound negative consequences for the more than 500,000 men, women and children with mobility disabilities and over 60,000 wheelchair and scooter users who live in the City, as well as for countless wheelchair-using tourists.

16.    The lack of accessible taxis significantly affects the ability of wheelchair-users to maintain employment and excel in the workplace.  Without accessible taxis, they often cannot

3

get to last-minute meetings or conferences.  They are similarly often not able to work late due to a lack of reliable transportation options to get them home quickly and safely.

17.     In a disaster or emergency, the ability to locate and use an accessible taxi can be vital to enabling a wheelchair user to evacuate safely.  Taxis play an integral part in the City's emergency evacuation plans and mandating a van that is not wheelchair accessible raises a grave risk that people who use wheelchairs will not be able to evacuate safely.

18.     The TLC's decision to approve a non-accessible van will only increase the City's reliance on the use of expensive and inferior alternatives such as paratransit, also known as Access-A-Ride, and Medicaid transportation.  It is estimated that the cost of operating Access-A-Ride for calendar year 2012 was $509 million.  Indeed, recent estimates suggest that Access-a-Ride now costs approximately $60 per trip.  These costs would be reduced substantially if New York City's taxi system were accessible to wheelchair users.

## JURISDICTION

19.     This is an action for declaratory and injunctive relief brought pursuant to Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.,* and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-101 *et seq.*  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

20.     This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

21.   Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District in which this Complaint is filed, because Defendants are located within this District, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, and the property that is the subject of this action is situated in this District.

## PARTIES

22.     Plaintiff Christopher Noel is a resident of New York City with a mobility disability that causes him to rely on a wheelchair.  He is a qualified individual with a disability within the meaning of all applicable statutes and a member of the class.

23.     Mr. Noel is employed as outreach manager for a healthcare benefits advising non-profit in New York City.  On a daily basis, his job requires him to travel to various appointments around the city, making presentations to different groups and consulting one-on-one with individuals.  Because he cannot rely on accessible medallion taxis to travel to different parts of the city within any given workday, he must rely on buses and paratransit, which involve extended waits and indirect routes, making his workday much less convenient and far less efficient than it would be if he had ready access to medallion taxis.

24.     Mr. Noel is otherwise qualified to use hail taxi services provided by medallion taxis in New York City. However, Mr. Noel has difficulty using or is completely unable to use medallion taxi service in New York City by virtue of Defendants' acts and/or omissions alleged herein.  Specifically, the TLC's approval of the use of vans which are not accessible to wheelchair users subjects Mr. Noel to discrimination, solely by reason of his disability, by excluding him from participation in and denying him the benefits of such hail taxi service.

25.     Plaintiff Simi Linton, Ph.D. is a resident of New York City with a mobility disability that causes her to rely on a power wheelchair.  She is a qualified individual with a disability within the meaning of all applicable statutes and a member of the class.

26.     Dr. Linton is a filmmaker, writer, and consultant who works primarily in New York City.  She often travels throughout the city for work, social, and speaking engagements, as well as for doctors' appointments.  Because of how difficult it is to obtain an accessible taxi, Dr. Linton must rely on either the bus system, which is slow and unreliable, or a private transportation company, which typically charges more than double the price that a taxi would cost.

27.     Dr. Linton, a lifelong New Yorker, has attempted to hail taxis on numerous occasions over the years, but has only succeeded in hailing an accessible taxi twice.

28.     Dr. Linton is otherwise qualified to use hail taxi services provided by medallion taxis in New York City. However, Dr. Linton has difficulty using or is completely unable to use medallion taxi service in New York City by virtue of Defendants' acts and/or omissions alleged herein. Specifically, the TLC's approval of the use of vans which are not accessible to wheelchair users subjects Dr. Linton to discrimination, solely by reason of her disability, by excluding her from participation in and denying her the benefits of such hail taxi service.

29.     Plaintiff United Spinal Association ("United Spinal") is a national disability rights and veterans service organizations founded in 1946. It is a New York based not-for-profit organization that seeks to advance the rights and well-being of persons with disabilities, including those who require transportation services that are accessible to persons with disabilities.

30.     United Spinal currently has approximately 40,000 members nationwide. Approximately 900 members of United Spinal reside in New York City and many more visit New York City on a regular basis. Many such members are having difficulty using or are completely unable to use medallion taxis by virtue of Defendants' acts and/or omissions alleged herein, including the TLC's approval of the use of vans which are not accessible to wheelchair users.

31.     The mission of United Spinal is to provide and create access to resources, enabling people with spinal cord injuries to fulfill their potential as active members of their communities. United Spinal drafted significant portions of the ADA and continues to advocate for the rights of people with disabilities through state and federal legislation, the courts, grassroots advocacy, and education.

32.     United Spinal currently expends substantial time and resources on advocacy work concerning policies and practices that affect people with disabilities in New York City, including advocating against the use of inaccessible vans, such as the Nissan Van, as taxis. The

6

comprehensive services offered by United Spinal include: providing assistance to veterans navigating benefit programs; funding spinal cord research and education; organizing the largest annual spinal cord disabilities conference in the country; advocating for the civil rights of its members; keeping members informed of legislative and advocacy issues; providing technical assistance and repair programs to wheelchair-users; and advocating for accessible travel.

33.     United Spinal itself has been injured as a direct result of Defendants' actions and omissions as alleged herein. United Spinal's interests are adversely affected because it must expend resources, as it is doing in this lawsuit, advocating for its constituents who are harmed by Defendants' discriminatory policies and practices. United Spinal has suffered injury in the form of diversion of these resources and frustration of its mission.

34.     In addition, one or more members of United Spinal have been injured as a direct result of Defendants' discriminatory policies and practices and would have standing to sue in their own right.

