E9GMTAXC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE TAXIS FOR ALL CAMPAIGN, et al.,

          Plaintiffs,

    v.                              11 Civ. 237 (GBD)

NEW YORK CITY TAXI AND
LIMOUSINE COMMISSION, et al.,

          Defendants.

------------------------------x

                              New York, N.Y.
                              September 16, 2014
                              12:20 p.m.

Before:

                HON. GEORGE B. DANIELS,

                            District Judge

                     APPEARANCES

SID WOLINSKY
JULIA M. PINOVER
    Attorneys for Plaintiffs

ZACHARY W. CARTER, Corporation Counsel
for the City of New York
    Attorney for Defendants
BY: MICHELLE L. GOLDBERG-CAHN



ALSO PRESENT: JESSICA TAYLOR

1           (Case called)

2           MR. WOLINSKY:  Sid Wolinsky of Disabilities Rights

3   Advocates for plaintiffs.  Good afternoon, your Honor.

4           MS. PINOVER:  Julia Pinover of Disabilities Rights

5   Advocates for plaintiffs.  Good afternoon, your Honor.

6           MS. GOLDBERG-CAHN:  Michelle Goldberg-Cahn, Assistant

7   Corporation Counsel for the defendants, and I'm joined by

8   Jessica Taylor, assistant general counsel from the Tax and

9   Limousine Commission.

10          THE COURT:  Good afternoon.

11          We are here to give final approval to the settlement

12  agreement.  Let me first hear from each side, if you want to

13  add something to it at this point.  I still have one or two

14  minor questions and then we can proceed.

15          MR. WOLINSKY:  I just have a few brief comments, your

16  Honor, because I know your Honor has reviewed the papers that

17  we filed with your Honor.  I went back and I looked at the file

18  and then I noticed that the first of plaintiffs' demand

19  prelitigation demand letter in this case that we are bringing

20  to a conclusion today is November 8, 2010, almost four years

21  ago.

22          Since that time the case has had every element in it

23  that would merit approval by your Honor in terms of this

24  fairness hearing.  Plaintiffs obtained complete relief.  They

25  asked only for declaratory relief in the form of meaningful

1  access to the taxi program.  And they have obtained all of
2  that.
3           The case was both vigorously litigated through three
4  and a half years, as well as being on a simultaneous settlement
5  track in which there was adversarial arm's length serious
6  negotiations that took place both with and without a training
7  neutral facilitator in literally dozens of settlement meetings
8  and exchanges of settlement.  The other element that courts
9  consider is the result as weighed against the risk of going
10 forward with this litigation.
11          I would say that this is a case that looking at it
12 from the beginning, your Honor, would give any plaintiff's
13 attorney contemplating the case heart palpitations.  There have
14 been only two other cases in this entire country challenging
15 the accessibility, the disability accessibility of a taxicab
16 fleet by a municipality.  Both of those were dismissed on
17 motions to dismiss on the papers.  This is a unique and
18 unprecedented case.
19          Finally, it sets a new standard of historical
20 dimensions for the City of New York.  I think it's fair to say
21 that this was one of the two or three most significant
22 disability rights, disability access cases in this country in
23 the last decade.  It will result in approximately 7,000
24 accessible cabs on the streets of New York going from 1.8
25 percent accessibility to 50 percent accessibility in five

1    years.  And because of that, your Honor will notice there is

2    not a single objection from any member of the class.

3               I should add, there was an interesting dimension to

4    the settlement that the Court might wish to note, which is,

5    this is not one of those class action settlements where the

6    plaintiffs' attorneys negotiated the settlement and then

7    presented the package to the class.  The major disability

8    organizations in this city actively participated in the

9    settlement negotiations to assure that they got what they

10   wanted.  They did and we urge that the Court give approval.

11              THE COURT:  Ms. Cahn.

12              MS. GOLDBERG-CAHN:  Your Honor, I really have nothing

13   further to add other than to echo Mr. Wolinsky's sentiment that

14   the city is very happy to support this settlement that will

15   give further disability access for persons with disabilities in

16   the transportation system.

