# EXHIBIT C

E9GMTAXC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE TAXIS FOR ALL CAMPAIGN, et
al.,

                    Plaintiffs,

          v.                              11 Civ. 237 (GBD)

NEW YORK CITY TAXI AND
LIMOUSINE COMMISSION, et al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          September 16, 2014
                                          12:20 p.m.

Before:

                    HON. GEORGE B. DANIELS,

                                          District Judge

                         APPEARANCES

SID WOLINSKY
JULIA M. PINOVER
     Attorneys for Plaintiffs

ZACHARY W. CARTER, Corporation Counsel
for the City of New York
     Attorney for Defendants
BY:  MICHELLE L. GOLDBERG-CAHN


ALSO PRESENT:  JESSICA TAYLOR

E9GMTAXC

(Case called)

MR. WOLINSKY:  Sid Wolinsky of Disabilities Rights Advocates for plaintiffs.  Good afternoon, your Honor.

MS. PINOVER:  Julia Pinover of Disabilities Rights Advocates for plaintiffs.  Good afternoon, your Honor.

MS. GOLDBERG-CAHN:  Michelle Goldberg-Cahn, Assistant Corporation Counsel for the defendants, and I'm joined by Jessica Taylor, assistant general counsel from the Tax and Limousine Commission.

THE COURT:  Good afternoon.

We are here to give final approval to the settlement agreement.  Let me first hear from each side, if you want to add something to it at this point.  I still have one or two minor questions and then we can proceed.

MR. WOLINSKY:  I just have a few brief comments, your Honor, because I know your Honor has reviewed the papers that we filed with your Honor.  I went back and I looked at the file and then I noticed that the first of plaintiffs' demand prelitigation demand letter in this case that we are bringing to a conclusion today is November 8, 2010, almost four years ago.

Since that time the case has had every element in it that would merit approval by your Honor in terms of this fairness hearing.  Plaintiffs obtained complete relief.  They asked only for declaratory relief in the form of meaningful

access to the taxi program.  And they have obtained all of that.

The case was both vigorously litigated through three and a half years, as well as being on a simultaneous settlement track in which there was adversarial arm's length serious negotiations that took place both with and without a training neutral facilitator in literally dozens of settlement meetings and exchanges of settlement.  The other element that courts consider is the result as weighed against the risk of going forward with this litigation.

I would say that this is a case that looking at it from the beginning, your Honor, would give any plaintiff's attorney contemplating the case heart palpitations.  There have been only two other cases in this entire country challenging the accessibility, the disability accessibility of a taxicab fleet by a municipality.  Both of those were dismissed on motions to dismiss on the papers.  This is a unique and unprecedented case.

Finally, it sets a new standard of historical dimensions for the City of New York.  I think it's fair to say that this was one of the two or three most significant disability rights, disability access cases in this country in the last decade.  It will result in approximately 7,000 accessible cabs on the streets of New York going from 1.8 percent accessibility to 50 percent accessibility in five

years.  And because of that, your Honor will notice there is not a single objection from any member of the class.

I should add, there was an interesting dimension to the settlement that the Court might wish to note, which is, this is not one of those class action settlements where the plaintiffs' attorneys negotiated the settlement and then presented the package to the class.  The major disability organizations in this city actively participated in the settlement negotiations to assure that they got what they wanted.  They did and we urge that the Court give approval.

THE COURT:  Ms. Cahn.

MS. GOLDBERG-CAHN:  Your Honor, I really have nothing further to add other than to echo Mr. Wolinsky's sentiment that the city is very happy to support this settlement that will give further disability access for persons with disabilities in the transportation system.

THE COURT:  I just had a couple of minor questions before we move forward.  I know I asked a number of questions the last time we were here.  The reimbursement of the conversion.  Is it the city's position that a subsidy is provided on the initial conversion or that's provided, also, with regard to the renewal of vehicles?

MS. GOLDBERG-CAHN:  It is the city's position that the requirement will be to support taxi vehicle owners who are converting initially.  And if they are required to convert a

E9GMTAXC

subsequent vehicle at the end of their retirement cycle, then the surcharge would go to support that conversion as well.

THE COURT:  When you say conversion, if I have a nonwheelchair-accessible vehicle and I am told to convert this year, then my next vehicle is a wheelchair-accessible vehicle. I have that vehicle in service for the next three years or I forget what the period is.  Then I have to get a subsequent vehicle.  Do I get subsidized.

MS. GOLDBERG-CAHN:  If you are going to be required for your second one, for your subsequent vehicle or if you decide to trade with someone who does have the obligation when you don't, then the answer would be yes.

THE COURT:  If I am told to convert, I will get the 7500 --

MS. GOLDBERG-CAHN:  It's about 15,000.

THE COURT:  15,000.  I will get the 15,000 to convert, extra cost of converting to a wheelchair-accessible vehicle?