35.     United Spinal can bring this action on behalf of its members because the interests at stake are germane to United Spinal's purpose and only injunctive and declaratory relief are requested which do not require the participation of individual members in the lawsuit.

36.     Plaintiff The Taxis for All Campaign ("Taxis for All") is a coalition of disability rights organizations and individuals in New York City dedicated to the goal of having all yellow medallion taxis be wheelchair accessible. The member groups of the Taxis for All campaign include the Anti-Discrimination Center of Metro New York, Brooklyn Center for Independence of the Disabled, Center for Independence of the Disabled in New York, Disabilities Network of New York City, Disabled in Action of Metropolitan New York, 504 Democratic Club, New York Lawyers for the Public Interest, New York City Chapter, National Multiple Sclerosis Society and United Spinal Association.

37.     Taxis for All was founded in 1996 in New York City by disability rights advocates who were frustrated by the inaccessibility of New York City medallion taxis and the inability of people with disabilities to get around in the city. For the past 14 years Taxis for All has and

continues to expend substantial time and resources on advocacy work concerning transportation difficulties faced by people with disabilities, including advocating against the use of inaccessible vans, such as the Nissan Van, as taxis. Their efforts include lobbying for legislative solutions, raising awareness, and organizing roll-in demonstrations at taxi stands to protest the inaccessibility of New York City taxis.

38.     Taxis for All itself has been injured as a direct result of Defendants' actions and omissions as alleged herein. Taxis for All's interests are adversely affected because it must expend resources, as it is doing in this lawsuit, advocating for its constituents who are harmed by Defendants' discriminatory policies and practices, including the TLC's approval of the use of vans which are not accessible to wheelchair users.

39.     In addition, one or more members of Taxis for All have been injured as a direct result of Defendants' discriminatory policies and practices and would have standing to sue in their own right. Taxis for All can bring this action on behalf of its members because the interests at stake are germane to its purpose.

40.     Plaintiff 504 Democratic Club ("504 Democrats") is a New York City-based coalition of Democrats working towards inclusion of people with disabilities in the political and social fabric of society and was founded in 1983.

41.     504 Democrats has approximately 350 members who are from all five boroughs, and include a diverse group of people with disabilities, public officials, friends and family who support the concepts set forth in Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990. Many of these members are having difficulty using or are completely unable to use medallion taxis by virtue of Defendants' acts and/or omissions alleged herein, including the TLC's approval of the use of vans which are not accessible to wheelchair users.

42.     504 Democrats currently expends substantial time and resources on advocacy work concerning policies and practices that affect people with disabilities in New York City, including advocating against the use of inaccessible vans, such as the Nissan Van, as taxis. Over the years,

504 Democrats has provided the leadership for starting many community activities. These activities include the Disability Independence Day March, held on the anniversary of the passage of the Americans with Disabilities Act, the annual Disability Budget and Policy Agenda, and advocacy work on behalf of city employees with disabilities. 504 Democrats participated in the founding of, and provides much of the leadership for the Taxis for All Campaign, dedicated to bringing wheelchair-accessible taxis and liveries to New York City.

43.    504 Democrats itself has been injured as a direct result of Defendants' actions and omissions as alleged herein. 504 Democrats' interests are adversely affected because it must expend resources, as it is doing in this lawsuit, advocating for its constituents who are harmed by Defendants' policies and practices. 504 Democrats has suffered injury in the form of diversion of these resources and frustration of its mission.

44.    In addition, one or more members of 504 Democrats have been injured as a direct result of Defendants' discriminatory policies and practices and would have standing to sue in their own right. 504 Democrats can bring this action on behalf of its members because the interests at stake are germane to 504 Democrats' purpose and only injunctive and declaratory relief are requested, which do not require the participation of individual members in the lawsuit.

45.    Plaintiff Disabled In Action ("DIA"), founded in 1970, is a nonprofit civil rights membership organization committed to ending discrimination against people with all disabilities.

46.    DIA consists primarily of, and is directed by, people with disabilities. DIA's members include residents with disabilities throughout New York City. Many of DIA's members are having difficulty using or are completely unable to use medallion taxis by virtue of Defendants' acts and/or omissions alleged herein, including the TLC's approval of the use of vans which are not accessible to wheelchair users.

47.    DIA's objectives include promoting the ability of persons with disabilities to live independently. To that end, DIA works for the passage of laws that affirm and defend the rights of people with disabilities. In addition, DIA works to educate government officials, community

leaders and the general public about disability issues and plans and participates in public demonstrations to draw attention to these issues.

48.     DIA has and continues to expend substantial time and resources on advocacy work concerning policies and practices that affect disabled residents of New York City, including advocating against the use of inaccessible vans such as the Nissan Van as taxis.  For instance, DIA advocated for passage of Local Law 58, the 1987 NYC Building Code amendment requiring that all commercial and residential buildings include accessible features in common areas and dwelling units when newly constructed or renovated.  DIA also has participated in legal actions against New York City for its holding a public Town Hall meeting at an inaccessible site, against the federal government for noncompliance with the ADA at fifteen federal courthouses in New York City, against the New York City Human Rights Commission for failure to provide written material in alternate formats, and against the New York City MTA for not operating Access-A-Ride in compliance with the ADA.

49.     DIA itself has been injured as a direct result of Defendants' actions and omissions as discussed herein.  DIA's interests are adversely affected because it must expend resources, as it is doing in this lawsuit, advocating for its constituents who are harmed by Defendants' policies and practices.  DIA has suffered injury in the form of diversion of these resources and frustration of its mission.