17              THE COURT:  I just had a couple of minor questions

18   before we move forward.  I know I asked a number of questions

19   the last time we were here.  The reimbursement of the

20   conversion.  Is it the city's position that a subsidy is

21   provided on the initial conversion or that's provided, also,

22   with regard to the renewal of vehicles?

23              MS. GOLDBERG-CAHN:  It is the city's position that the

24   requirement will be to support taxi vehicle owners who are

25   converting initially.  And if they are required to convert a

1  subsequent vehicle at the end of their retirement cycle, then
2  the surcharge would go to support that conversion as well.
3              THE COURT:  When you say conversion, if I have a
4  nonwheelchair-accessible vehicle and I am told to convert this
5  year, then my next vehicle is a wheelchair-accessible vehicle.
6  I have that vehicle in service for the next three years or I
7  forget what the period is.  Then I have to get a subsequent
8  vehicle.  Do I get subsidized.
9              MS. GOLDBERG-CAHN:  If you are going to be required
10 for your second one, for your subsequent vehicle or if you
11 decide to trade with someone who does have the obligation when
12 you don't, then the answer would be yes.
13             THE COURT:  If I am told to convert, I will get the
14 7500 --
15             MS. GOLDBERG-CAHN:  It's about 15,000.
16             THE COURT:  15,000.  I will get the 15,000 to convert,
17 extra cost of converting to a wheelchair-accessible vehicle?
18             MS. GOLDBERG-CAHN:  Yes.
19             THE COURT:  When that vehicle runs its course, if I
20 still continue to have a wheelchair-accessible vehicle, I will
21 get that 15,000 dollar subsidy every time I renew the
22 wheelchair-accessible vehicle?
23             MS. GOLDBERG-CAHN:  Only if you're obligated to, or if
24 you take on someone else's obligation to.  But not if you are
25 not obligated to, don't buy onto someone else's obligation to

E9GMTAXC

1    and decide on your own to do it.  To clarify, I think it's
2    about $4,000 a year for the life of the cycle instead of
3    15,000.
4             THE COURT:  How is it that I will convert to a
5    wheelchair-accessible vehicle and not continue to have a
6    wheelchair-accessible --
7             MS. GOLDBERG-CAHN:  The way that the rules that were
8    passed and I think were published -- they were passed in April
9    and published in mid June and are now in effect contemplated,
10   is that for the many fleets, one in every two have to be
11   converted.  And for the independents it's a lottery system.  If
12   you draw the lottery where you have the obligation the first
13   time in the cycle, when your vehicle is up for retirement, you
14   will not be obligated under your second vehicle that you're
15   purchasing, whereas the folks who were not obligated the first
16   time would be obligated the second time.
17            THE COURT:  The city, each cycle, they are different
18   individuals or fleets will have the obligation to convert.
19            MS. GOLDBERG-CAHN:  That's correct.
20            THE COURT:  And if they have that obligation to
21   convert, they get the subsidy?
22            MS. GOLDBERG-CAHN:  Yes.
23            THE COURT:  But if I have a wheelchair-accessible
24   vehicle and I am not in the lottery, what is it that you
25   contemplate that you expect me to do?

1          MS. GOLDBERG-CAHN:  When you say you are not in the
2  lottery, you mean you were not obligated to purchase --
3          THE COURT:  I was obligated the first time and I
4  purchased.  Now I have to renew my vehicle.  I'm not obligated
5  to continue with the wheelchair-accessible vehicle.
6          MS. GOLDBERG-CAHN:  You might decide that it's more
7  beneficial for you to continue because you're comfortable with
8  the vehicle and like the vehicle, but you are not going to be
9  required to have an accessible vehicle for the independents
10 because the other people who didn't have the obligation the
11 first time will be, but you may.  And if you are not obligated,
12 and you decide to do it voluntarily, you won't be compensated
13 under the fund, although I believe there are other grants and
14 things that are available to help incentivize you.
15         THE COURT:  What I don't understand is, from a
16 financial point of view from the city, and even from a
17 cooperative relationship with the fleet owners and the
18 independents, why would you want to force people to do it and
19 give them incentive and reimburse them for being forced to do
20 it but not encourage them to continue it or to voluntarily do
21 it?  I've always had some difficulty with that.  Because it's
22 going to cost the city the same amount of money.
23         MS. GOLDBERG-CAHN:  If we were to compensate everyone,
24 even those that would not be required under the settlement to
25 operate a wheelchair-accessible vehicle, then the fund would be

1     double the cost of what it is now and that cost would be borne

2     by the public with a surcharge far greater than the 30 cents.