MS. GOLDBERG-CAHN:  Yes.

THE COURT:  When that vehicle runs its course, if I still continue to have a wheelchair-accessible vehicle, I will get that 15,000 dollar subsidy every time I renew the wheelchair-accessible vehicle?

MS. GOLDBERG-CAHN:  Only if you're obligated to, or if you take on someone else's obligation to.  But not if you are not obligated to, don't buy onto someone else's obligation to

and decide on your own to do it.  To clarify, I think it's about $4,000 a year for the life of the cycle instead of 15,000.

THE COURT:  How is it that I will convert to a wheelchair-accessible vehicle and not continue to have a wheelchair-accessible --

MS. GOLDBERG-CAHN:  The way that the rules that were passed and I think were published -- they were passed in April and published in mid June and are now in effect contemplated, is that for the many fleets, one in every two have to be converted.  And for the independents it's a lottery system.  If you draw the lottery where you have the obligation the first time in the cycle, when your vehicle is up for retirement, you will not be obligated under your second vehicle that you're purchasing, whereas the folks who were not obligated the first time would be obligated the second time.

THE COURT:  The city, each cycle, they are different individuals or fleets will have the obligation to convert.

MS. GOLDBERG-CAHN:  That's correct.

THE COURT:  And if they have that obligation to convert, they get the subsidy?

MS. GOLDBERG-CAHN:  Yes.

THE COURT:  But if I have a wheelchair-accessible vehicle and I am not in the lottery, what is it that you contemplate that you expect me to do?

MS. GOLDBERG-CAHN:  When you say you are not in the lottery, you mean you were not obligated to purchase --

THE COURT:  I was obligated the first time and I purchased.  Now I have to renew my vehicle.  I'm not obligated to continue with the wheelchair-accessible vehicle.

MS. GOLDBERG-CAHN:  You might decide that it's more beneficial for you to continue because you're comfortable with the vehicle and like the vehicle, but you are not going to be required to have an accessible vehicle for the independents because the other people who didn't have the obligation the first time will be, but you may.  And if you are not obligated, and you decide to do it voluntarily, you won't be compensated under the fund, although I believe there are other grants and things that are available to help incentivize you.

THE COURT:  What I don't understand is, from a financial point of view from the city, and even from a cooperative relationship with the fleet owners and the independents, why would you want to force people to do it and give them incentive and reimburse them for being forced to do it but not encourage them to continue it or to voluntarily do it?  I've always had some difficulty with that.  Because it's going to cost the city the same amount of money.

MS. GOLDBERG-CAHN:  If we were to compensate everyone, even those that would not be required under the settlement to operate a wheelchair-accessible vehicle, then the fund would be

double the cost of what it is now and that cost would be borne by the public with a surcharge far greater than the 30 cents.

THE COURT:  Why wouldn't you simply just figure out what number of vehicles that is the 50 percent at that year and then when you get to that 50 percent you put in the people who want to continue or convert and then you add people who, as they say, may want to go kicking and screaming to convert.  Why would you want to fill up the 50 percent with people who are being forced to do it rather than who want to do it voluntarily and want to continue to do it if you still are going to cap -- let's take a round number.  If we have 15,000 vehicles five years from now, then your goal would be that you would have 7,500 minimally on the street.  What difference does it make to the city whether those are voluntary or involuntary?

MS. GOLDBERG-CAHN:  I think the idea was so that the responsibility or the obligation is borne evenly among the different groups between independents and fleet owners and the like.  There is a process in place under the rules that contemplates trading those obligations.  So maybe the fleet owner says I have a hundred vehicles, I'm very happy with a successful vehicle and I want to purchase more, and they can trade that obligation to someone who might find it to be more of a financial burden on them.  We know that this conversion requiring it the way they sort of sketched it out under the rule gets us to at least the minimum of 50 percent, but there

are opportunities for people to trade in or to continue the obligation otherwise.

THE COURT: I understand.

Basically, I am going to give approval to the settlement. Quite frankly, because of the nature of the questions I've asked this time and last time, it's not my view that this is a perfect settlement. I think that I would encourage the city to consider the voluntary participation to play a part in their determination of who is converted. I think we have a happier fleet if the majority of the people are people who have, particularly in the future, experience with this and are comfortable with it and want to continue rather than those who you have to continue to force to participate. My view is that's somewhat of a weakness in the view. And I think I will encourage the city to reevaluate that and see whether there is a way that it doesn't add additional cost. It gives people the opportunity to do it who really want to do it. And it is less aggressive administration on behalf of the Taxi and Limousine Commission.

Quite frankly, five years from now two-thirds of the taxi owners may want to convert and may think it's reasonable. To sort of say to them, you folks who believe that this is a good idea to do on your own, you have to bear that cost as opposed to those people who we are going to force you to do it and we are going to give you money because we are forcing you

E9GMTAXC

to do it.  I am not sure that that's the most efficient way to administer the program.