50.     In addition, one or more members of DIA have been injured as a direct result of Defendants' discriminatory policies and practices and would have standing to sue in their own right.  DIA can bring this action on behalf of its members because the interests at stake are germane to DIA's purpose and only injunctive and declaratory relief are requested, which do not require the participation of individual members in the lawsuit.

51.     Defendant New York City Taxi and Limousine Commission ("TLC") is a city agency established in 1971 by the New York City Charter ("Charter").  NY City Charter § 2300.

52.     The TLC is run by a nine-member commission, and one of the nine members is designated as the chairman and chief executive officer.  *Id.* § 2301(a) and (c).

10

53.     The purpose of the TLC is the "continuance, further development and improvement of taxi and limousine service in the city of New York." NY City Charter § 2300.

54.     The Charter further defines the purpose of the TLC as "consonant with the promotion and protection of the public comfort and convenience to adopt and establish an overall public transportation policy governing taxi . . . services as it relates to the overall public transportation network of the city; to establish certain rates, standards of service, standards of insurance and minimum coverage; standards for driver safety, standards for equipment safety and design; standards for noise and air pollution; and to set standards and criteria for the licensing of vehicles, drivers and chauffeurs, owners and operators engaged in such services." NY City Charter § 2300.

55.     The TLC's jurisdiction also extends to regulating and supervising "transportation of persons by licensed vehicles for hire in the city" over rates of fare, standards, and conditions of service. NY City Charter § 2303(b)(a).

56.     The TLC is a "public entity" within the meaning of 42 U.S.C. § 12131.

57.     Defendant David Yassky, sued here in his official capacity, is Chairman and Commissioner of the TLC and is thus responsible for, and a participant in, the actions and/or omissions of the TLC.

## FACTUAL ALLEGATIONS

### The TLC's Approval of a Van which Is Not Accessible as the Taxi for New York City.

#### *The Taxi of Tomorrow Initiative.*

58.     In 2007, the Department of Citywide Administrative Service introduced the Taxi of Tomorrow ("TOT") Initiative. The purpose of the TOT Initiative was to create the first purpose-built vehicle to serve as New York City's exclusive taxi to be used by taxi medallion owners for the next ten years, from October 31, 2013 through October 31, 2023.

59.     In December 2010 the TLC announced the selection of three finalists in the TOT competition: the Ford Transit Connect, Karsan V1 and Nissan NV200 van.

11

60.     All of these vehicles are characterized and advertised as "vans" by their respective manufacturers. All are considered by the automotive industry to be vans.

61.     Of these vehicles, only the Karsan V1 was proposed to be built directly from the factory to be accessible to wheelchair users. The Karsan V1 was the only vehicle which, had it been selected, would have resulted in a fully accessible medallion fleet.

62.     The Ford Transit Connect and Nissan Van vehicles can be modified to be accessible to wheelchair users. However, neither company proposed, nor did the TLC require, that the accessible version of the Transit Connect or Nissan Van be selected as the official Taxi of Tomorrow to be mandated for use by all medallion holders over the next ten years.

63.     In May 2011, the TLC selected the Nissan Van to become the Taxi of Tomorrow – making the NV200 van the first taxi purpose built for use in New York City and the City's exclusive taxi for the next decade.

64.     The Nissan Van, as designed, is not accessible to wheelchair users because it does not include a ramp or lift to allow them to enter the vehicle independently and safely.

### The Nissan Van Is a Van.

65.     Under Title III of the ADA, when a provider of taxi service purchases or leases a vehicle other than an automobile, the vehicle is required to be accessible. 49 C.F.R. § 37.29(b). Specifically, under the ADA, it is discrimination for a provider of public transportation to purchase or lease a new van with a seating capacity of less than eight persons, including the driver, which is not readily accessible to or usable by individuals with disabilities unless equivalent service is provided to persons with disabilities. 42 U.S.C. § 12184(b)(5); *see also* 49 C.F.R. § 37.103(d).

66.     In order to provide equivalent service to persons with disabilities, taxi providers must ensure that, among other things, wheelchair users can hail a taxi within the same amount of time as their non-disabled counterparts. 49 C.F.R. § 37.105. Wheelchair users are currently unable to hail an accessible taxi in the same amount of time as non-disabled individuals.

67.     In fact, taxi providers in New York City do not currently provide equivalent service to the City's men, women and children who use wheelchairs due to, among other things, the significant difference in response times.  Even using the "accessible dispatch system," in which wheelchair users can request by telephone an accessible taxi, the average wait time is twenty to twenty-five minutes, a far cry from the average ten minute wait time for most non-disabled passengers.

68.     The Nissan NV200 is a van which seats less than eight including the driver.

69.     Automotive industry, consumer groups and articles, periodicals and publications uniformly categorize the Nissan Van as a van.

70.     The Nissan USA webpage, nissancommercialvehicles.com, lists the NV200 van under the category "Commercial Vans and Trucks".

71.     Nissan describes the NV200 on its webpage as a "compact cargo van" and markets the NV200 as a "van" in its markets in the United States and abroad.

72.     The Nissan van has been recognized by the automotive industry as a van.  The Nissan Van has won multiple awards for Van of the Year, including but not limited to the Professional Van and Light Truck Magazine Van of the Year Award (2010), the International Van of the Year Award in Europe (2010) and the 2010 Commercial Delivery Van of the Year Award in China (2010).

### The TLC's New Rules.

73.     On September 20, 2012 the TLC passed rules for the first time mandating that all unrestricted medallion holders replace their vehicles, as they are retired, with the Nissan Van, starting on October 31, 2013.  These rules were promulgated pursuant to sections 1043 and 2303 of the Charter of the City of New York and took effect on October 20, 2012.