3             THE COURT:  Why wouldn't you simply just figure out

4     what number of vehicles that is the 50 percent at that year and

5     then when you get to that 50 percent you put in the people who

6     want to continue or convert and then you add people who, as

7     they say, may want to go kicking and screaming to convert.  Why

8     would you want to fill up the 50 percent with people who are

9     being forced to do it rather than who want to do it voluntarily

10    and want to continue to do it if you still are going to cap --

11    let's take a round number.  If we have 15,000 vehicles five

12    years from now, then your goal would be that you would have

13    7,500 minimally on the street.  What difference does it make to

14    the city whether those are voluntary or involuntary?

15            MS. GOLDBERG-CAHN:  I think the idea was so that the

16    responsibility or the obligation is borne evenly among the

17    different groups between independents and fleet owners and the

18    like.  There is a process in place under the rules that

19    contemplates trading those obligations.  So maybe the fleet

20    owner says I have a hundred vehicles, I'm very happy with a

21    successful vehicle and I want to purchase more, and they can

22    trade that obligation to someone who might find it to be more

23    of a financial burden on them.  We know that this conversion

24    requiring it the way they sort of sketched it out under the

25    rule gets us to at least the minimum of 50 percent, but there

1    are opportunities for people to trade in or to continue the
2    obligation otherwise.
3            THE COURT:  I understand.
4            Basically, I am going to give approval to the
5    settlement.  Quite frankly, because of the nature of the
6    questions I've asked this time and last time, it's not my view
7    that this is a perfect settlement.  I think that I would
8    encourage the city to consider the voluntary participation to
9    play a part in their determination of who is converted.  I
10   think we have a happier fleet if the majority of the people are
11   people who have, particularly in the future, experience with
12   this and are comfortable with it and want to continue rather
13   than those who you have to continue to force to participate.
14   My view is that's somewhat of a weakness in the view.  And I
15   think I will encourage the city to reevaluate that and see
16   whether there is a way that it doesn't add additional cost.  It
17   gives people the opportunity to do it who really want to do it.
18   And it is less aggressive administration on behalf of the Taxi
19   and Limousine Commission.
20           Quite frankly, five years from now two-thirds of the
21   taxi owners may want to convert and may think it's reasonable.
22   To sort of say to them, you folks who believe that this is a
23   good idea to do on your own, you have to bear that cost as
24   opposed to those people who we are going to force you to do it
25   and we are going to give you money because we are forcing you

1    to do it.  I am not sure that that's the most efficient way to
2    administer the program.
3            MS. GOLDBERG-CAHN:  I think what you describe, I think
4    that there is an expectation that with more experience, getting
5    more accessible vehicles on the road and with the driver's
6    compensation portion of the fund that would incentivize
7    drivers, perhaps drivers might be demanding of fleet owners to
8    do more accessible.
9            I just want to remind the Court, there is an annual
10   review mechanism in the rule where perhaps it will be looked at
11   and said, you know what, maybe we don't want to just compensate
12   fully.  We may want to bear that cost a little bit more evenly
13   in a different way.  There is that mechanism built in as well.
14           THE COURT:  This is one of the issues that has given
15   me some concern and I raise now because in that continued
16   evaluation and in the Court's continued jurisdiction to
17   participate in that, I think that that's something that should
18   be reviewed, whether or not it's appropriate to do that or how
19   it plays itself out.  But my guess is that once there are
20   significant number of these vehicles on the street, the
21   landscape will significantly change.
22           The only other issue that I have some concern about is
23   the surcharge.  I think there is a rational basis for the
24   surcharge.  I'm a little concerned that there isn't a plan to
25   reduce or to terminate the surcharge at some point.  I would,

again, encourage that as the program unfolds that this be evaluated constantly because I think all of the people who are serviced by the taxi industry, whether we are talking about the wheelchair bound or not, are bearing an additional cost which I am not sure will always be necessary.