MS. GOLDBERG-CAHN:  I think what you describe, I think that there is an expectation that with more experience, getting more accessible vehicles on the road and with the driver's compensation portion of the fund that would incentivize drivers, perhaps drivers might be demanding of fleet owners to do more accessible.

I just want to remind the Court, there is an annual review mechanism in the rule where perhaps it will be looked at and said, you know what, maybe we don't want to just compensate fully.  We may want to bear that cost a little bit more evenly in a different way.  There is that mechanism built in as well.

THE COURT:  This is one of the issues that has given me some concern and I raise now because in that continued evaluation and in the Court's continued jurisdiction to participate in that, I think that that's something that should be reviewed, whether or not it's appropriate to do that or how it plays itself out.  But my guess is that once there are significant number of these vehicles on the street, the landscape will significantly change.

The only other issue that I have some concern about is the surcharge.  I think there is a rational basis for the surcharge.  I'm a little concerned that there isn't a plan to reduce or to terminate the surcharge at some point.  I would,

E9GMTAXC

again, encourage that as the program unfolds that this be evaluated constantly because I think all of the people who are serviced by the taxi industry, whether we are talking about the wheelchair bound or not, are bearing an additional cost which I am not sure will always be necessary.

Quite frankly, as I said, my attitude about city services is that because you tell me that you are going to pick up my garbage three times a week rather than two times a week that I'm supposed to give you extra money to do that. If that's the right thing to do and that's the service that's being provided -- that's not an accurate analogy here, given the nature of the industry.

But it seems to me that, as I say, although there have been discussions about what financial benefits the city gets for medallions and other income that is related to providing taxi service, the city is not in the business of doing this for profit and we know that and we all understand that. So I think that it is for the general public it is at least comforting to know that the city is revising this in terms of cost and whether or not that cost is necessary rather than in terms of income.

There are a significantly greater number of medallions that are still to be sold and my guess is that the medallions will continue to get more valuable rather than less valuable, particularly factoring this in. And I think it is important to

not only reevaluate everyone's cooperative voluntary participation in this effort, but also to make the riders and the citizens and visitors of this city not have to pay additional costs for a significant period of time that are not necessary to the implementation of the program or to the provider of services. And I just note that not as a fatal flaw in this agreement, but something that I think the record should indicate that the city should aggressively be evaluating and ask the questions and be able to demonstrate that this additional cost is appropriate for all riders of taxis at this point, some time in the future, and whether or not that additional cost is now a factor that the process is working such that the additional cost is not necessary, particularly if, as you say, if you are not going to reimburse people who voluntarily do this.

At some point, hopefully, we will live in a world where at least three-quarters of the taxi owners will want a wheelchair, if not all the taxi drivers will want a wheelchair-accessible vehicle. And at some point the competition itself will dictate who is going to ride what type of vehicle above the 50 percent.

MS. GOLDBERG-CAHN: Your Honor, that is exactly what the annual review mechanism is in the rule. Perhaps there will be a determination there should no longer be a surcharge or perhaps the costs of the accessible vehicles will go down so

dramatically that if there is a surcharge it would also be reduced dramatically. And I just wanted to reiterate, the additional medallions that you are referencing and that are still to be sold and can be sold, those are on top of our 50 percent. If they are all sold, we are looking at 58 percent or higher.

THE COURT: You are not including that? That's not going to weigh in as part of the 50 percent?

MS. GOLDBERG-CAHN: Correct.

THE COURT: That's good to know.

Anything further?

MR. WOLINSKY: No, your Honor.

THE COURT: I am going to give final approval to the settlement. I think it's fair and reasonable and adequate to achieve the purposes of this litigation. I think that this is a significant settlement, not just for the plaintiffs' wheelchair bound riders that the plaintiffs represent, but also for riders, all riders in general and for all citizens and visitors of this city.

I know the nature of the aggressive and sometimes contentious litigation over this issue, and I think in context that this is a result that, quite frankly, I am not sure a year ago that the parties could have contemplated. I just want to say one more thing and I'll give you a copy of this statement. We should not minimize the importance of this historic moment.

E9GMTAXC

Decades from now most people will take it for granted.

But this is one of the most significant acts of inclusion in this city since Jackie Robinson joined the Brooklyn Dodgers.  It's an act of a city that equally values all of its residents and visitors and I commend the plaintiffs and their lawyers for their persistence and the mayor and the city's representatives for the good judgment that today's agreement represents.  It makes us a better city.  It is simply the right thing to do.  I will give final approval and hope and will monitor that we can move forward efficiently and accomplish what everyone cooperatively wants to accomplish by this agreement.

I want to thank all the parties.

oOo