74.     The new rules taking effect on October 20, 2012 (the "new TLC Rules") in fact impose substantially greater control over the taxi industry by the TLC than ever before.  This is the first time in the history of New York City taxi regulation that the TLC will require taxi medallion owners to purchase and use a single brand and model automobile.

75.     The new TLC Rules also are a new major affirmative step toward perpetuating and ensuring the long-term inaccessibility of the New York taxi fleet.

76.     Before the new TLC Rules, any unrestricted medallion owner who wanted to purchase an accessible vehicle had a range of choices of such a vehicle. Such medallion owners could select from six different versions of accessible vehicles representing a number of different body configurations and prices. Specifically, a medallion owner could purchase as an accessible vehicle, the 2011 or 2012 MV1 Purpose Built Accessible Vehicle, the 2011 accessible Toyota Sienna, or one of three versions of the 2012 accessible Toyota Sienna.

77.     This option no longer exists for 11,741 of the current unrestricted medallion holders because, under the new TLC Rules, the TLC only allows up to 469 of the current holders of unrestricted medallions to choose to purchase any accessible vehicle as long as it conforms to the TLC's issued requirements. The remaining 11,741 holders of unrestricted medallions will be required to use the Nissan Van.

78.     Prior to the new TLC Rules, an unrestricted medallion owner who wanted an accessible vehicle could purchase a vehicle which was specifically designed and factory built as an accessible vehicle and came from the factory in accessible form without any retrofitting requirements. Vehicles which have been purpose built to be accessible are viewed by medallion owners to be superior to vehicles which have had to be extensively retrofitted in order for a ramp to be installed. This option of a factory built accessible taxi no longer exists for 11,741 of the current unrestricted medallion holders.

79.     Prior to the new TLC Rules, all unrestricted medallion owners who wished to purchase an accessible vehicle had several options available to them which would allow a person in a wheelchair to ride in the accessible vehicle with more than one additional passenger. That option also has been taken away by the new TLC Rules which require the remaining 11,741 holders of unrestricted medallions to use the Nissan Van, a vehicle which, when carrying a person in a wheelchair, can only accommodate one additional passenger.

80.     Prior to the new TLC Rules, all taxi medallion owners could select from several different priced options of accessible vehicles.  As described below, all taxi medallion owners who must or who seek to purchase an accessible vehicle must pay a penalty of up to 50% above the price of the non-accessible vehicle.

### The TLC Agreement with Nissan.

81.     On October 9, 2012 the City of New York, on behalf of the TLC, entered into what is termed as a Vehicle Supply Agreement ("Agreement") with Nissan Taxi marketing N.A., LLC ("Nissan").  The Agreement grants Nissan the exclusive right to sell its vehicle, the Nissan Van, to holders of unrestricted medallions.

82.     On November 16, 2012 the Department of Citywide Administrative Services submitted the Agreement to the Office of the Comptroller for registration.  Following a thorough review, on December 14, 2012, the Agreement was rejected by the Office of the Comptroller due to the TLC's failure to require that the Nissan Van be accessible to wheelchair users.  At this time the City has not issued a formal response to the Comptroller's rejection of the contract and it appears that the City intends to move forward with the Taxi of Tomorrow Initiative.

83.     The Agreement requires that all Nissan Vans made available for purchase include the following features: (i) premium vinyl seats, (ii) a low-annoyance horn, (iii) a panoramic glass roof panel, (iv) an active carbon lined headliner to neutralize odors, (v) rear passenger reading lamps and (vi) rear passenger charging stations, to allow passengers to charge iPods and cellular phones.

84.     Despite the numerous passenger amenities included in the Agreement the TLC did not require that all Nissan Vans include a ramp to make them accessible to and usable by wheelchair users.

85.     Under the Agreement, holders of 11,741 unrestricted medallions issued prior to January 1, 2012 must purchase the Nissan Van when it is time for their current vehicles to be replaced starting on October 31, 2013.

86.     The Agreement details the yearly pricing for each Model Year that the Nissan Van will be mandated for purchase.  Under the Agreement the Manufacturer's Suggested Retail Price for the 2014 Model Year of the Nissan Van is $29,700.  This price increases for each subsequent model year.

87.     An accessible version of the Nissan Van has been designed but the TLC did not require Nissan to make an accessible version of the vehicle available directly from the factory.

88.     Instead, in order to provide medallion holders with the accessible version of the Nissan Van, the vehicle must be sent to a Nissan-approved third party accessibility converter in order to be modified to be accessible to wheelchair users.  Medallion holders who purchase the accessible van will have to pay for this conversion.

89.     Conversion of the vehicle entails lowering of the floor, modification of the gas tank, fuel lines and seating area and addition of a ramp.  This extensive rebuilding, retrofitting and conversion process is viewed by medallion owners to result in a vehicle which is structurally inferior to the original factory built NV200.

90.     Moreover, following conversion the Nissan Van is only able to seat one additional passenger in addition to a wheelchair user, thus limiting its pool of potential fare-paying riders for the owners of such a vehicle.

91.     The TLC and Nissan agreed in the contract that the cost of the accessible version of the Nissan Van will include a conversion fee.  The TLC and Nissan agreed in the contract that the conversion fee can be as much as $14,000 more than the manufacturer's suggested retail price of the non-accessible Nissan Van. This means that while the 2014 Nissan Van that cannot be used by people who use wheelchairs and scooters will sell for $29,700, the accessible version may cost up to $43,700, nearly 50% more than the non-accessible version.

92.     Because of its economic and marketing power with Nissan, the relative price of the Nissan Van, in its accessible and inaccessible versions, was within the control of the TLC. The TLC could have set the price of the accessible vehicle at the same price as the non-accessible vehicle.  It chose not to do so.