Quite frankly, as I said, my attitude about city services is that because you tell me that you are going to pick up my garbage three times a week rather than two times a week that I'm supposed to give you extra money to do that. If that's the right thing to do and that's the service that's being provided -- that's not an accurate analogy here, given the nature of the industry.

But it seems to me that, as I say, although there have been discussions about what financial benefits the city gets for medallions and other income that is related to providing taxi service, the city is not in the business of doing this for profit and we know that and we all understand that. So I think that it is for the general public it is at least comforting to know that the city is revising this in terms of cost and whether or not that cost is necessary rather than in terms of income.

There are a significantly greater number of medallions that are still to be sold and my guess is that the medallions will continue to get more valuable rather than less valuable, particularly factoring this in. And I think it is important to

1    not only reevaluate everyone's cooperative voluntary
2    participation in this effort, but also to make the riders and
3    the citizens and visitors of this city not have to pay
4    additional costs for a significant period of time that are not
5    necessary to the implementation of the program or to the
6    provider of services.  And I just note that not as a fatal flaw
7    in this agreement, but something that I think the record should
8    indicate that the city should aggressively be evaluating and
9    ask the questions and be able to demonstrate that this
10   additional cost is appropriate for all riders of taxis at this
11   point, some time in the future, and whether or not that
12   additional cost is now a factor that the process is working
13   such that the additional cost is not necessary, particularly
14   if, as you say, if you are not going to reimburse people who
15   voluntarily do this.
16            At some point, hopefully, we will live in a world
17   where at least three-quarters of the taxi owners will want a
18   wheelchair, if not all the taxi drivers will want a
19   wheelchair-accessible vehicle.  And at some point the
20   competition itself will dictate who is going to ride what type
21   of vehicle above the 50 percent.
22            MS. GOLDBERG-CAHN:  Your Honor, that is exactly what
23   the annual review mechanism is in the rule.  Perhaps there will
24   be a determination there should no longer be a surcharge or
25   perhaps the costs of the accessible vehicles will go down so

1   dramatically that if there is a surcharge it would also be
2   reduced dramatically.  And I just wanted to reiterate, the
3   additional medallions that you are referencing and that are
4   still to be sold and can be sold, those are on top of our 50
5   percent.  If they are all sold, we are looking at 58 percent or
6   higher.
7            THE COURT:  You are not including that?  That's not
8   going to weigh in as part of the 50 percent?
9            MS. GOLDBERG-CAHN:  Correct.
10           THE COURT:  That's good to know.
11           Anything further?
12           MR. WOLINSKY:  No, your Honor.
13           THE COURT:  I am going to give final approval to the
14  settlement.  I think it's fair and reasonable and adequate to
15  achieve the purposes of this litigation.  I think that this is
16  a significant settlement, not just for the plaintiffs'
17  wheelchair bound riders that the plaintiffs represent, but also
18  for riders, all riders in general and for all citizens and
19  visitors of this city.
20           I know the nature of the aggressive and sometimes
21  contentious litigation over this issue, and I think in context
22  that this is a result that, quite frankly, I am not sure a year
23  ago that the parties could have contemplated.  I just want to
24  say one more thing and I'll give you a copy of this statement.
25  We should not minimize the importance of this historic moment.

1  Decades from now most people will take it for granted.
2              But this is one of the most significant acts of
3  inclusion in this city since Jackie Robinson joined the
4  Brooklyn Dodgers.  It's an act of a city that equally values
5  all of its residents and visitors and I commend the plaintiffs
6  and their lawyers for their persistence and the mayor and the
7  city's representatives for the good judgment that today's
8  agreement represents.  It makes us a better city.  It is simply
9  the right thing to do.  I will give final approval and hope and
10 will monitor that we can move forward efficiently and
11 accomplish what everyone cooperatively wants to accomplish by
12 this agreement.
13             I want to thank all the parties.
14                                o0o
15
16
17
18
19
20
21
22
23
24
25