16

93.     The increased cost for the accessible version was set by the TLC and Nissan as part of the agreement. This significant additional cost will in fact prevent many medallion holders from being able to afford to purchase the accessible version of the Nissan Van. The TLC's failure to ensure that this cost is reasonable and affordable to medallion holders creates a significant deterrent to, and penalty for, the purchase of accessible vehicles by medallion holders.

94.     The Nissan Van can be manufactured directly from the factory in an accessible version. For instance, the Nissan Van will be manufactured direct from the factory in an accessible version for use in London, England's taxi fleet. No separate, increased cost for conversion after manufacturing will be required.

95.     By mandating the use of an inaccessible van, failing to require that Nissan make available an accessible version of the Nissan Van directly from the factory and by requiring unrestricted medallion holders to pay nearly 50% more for a vehicle that they view to be inferior and that can carry only one additional passenger with a wheelchair user, the TLC is inhibiting medallion owners from purchasing an accessible vehicle.

96.     Although the City of New York profits to the extent of hundreds of millions of dollars from its involvement with the taxi industry, the City has chosen to offer no subsidies or incentives to encourage the purchase of accessible taxis or to defray the penalty which owners have to pay in order to acquire an accessible Nissan Van.

97.     Although the City has multiple incentives and benefits that it can make available to encourage the purchase of a particular type of vehicle, such as what occurred in New York with respect to hybrid vehicles, the TLC has deliberately chosen to provide no such incentives for the purchase of accessible vehicles.

98.     The TLC sets what is known as the "standard lease cap" which establishes the amount an owner of a taxi can charge to a driver to lease the taxi. Despite the fact that the accessible version of the Nissan Van may cost almost 50% more than the non-accessible version of the Nissan Van, the TLC does not permit taxi owners to lease the accessible version of the Nissan Van for more than the non-accessible version of the Nissan Van. Under the newly passed

17

TLC rules, the standard lease cap for the Nissan Van either non-accessible or accessible is the same $1114 weekly. *See* 35 RCNY § 58-21(c)(3)(iii).

99. Any purported "choice" of a medallion owner in selecting an accessible van is false. In fact, there is no real choice. No medallion owner would seek to pay 50% more for an accessible taxi in order to provide taxi service at the same rate as non-accessible taxis, using what medallion owners view as a structurally inferior vehicle that when carrying a wheelchair user has room for only one additional passenger.

### The TLC's Increasing Control Over New York City's Taxi Fleet.

100. The TLC Agreement with Nissan and the new TLC Rules represent an unprecedented increase in the TLC's control of the New York City taxi fleet. Never has the TLC has exerted more control over New York City's taxi industry and more so than any other city or jurisdiction.

101. The TLC has moved beyond merely setting specifications for vehicles to signing an agreement with a single vehicle manufacturer to provide the identical vehicle at a set price to taxi medallion owners for the next decade. Indeed the TLC has committed to Nissan that private medallion owner will purchase Nissan's vans.

102. The TLC has taken away virtually all independent decision-making from the taxi medallion owners. The TLC has now expanded its rules to control taxi medallion owners even more by limiting any individual choice of the majority of taxi medallion owners as to which vehicle they may purchase. The purchase of such vehicles is not a private or an individualized transaction between a vehicle manufacturer and a taxi medallion owner. The TLC is inextricably intertwined in the purchasing relationship. No longer may the TLC hide behind the facade of a mere "regulator" or "licensor." Through the Vehicle Supply Agreement and the new TLC Rules, the TLC has vastly expanded its control of New York City taxi service.

103. Furthermore, with this pervasive control, the TLC inhibits the purchase of accessible vehicles. Instead of mandating a fully accessible fleet, the TLC offers an "accessible version" which is more expensive and viewed as structurally inferior and economically

undesirable, leaving taxi medallion owners with no actual choice but to purchase a van that is inaccessible.

### TLC Approval of Other Non-Accessible Vans for Use as Taxis.

104.    The Taxi of Tomorrow Initiative is not the first time that the TLC has approved a non-accessible van to serve as a taxi, causing taxi medallion owners to violate Title III of the ADA.

105.    As required under the New York City Charter, the TLC promulgates rules that set forth the specifications with which vehicles must comply with in order to operate as medallion taxis.

106.    The TLC has found that the Ford Transit Connect, the Toyota Sienna, the Honda Odyssey and the Dodge Grand Caravan vehicles comply with these specifications and has allowed them to serve as taxis in New York City.

107.    These vehicles are considered by their respective manufacturers, as well as the industry, to be vans.  The TLC has not required that medallion owners purchase the version of these vans that are accessible to wheelchair users.  Instead, despite the fact that all of these vans may be modified to be accessible, the TLC has allowed the non-accessible versions for use as medallion taxis.

108.    The Ford Transit Connect is referred to as a "Transit Van" on the manufacturer's website, ford.com.  The Transit Connect Taxi is certified to Ford Light Commercial Vehicle Durability Standards and was awarded Van of the Year (2004) by Professional Van and Light Truck Magazine.  The Transit Connect was also awarded the North American Truck of the Year Award at the North American International Auto Show in 2010.

109.    The Toyota Sienna is a van; it is referred to as a "Minivan" on the manufacturer's website, Toyota.com.  The Sienna received the Most Dependable Minivan Award from J.D. Power and Associates in 2011 and in 2012.

110.    The Honda Odyssey is a van; it is characterized as a "Minivan" on the manufacturer's website, Honda.com.  The Odyssey won *MotorWeek*'s 2012 Drivers' Choice Award for "Best Minivan" for 2011 and 2012.

111.    The Dodge Grand Caravan is a van; it is referred to as a "Minivan" on the manufacturer's website, dodge.com.  It is characterized as the bestselling and most awarded minivan ever.

112.    These non-accessible vans are currently in operation today and will continue to operate as taxis until they are replaced with the inaccessible Nissan Van.

## CLASS ACTION ALLEGATIONS

113.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs bring this action for injunctive and declaratory relief on their own behalf, on behalf of their members, and on behalf of all persons similarly situated and all residents in and visitors to New York City with mobility disabilities who have been and are currently being discriminated against by Defendants' actions and omissions as alleged herein. The class the named Plaintiffs seek to represent consists of all people with mobility disabilities who need and want to use New York City medallion taxis.

114.    The persons in the class are so numerous that joinder of all members of the class is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.

115.    Data from the United States Census conducted in 2000 indicate that more than 1.6 million residents over the age of 21 in New York City self-identify as having a disability.  Such data further show that more than 220,000 non-institutionalized New York City residents over the age of 16 have a sensory disability, which includes visual disabilities, and more than 588,000 non-institutionalized New York City residents over the age of 16 have a physical disability, which includes mobility disabilities.

116.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented, in that Plaintiffs' members and individuals in the class will continue to be denied access to medallion taxis.

117.     Common questions of law and fact predominate, including the question of whether affirmatively sanctioning and, in the case of the Nissan Van requiring, the purchase of a van that is not accessible to wheelchair users in violation of the Title III of the ADA violates the TLC's obligations under the Rehabilitation Act of 1973, Title II of the ADA and the NYCHRL and discriminates against individuals with disabilities.

118.     The claims of the named Plaintiffs, or their members, are typical and are not in conflict with the interests of the class as a whole.  Defendants' course of conduct and violation of the law as alleged herein has caused Plaintiffs and class members to be deprived of the opportunity to effectively utilize Defendants' program, service and/or activity.  Therefore, all class members will suffer the same or similar injuries for the purposes of the injunctive and declaratory relief sought.  Plaintiffs' claims are thereby representative of and co-extensive with the claims of the class.

119.     The named Plaintiffs are adequate class representatives because they and/or their members do not have any conflicts of interest with other class members, and will prosecute the case vigorously on behalf of the class.

120.     The attorneys representing the class are experienced both in disability law and in class action institutional litigation.  Counsel representing the Plaintiff class is qualified to fully prosecute this litigation and possesses adequate resources to see this matter through to resolution.  Counsel will fairly and adequately represent and protect the interests of the class.

121.     Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

122.     On August 10, 2011 the Court issued an order granting the parties' request to stipulate to class certification. The order defines the class as "All persons using wheelchairs or

scooters who reside in or visit New York City who are persons with disabilities under the Americans with Disabilities Act, Rehabilitation Act and/or City Human Rights law and who seek to use New York City medallion taxis."

## FIRST CAUSE OF ACTION
## FOR VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794, ET SEQ.

123.   Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs 1 through 122 inclusive, as though fully set forth herein.

124.   Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

125.   An "individual with a disability" is defined under the statute, in pertinent part, as "an individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102). "Qualified" means, with respect to services, a person who meets the essential eligibility requirements for the receipt of such services. 28 C.F.R. § 41.32.

126.   Plaintiffs' members include, and Plaintiffs represent, qualified individuals with disabilities within the meaning of the applicable statutes.

127.   The TLC has jurisdiction over "assistance to the business community and industry of public transportation affected by this chapter in aid of continuation, development and improvement of service and the safety and convenience of the public, including assistance in securing federal and state grants." NY City Charter § 2303(b)(10).

128.   The TLC has received federal financial assistance.

129.     Using a non-accessible version of the Nissan Van is a direct violation of Title III of the ADA. When a provider of taxi service purchases or leases a vehicle *other than an automobile* (such as a van), the vehicle is required to be accessible. 49 C.F.R. § 37.29(b). The ADA is clear: it constitutes discrimination for a private provider of public transportation to purchase or lease a new van with a seating capacity of less than eight persons, including the driver, which is not readily accessible to or usable by individuals with disabilities unless equivalent service is provided to persons with disabilities. 42 U.S.C. § 12184(b)(5); *see also* 49 C.F.R. § 37.103(d). Neither the TLC nor the taxi medallion owners currently provide equivalent service to individuals with disabilities because, among other things, the Accessible Dispatch System still results in far greater response times for disabled passengers needing an accessible taxi.

130.     The TLC's policies and requirements are causing the underlying violation of the Title III of the ADA. As discussed above, because the TLC has ensured that the accessible version of the Nissan Van is more expensive and viewed as structurally inferior and economically undesirable, private medallion owners effectively have no choice but to purchase an inaccessible version of the Nissan Van. Thus, through its actions, the TLC is causing private medallion owners to violate Title III of the ADA.

131.     By approving the use of, and in fact requiring the purchase of, an inaccessible van in violation of Title III of the ADA, the TLC is causing discrimination against individuals with disabilities for whom the vans which are now allowed, and which will be allowed, are inaccessible and for whom no equivalent service for medallion taxi service is provided in violation of the Rehabilitation Act of 1973. As described herein, the actions of the TLC constitute discrimination on the basis of disability against Plaintiffs and class members.

132.     The TLC is further violating the Rehabilitation Act by denying meaningful access to persons using wheelchairs. As discussed above, through the Agreement with Nissan and the new TLC Rules, the TLC has exerted more control than ever over New York City's taxi industry.

TLC's increasingly pervasive control over the taxi industry has essentially transformed a private taxi industry into a "program or activity" of a public entity. The TLC does far more than simply license and/or regulate taxis in New York City.

133.    As a public entity, the TLC must provide meaningful access to its programs and activities. However, the TLC is failing to do so. Rather the TLC's pervasive control inhibits the purchase of accessible vehicles since, as discussed above, they are more expensive and viewed as structurally inferior and economically undesirable, leaving taxi medallion owners with no actual choice but to purchase a van that is inaccessible.

134.    By requiring the purchase of an inaccessible van, the TLC has ensured that the vast majority of the New York City taxi fleet will violate Title III of the ADA and in turn will remain largely inaccessible to wheelchair users for the next ten years. The TLC's actions result in a clear and outright denial of meaningful access to the taxi fleet of New York City.

135.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs and their members will suffer irreparable harm in that they will continue to be discriminated against and denied access to the program or activity operated and overseen by Defendants.

136.    Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 29 U.S.C. §794(a).

## SECOND CAUSE OF ACTION
## FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
## 42 U.S.C. § 12131, ET SEQ.

137.    Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs 1 through 136 inclusive, as though fully set forth herein.

138.    Title II of the Americans with Disabilities Act, 42 U.S.C. §12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

139.    The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). The named Plaintiffs, members of organizational Plaintiffs, and the class Plaintiffs represent are people who have mobility disabilities that substantially limit the major life activities of walking, standing, and/or moving about in their communities without mobility aids. Thus, Plaintiffs' members are, or Plaintiffs represent, qualified individuals with disabilities within the meaning of 42 U.S.C. § 12102, 42 U.S.C. § 12131, and 28 C.F.R. § 35.104.

140.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1). Defendants qualify as a public entity within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

141.    Using a non-accessible version of the Nissan Van is a direct violation of Title III of the ADA. When a provider of taxi service purchases or leases a vehicle *other than an automobile* (such as a van), the vehicle is required to be accessible. 49 C.F.R. § 37.29(b). The ADA is clear: it constitutes discrimination for a private provider of public transportation to purchase or lease a new van with a seating capacity of less than eight persons, including the driver, which is not readily accessible to or usable by individuals with disabilities unless equivalent service is provided to persons with disabilities. 42 U.S.C. § 12184(b)(5); *see also* 49 C.F.R. § 37.103(d). Neither the TLC nor the taxi medallion owners currently provide equivalent service to individuals with disabilities because, among other things, the Accessible Dispatch System still results in far greater response times for disabled passengers needing an accessible taxi.

142.    The TLC's policies and requirements are causing this underlying violation of the Title III of the ADA. As discussed above, because the TLC has ensured that the accessible version of the Nissan Van is more expensive and viewed as structurally inferior and

economically undesirable, private medallion owners effectively have no choice but to purchase an inaccessible version of the Nissan Van. Thus, through its actions, the TLC is causing private medallion owners to violate Title III of the ADA.

143.     By approving the use of, and in fact requiring the purchase of, an inaccessible van in violation of Title III of the ADA, the TLC is causing discrimination against individuals with disabilities for whom the vans which are now allowed, and which will be allowed, are inaccessible and for whom no equivalent service for medallion taxi service is provided in violation of Title II of the ADA, 42 U.S.C. § 12131, *et. seq.* As described herein, the actions of the TLC constitute discrimination on the basis of disability against Plaintiffs and class members.

144.     Congress directed the Department of Justice ("DOJ") to write regulations implementing Title II's prohibition against discrimination. 42 U.S.C. § 12134. Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA. 28 C.F.R. § 35.101 *et. seq.* One such regulation requires that "a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. §35.130(b)(7). Here the TLC has adopted new policies, practices and procedures in conjunction with the Agreement with Nissan and new TLC Rules. However, the TLC has failed to make reasonable modifications to its policies as required by 28 C.F.R. §35.130(b)(7) to ensure this program or activity does not discriminate against persons with disabilities, namely wheelchair users who require accessible taxicabs.

145.     The TLC is further violating the ADA by denying meaningful access to persons using wheelchairs pursuant to Subtitle A of Title II of the ADA. As discussed above, through the Taxi of Tomorrow Initiative, the TLC has exerted more control than ever over New York City's taxi industry. TLC's increasingly pervasive control over the taxi industry has essentially

transformed a private taxi industry into a "program, service or activity" of a public entity. The TLC does far more than simply license and/or regulate taxis in New York City.

146.    As a public entity, the TLC must provide meaningful access to its programs and activities. However, the TLC is failing to do so. Rather the TLC's pervasive control inhibits the purchase of accessible vehicles since, as discussed above, they are more expensive and viewed as structurally inferior and economically undesirable, leaving taxi medallion owners with no actual choice but to purchase a van that is inaccessible.

147.    By requiring the purchase of an inaccessible van, the TLC has ensured that the vast majority of New York City taxi fleet will violate Title III of the ADA and in turn will remain largely inaccessible to wheelchair users for the next ten years. The TLC's actions result in a clear and outright denial of meaningful access to the taxi fleet of New York City.

148.    The TLC is also violating Subtitle B of Title II of the ADA. Subtitle B mandates that "if a public entity operates a demand responsive system, it shall be considered discrimination . . . for such an entity to purchase or lease a new vehicle for use on such a system . . . that is not readily accessible to and useable by individuals with disabilities, including individuals who use wheelchairs, unless such a system, when viewed in its entirety, provides a level of service to such individuals equivalent to the level of service such system provides to individuals without disabilities." 42 U.S.C. § 12144.

149.    Through contractual or other arrangement or relationship with the private taxi medallion owners, there is little question that the TLC now "operates" New York City's taxi fleet and is subject to Subtitle B. As discussed above, the TLC has taken away virtually all independent decision-making from the taxi medallion owners. The TLC has now expanded its rules to control taxi medallion owners even more by limiting any individual choice of the majority of taxi medallion owners as to which vehicle they may purchase. Moreover, the TLC does not provide equivalent service to individuals with disabilities because, among other things,

the Accessible Dispatch System still results in far greater response times for disabled passengers needing an accessible taxi.

150.    Given the TLC's pervasive control, it can and should require all taxis purchased by medallion owners to be wheelchair accessible. In fact, any exemptions for taxi accessibility do not apply to the taxi medallion owners because the TLC is forcing them to purchase vans, not automobiles. As discussed above, when using a vehicle other than an automobile (such as a van), taxi medallion owners must ensure that it is accessible to wheelchair users. 49 C.F.R. § 37.29(b).

151.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs and their members will suffer irreparable harm in that they will continue to be discriminated against and denied access to the program or activity operated and overseen by the TLC.

152.    Consequently, Plaintiffs are entitled to injunctive relief pursuant to section 203 of the ADA, 42 U.S.C. §12133, and attorneys' fees.

## THIRD CAUSE OF ACTION FOR VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW, N.Y.C. ADMIN. CODE § 8-101, ET SEQ.

153.    Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs 1 through 152 inclusive, as though fully set forth herein.

154.    The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a), provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."

155.    The term "person" includes governmental bodies or agencies.  N.Y.C. Admin.
Code § 8-102(1).  The TLC is a governmental body or agency and thus Defendants qualify as a
person within the meaning of N.Y.C. Admin. Code § 8-102(1).  The TLC is, at the very least, a
manager of a provider of public accommodation.

156.    The term "place or provider of public accommodation" includes providers, whether
licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges
of any kind, and places whether licensed or unlicensed, where goods, services, facilities,
accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise
made available.  N.Y.C. Admin Code § 8-102(9).  Medallion taxi service constitutes a public
accommodation and is a service, accommodation, advantage, or privilege offered to the general
public and thus falls within the meaning of N.Y.C. Admin Code § 8-102(9).

157.    The NYCHRL additionally requires that any person prohibited from discriminating
under Section 8-107 on the basis of disability "shall make reasonable accommodation to enable a
person with a disability to…enjoy the right or rights in question provided that the disability is
known or should have been known by the covered entity."  N.Y.C. Admin. Code § 8-107(15).
The term "covered entity" is defined as a person required to comply with any provision of
Section 8-107 which includes Defendants under N.Y.C. Admin. Code § 8-102(1).

158.    The TLC's failure to require more accessible taxis than the current less than 2% of
the taxi fleet, as well as the TLC's approval of vans for use in providing medallion taxi service
which are not accessible to wheelchair users, including the Nissan Van, serve to directly and
indirectly refuse, withhold from and/or deny people with mobility disabilities access to the public
accommodation of medallion taxi service in violation of N.Y.C. Admin. Code § 8-107(4)(a).

159.    The TLC is a covered entity and must make the reasonable accommodations
necessary to ensure that all vehicles, including vans approved for use as medallion taxis, are

accessible to wheelchair users and allow people with mobility disabilities to enjoy the right of access to the public accommodation of medallion taxi service as required by N.Y.C. Admin. Code § 8-107(15).

## FOURTH CAUSE OF ACTION
## FOR DECLARATORY RELIEF

160.    Plaintiffs re-allege and incorporate herein all of the allegations contained in paragraphs 1 through 159 inclusive, as though fully set forth herein.

161.    Plaintiffs contend that Defendants have failed and are failing to comply with applicable laws prohibiting discrimination against persons with disabilities in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.,* Title II of the ADA, 42 U.S.C. § 12131, *et seq.,* and the NYCHRL, N.Y.C. Admin. Code §8-101, *et seq.*

162.    Defendants dispute Plaintiffs' contention.

163.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

164.    WHEREFORE, Plaintiffs prays for relief as set forth below.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment as follows, including but not limited to:

A.  For an order finding and declaring that Defendants' policies and practices affirmatively sanctioning the use of vans in providing medallion taxi service which are not accessible to wheelchair users, including the Nissan Van, in the context of the facts pleaded in this Complaint, violate the Rehabilitation Act of 1973;

B.  For an order finding and declaring that Defendants' policies and practices affirmatively sanctioning the use of vans in providing medallion taxi service which are not accessible to wheelchair users, including the Nissan Van, in the context of the facts pleaded in this Complaint, violate the Americans with Disabilities Act;

C. For an order finding and declaring that Defendants' policies and practices affirmatively maintaining a taxi fleet which is over 98% inaccessible and sanctioning the use of vans in providing medallion taxi service which are not accessible to wheelchair users, including the Nissan Van, in the context of the facts pleaded in this Complaint, violate the New York City Human Rights Law.

D. For injunctive relief prohibiting Defendants from continuing to violate the Rehabilitation Act, Americans with Disabilities Act, and the New York City Human Rights Law;

E. An award of Plaintiffs' reasonable attorneys' fees and costs; and

F. Such other and further relief as the Court may deem just and proper.

Dated:
    New York, NY

By: _____

JULIA PINOVER (JMP333)
Disability Rights Advocates
1560 Broadway, 10th Floor
New York, NY 10036
Telephone:   (212)644-8644
Facsimile:   (212) 644-8636
Email:   general@dralegal.org

SID WOLINSKY (CA Bar No. 33716)*
MARY-LEE SMITH (CA Bar No. 239086)*
KARA J. JANSSEN (CA Bar No. 274762)*
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, CA 94704
Telephone:   (510) 665-8644
Facsimile:   (510) 665-8511
TTY:   (510) 665-8716
Email:   general@dralegal.org
*Admitted *pro hac vice*

Attorneys for Plaintiffs